# UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF FLORIDA

SERIES 21-12-1644, a designated series MSP RECOVERY CLAIMS, SERIES LLC; SERIES 17-03-615, a designated series of MSP RECOVERY CLAIMS, SERIES LLC; SERIES 17-04-631, a designated series of MSP RECOVERY CLAIMS, SERIES LLC; SERIES 23-05-1945, a designated series of MSP RECOVERY CLAIMS, SERIES LLC; SERIES 16-08-483, a designated series of MSP RECOVERY CLAIMS, SERIES LLC; SERIES 15-09-157, a designated series of MSP RECOVERY CLAIMS, SERIES LLC; SERIES 15-09-355, a designated series of MSP RECOVERY CLAIMS, SERIES LLC; and SERIES 16-11-509, a designated series of MSP RECOVERY CLAIMS, SERIES LLC,

                Plaintiffs,

    v.

NOVARTIS PHARMACEUTICALS CORPORATION; EXPRESS SCRIPTS, INC.; EXPRESS SCRIPTS SPECIALTY DISTRIBUTION SERVICES, INC.; CURASCRIPT, INC., d/b/a CURASCRIPT, SD; PRIORITY HEALTH CARE DISTRIBUTION, INC., d/b/a CURASCRIPT SD AND CURASCRIPT SPECIALTY DISTRIBUTION SD; ACCREDO HEALTH GROUP; THE ASSISTANCE FUND, INC; NATIONAL ORGANIZATION FOR RARE DISORDERS, INC.; and CHRONIC DISEASE FUND, INC. d/b/a GOOD DAYS FUND,

**CASE NO.:**

**CLASS ACTION COMPLAINT**

**JURY TRIAL REQUESTED**

Defendants.

## CLASS ACTION COMPLAINT

## TABLE OF CONTENTS

I.    NATURE OF ACTION ................................................................... 2

II.   PARTIES, JURISDICTION, AND VENUE .................................... 13

III.  STANDING ................................................................................. 22

    A.  ASSIGNMENT AGREEMENTS .............................................. 25

IV.   FACTUAL ALLEGATIONS ......................................................... 42

    A.  REGULATORY BACKGROUND ............................................ 42

    B.  DEFENDANTS' UNLAWFUL CO-PAYMENT SCHEMES ........ 58

    C.  DEFENDANTS' MISREPRESENTATIONS AND FALSE CERTIFICATIONS .............. 75

    D.  DEFENDANTS' SCHEME IMPLICATED RELATIONS OF SPECIAL TRUST ............. 80

    E.  THE HARMFUL IMPACT ON ASSIGNORS AND THE CLASS MEMBERS ............... 87

V.    CLASS ACTION ALLEGATIONS ................................................ 89

VI.   TOLLING OF THE STATUTE OF LIMITATIONS ..................... 94

VII.  CLAIMS FOR RELIEF ............................................................... 96

VIII. DEMAND FOR JUDGMENT ..................................................... 165

Plaintiffs, Series 21-12-1644, a designated series MSP Recovery Claims, Series LLC ("Series 21-12-1644"); Series 17-03-615, a designated series of MSP Recovery Claims, Series LLC ("Series 17-03-615"); Series 17-04-631, a designated series of MSP Recovery Claims, Series LLC ("Series 17-04-631"); Series 23-05-1945, a designated series of MSP Recovery Claims, Series LLC ("Series 23-05-1945"); Series 16-08-483, a designated series of MSP Recovery Claims, Series LLC ("Series 16-08-483"); Series 15-09-157, a designated series of MSP Recovery Claims, Series LLC ("Series 15-09-157"); SERIES 15-09-355, a designated series of MSP Recovery Claims, Series LLC ("Series 15-09-355"); and Series 16-11-509, a designated series of MSP Recovery Claims, Series LLC ("Series 16-11-509") (collectively, "Plaintiffs") on behalf of themselves and the Class described herein,[1] bring this action against  (1) Novartis Pharmaceuticals Corporation ("Novartis"); (2) Express Scripts, Inc.; Express Scripts Specialty Distribution Services, Inc.; CuraScript, Inc., d/b/a CuraScript, SD; Priority Healthcare Corp. and Priority Health Care Distribution, Inc., d/b/a CuraScript SD and CuraScript Specialty Distribution SD; and Accredo Health Group (hereinafter collectively referred to as "ESI"); (3) The Assistance Fund, Inc. ("TAF"); (4) National Organization for Rare Disorders,

---

[1] The Class Members consist of Medicare Advantage health plans—i.e., Medicare Advantage entities such as Medicare Advantage Organizations ("MAOs"), Independent Practice Associations ("IPAs"), Management Service Organizations ("MSOs"), Health Maintenance Organizations ("HMOs"), and other Medicare first tier and downstream entities—and their assignees (collectively referred to as "MA Plans" or "Medicare Advantage health plans").

1

Inc. ("NORD"); and (5) Chronic Disease Fund, Inc. d/b/a/ Good Days Fund ("CDF"), and allege as follows:

## I.    <u>NATURE OF ACTION</u>

1.    This action arises from Novartis' conspiratorial schemes to circumvent Medicare's cost-sharing obligations, resulting in inflated prices and increased dispensing of Gilenya and Afinitor (collectively, "Subject Drugs" or "Novartis Drugs"). Gilenya is approved for treatment of multiple sclerosis ("MS"), and Afinitor is approved for treatment of renal cell carcinoma ("RCC").

2.    Novartis knowingly and willfully violated numerous federal and state laws by paying millions to three third-party foundations, TAF, CDF, and NORD (collectively, the "Charities"), to cover the Medicare Part D copay obligations of Gilenya or Afinitor patients. This conduct generated millions of dollars in unlawful claims submitted to and paid for by Medicare Part D Sponsors, such as the Assignors and Class Members.

3.    With respect to the Novartis Drug Gilenya, starting in 2010, Novartis used TAF as a conduit: it paid TAF with the intent and understanding that, in violation of numerous federal and state laws, TAF would use Novartis' money to cover the co-pays of patients taking Gilenya. Novartis intended the payments to ensure that Gilenya patients never faced the steep prices that Novartis charged for Gilenya, thus inducing patients to seek dispensing the drug.

4.      Novartis paid TAF millions of dollars because it knew that TAF would use Novartis' money to cover Gilenya co-pays, thus increasing Gilenya sales and enriching Novartis in amounts that far exceeded its payments to TAF. Ostensibly, TAF operated a "MS" fund that covered co-pays for any of the many MS drugs on the market. In practice, however, Novartis conspired with TAF so that they operated the MS fund to maximize the proportion of Gilenya patients who benefitted whenever Novartis made a payment to TAF.

5.      Novartis and TAF effectuated this scheme through a specialty pharmacy, ESI, to which Novartis referred Gilenya patients who faced co-pays for Gilenya. ESI, in turn, arranged for the Medicare-eligible patients to obtain co-pay coverage from TAF. ESI then reported back to Novartis how many Gilenya patients were receiving co-pay coverage from each foundation. Thus, by coordinating with and sharing data between Novartis, ESI, and TAF, Novartis was able to determine how much money TAF would need to cover co-pays for Gilenya.

6.      Once ESI reported the number of patients in need of co-pay assistance for Gilenya, Novartis arranged for TAF to open its MS fund at a certain time and for ESI to have personnel working overtime at that same time submitting applications to TAF on behalf of those patients seeking co-pay assistance. By timing these events, Novartis ensured that its payments to TAF were exclusively or primarily used to cover co-pays for Gilenya.

7.     Upon information and belief, ESI would then directly submit claims relating to those patients to Assignors, along with false certifications regarding how those claims were generated, and then receive payment directly from Assignors.

8.     Because Novartis effectively eliminated patient and physician price sensitivity for Gilenya, Novartis was free to inflate its prices to otherwise untenable levels and simultaneously induce patients to seek and physicians to prescribe its drugs over competing products that did not have a 'free' copay option.

9.     With respect to the Novartis Drug, Afinitor, starting in 2010, Novartis used CDF and NORD as conduits: it paid CDF and NORD with the intent and understanding that, in violation of numerous federal and state laws, CDF and NORD would use Novartis' money to cover the co-pays of patients taking Afinitor. Novartis intended the payments to ensure that Afinitor patients never faced the steep prices that Novartis charged for Afinitor, thus inducing patients to seek dispensing of the drug.

10.     Novartis paid NORD millions of dollars because it knew that NORD would use Novartis' money to cover Afinitor co-pays, thus increasing Afinitor sales and enriching Novartis in amounts that far exceeded its payments to NORD.

11.     Ostensibly, NORD operated a "RCC" fund that covered co-pays for any of the various RCC drugs on the market. In practice, however, Novartis conspired with NORD so that NORD operated the RCC funds to maximize the proportion of

Afinitor patients who benefitted from Novartis' payments to NORD.

12.    Specifically, because Afinitor was only approved t as a second-line RCC treatment only, Novartis conspired with NORD to create a new RCC fund that was narrowly defined to limit the treatment options to second-line RCC treatments only. NORD then created the "Advanced Renal Cell Carcinoma Second Line Co-Payment Assistance Program", which excluded any patients seeking assistance with first-line RCC treatments and disproportionately funded patients taking Afinitor compared to its overall usage rate among all RCC drugs.

13.    Novartis also paid CDF millions of dollars because it knew that CDF would use Novartis' money to cover Afinitor co-pays, thus increasing Afinitor sales and enriching Novartis in amounts that far exceeded its payments to CDF.

14.    Specifically, after Afinitor was approved to treat progressive neuroendocrine tumors of pancreatic origin ("PNET"), Novartis and CDF agreed that CDF would open a copay assistance fund to pay Afinitor copays for PNET patients. At that time, Novartis knew that the FDA had approved a competing drug to treat PNET. However, Novartis knew that CDF's PNET fund would be used to pay the copays of Afinitor patients only and not those of patients seeking assistance for the other PNET drug. Novartis thereby ensured that all payments made to CDF would be used exclusively to cover the copays for patients taking its own drug, Afinitor.

15.    Novartis conspired with ESI and TAF to circumvent Congressionally mandated copay requirements for patients taking Gilenya (hereinafter the "Gilenya Scheme"); and Novartis conspired with NORD and CDF to circumvent Congressionally mandated copay requirements for patients taking Afinitor (hereinafter the "Afinitor Scheme) (collectively the "Co-payment Schemes" or "Schemes").

16.    The Co-payment Schemes were designed to eliminate patient and physician sensitivity to ever-increasing prices of the Novartis Drugs and induce the dispensing (and thus payment for) the Novartis Drugs under false pretenses.[2]

17.    As a result, Plaintiffs' Assignors[3] and the Class Members paid inflated prices for the Novartis Drugs, and, upon information and belief, paid for fraudulently generated claims, and paid inflated quantities of dispensed Novartis Drugs on behalf of beneficiaries enrolled in their health plans ("Enrollees", "Members" or "Beneficiaries").

18.    Defendants executed their Schemes by engaging in a continuous stream

---

[2] When Medicare beneficiaries, including those covered by MA Plans, obtain a prescription drug, the beneficiaries may be required to make a co-payment. Congress included co-payment requirements in the Medicare structure, in part, to encourage market forces to serve as a check on health care costs, specifically including the prices that companies can demand for their drugs. Austin Fredrick, *The Cloak of Social Responsibility: Pharmaceutical Corporate Charity*, 153 TAX NOTES, no. 9, 2016 [hereinafter *Cloak of Social Responsibility*].

[3] Plaintiffs hold assigned rights through assignments from several entities including MAOs, full-risk organizations such as MSOs, IPAs, and other Medicare and Medicaid first-tier, downstream, and related entities, all of which act as insurers and direct payors and provide prescription drug benefits to their enrolled beneficiaries.

of overt acts over the course of several years, effectively eliminating patient and physician price sensitivity and lining Defendants' pockets with millions in fraudulently induced payments. This resulted in three related, cognizable economic injuries as Assignors and Class Members paid significantly higher costs than they would otherwise have to pay but for the Co-Payment Schemes.

19.    *First*, the Schemes enabled Defendants to fraudulently-induce dispensing, and thus payment for the Novartis Drugs.

20.    *Second,* the Schemes enabled Novartis to circumvent Medicare's cost-sharing requirements, thereby eliminating patient and physician price sensitivity, resulting in exorbitant drug prices substantially in excesses of what would have otherwise been possible had cost-sharing obligations remained a requirement for Medicare beneficiaries prescribed Novartis Drugs.

21.    *Third*, the Schemes rendered claims for the Novartis Drugs unpayable, and fraudulently generated, under state and federal law and enabled Defendants to conceal this fact for many years.

22.    At all relevant times here, Novartis agreed to, and did, pay the Charities and ESI with the intent to induce the Charities and ESI to facilitate the waiver of copay obligations for Beneficiaries seeking to use the Novartis Drugs.

23.    Novartis' routine payment of bribes and/or kickbacks to the Charities and ESI constituted violations of the federal Anti-Kickback Statute ("AKS"), 42

U.S.C. § 1320a-7b, thereby rendering each claim fraudulently generated and unpayable under federal healthcare programs, and disqualifying Novartis from receiving any payment from Assignors for the Subject Drugs during the course of the Scheme.

24.     Novartis' bribes and/or kickbacks to the Charities and ESI, as part of the distribution chain for the Novartis Drugs, were made with the intent to cause, and, upon information and belief, did cause, the submission of fraudulent claims to Assignors.

25.     Upon information and belief, because these fraudulently generated claims were submitted along with false certifications regarding the underlying conduct that preceded submission of those claims, Defendants caused Assignors to pay for those claims (and thus lose money and property) under false pretenses.

26.     In other words, these Schemes caused Plaintiffs and Class Members to lose money and property under false pretenses and fraudulent representations, subjecting Defendants to joint and several liability under the Racketeer Influenced and Corrupt Organizations Act of 1970 ("RICO"). *See* 18 U.S.C. §§ 1341, 1343 (RICO liability attaches to "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent *pretenses, representations, or promises*.")

27.     Defendants' conduct undertaken in furtherance of the Schemes also

violated several state laws, namely, (1) Conn. Gen. Stat. §§ 53a-161c and 53a-161d; (2) Fla. Stat. §§ 456.054 and 817.505; (3) 740 Ill. Comp. Stat. 92/5; (4) Mass. Gen. Laws ch. 175H, § 3; (5) Ohio Rev. Code Ann. § 3999.22.

28.    Defendants' conduct undertaken in furtherance of the Schemes also violated several state consumer protection laws, namely, (1) Conn. Gen. Stat. §§ 42-110a ; (2) Fla. Stat. § 501.201; (3) 815 Ill. Comp. Stat. 505/1; (4) Mass. Gen. Laws Ch. 93A; (5) N.Y. Gen. Bus. Law § 349; (6) Ohio Rev. Code Ann. § 4165; (7) 73 Pa. Cons. Stat. § 201-1; (8) Wash. Rev. Code § 19.86.919; and (9) Wis. Stat. § 100.18.

29.    Novartis's bribes and/or kickbacks also constituted "unlawful activity" under 18 U.S.C. § 1952(b), as bribery in violation of the laws of the United States, Connecticut, Florida, Illinois, Massachusetts, and Ohio.

30.    In furtherance of the Schemes, Defendants used interstate mail and wire facilities with the intent to (1) distribute the proceeds from this unlawful activity, and (2) promote, manage, establish, carry on, or facilitate the promotion, management, establishing, or carrying on of this unlawful activity.

31.    Claims relating to these bribes and kickbacks, violating the AKS and above state laws, will hereinafter be referred to as the "AKS-tainted", "tainted", or "fraudulently generated" claims.

32.    Assignors and Class Members were proximately harmed each time a

tainted claim was submitted, under the false pretense that it was a "clean" claim and paid by the Assignors and Class Members. This caused the Assignors and Class Members to lose money and property and deprived them of the "benefit of their bargain" i.e., paying a claim that was free from unlawful activity.

33.    Per the necessary conditions for any payment under a Medicare plan, and pursuant to Assignors' contracts with CMS, a claim for payment was legally unpayable when tainted by an AKS violation. *See* 42 C.F.R. §§ 423.504; 423.505.

34.    Nevertheless, upon information and belief, Defendants used the mail and wires to cause the submission of false certifications to Assignors and Class Members, deceiving them into paying for fraudulently generated claims.

35.    In June 2020, Novartis paid $51.3 million to settle the United States' claims that Novartis, ESI, and the Charities violated the Anti-Kickback Statute ("AKS") and False Claims Act, 31 U.S.C. § 3729 ("FCA"). Novartis entered into a Settlement Agreement ("Novartis Settlement") with the United States Department of Justice ("DOJ") and on behalf of the Office of Inspector General ("OIG") of the Department of Health and Human Services relating to the general conduct at issue in this lawsuit. [*See* Novartis Settlement, attached as **Exhibit 1**; DOJ Press Release, attached as **Exhibit 2**].

36.    The Novartis Settlement did not address or settle damages sustained by the Assignors and Class Members. The terms of the Novartis Settlement did not

address the claims Plaintiffs set forth in the action.

37.    Plaintiffs bring this lawsuit to redress the damages sustained by the Assignors and Class Members as a result of Defendants' unlawful Scheme to circumvent Medicare's cost-sharing requirements and increase the price and dispensed quantity of the Subject Drugs.

38.    Each Defendant named in this action is jointly and severally liable for the harm caused by conduct undertaken by the other Defendants, including the conduct of the (knowing and unknowing) pharmacies that submitted claims to Assignors during the course of the Scheme.

39.    The improper actions alleged herein allowed Novartis to maintain supra-competitive prices by eliminating price sensitivity that would have directly benefited consumers and the public at large by forcing Novartis to price their products at market realities. Patient price sensitivity counterbalances Novartis' desire to inflate prices for its drugs—which is why Congress relies on price sensitivity as a vital mechanism for combatting supra-competitive pricing for Government Payors.[4]

40.    The Charities' co-payment assistance programs allowed Novartis to

---

[4] Reference to "Government Payors" refers to payors who used Medicare or Medicaid dollars to purchase the Novartis Drugs during the relevant time period. CMS provides data on the amount spent by Government Payors for each drug, each year. That data is available here: https://www.cms.gov/research-statistics-data-and-systems/statistics-trends-and-reports/information-on-prescription-drugs.

increase the price of the Subject Drugs without regard to the relevant market conditions by insulating Novartis from the realities of patients' inability to afford their co-payment obligations—obligations that would have had to have been capped at a reasonable amount but-for the unlawful Scheme alleged herein. Not only did this allow Novartis to charge supra-competitive prices, but also resulted in the artificially increased volume of dispensed Novartis Drugs.[5]

41.     It was foreseeable, and intended, that Defendants' scheme to defraud Medicare Payors would result in the use of mail and wires in furtherance of that scheme.

42.     For instance, Novartis utilized the wires to transmit their "donations" (or "Corporate Contributions") to the Charities, which, in reality, were bribes and/or kickbacks to the Charities and ESI.

43.     Defendants would also use the mail and wire to communicate with pharmacies, including ESI, regarding, among other things, referrals and co-payments for patients dispensed the Novartis Drugs. Upon information and belief, this resulted in the further use of mail and wires by pharmacies, including ESI, submitting claims for payment (along with accompanying false certifications) to Assignors and Class Members. This further resulted in the use of mail and wires

---

[5] Defendants conducted a distinct scheme and have harmed the following putative class: (i) all insurers who paid for the cost of the Novartis Drugs whose beneficiaries' co-payments were provided by the Charities; and (ii) all insurers who paid for the cost of the Novartis Drugs during the time in which the Scheme was in effect and/or the effects of the Scheme remained.

each time the pharmacies, including ESI, received payment from Assignors and Class Members.

44.    Defendants' conduct violated the AKS, 42 U.S.C. § 1320a-7b; the Travel Act, 18 U.S.C. § 1952; Mail Fraud, 18 U.S.C. § 1341; Wire Fraud, 18 U.S.C. § 1343; (1) Conn. Gen. Stat. §§ 53a-161c and 53a-161d; (2) Fla. Stat. §§ 456.054 and 817.505; (3) 740 Ill. Comp. Stat. 92/5; (4) Mass. Gen. Laws ch. 175H, § 3; (5) Ohio Rev. Code Ann. § 3999.22.

45.    Defendants' conduct undertaken in furtherance of the Schemes also violated several state consumer protection laws, namely, (1) Conn. Gen. Stat. §§ 42-110a ; (2) Fla. Stat. § 501.201; (3) 815 Ill. Comp. Stat. 505/1; (4) Mass. Gen. Laws Ch. 93A; (5) N.Y. Gen. Bus. Law § 349; (6) Ohio Rev. Code Ann. § 4165; (7) 73 Pa. Cons. Stat. § 201-1; (8) Wash. Rev. Code § 19.86.919; (9) Wis. Stat. § 100.18.

## II.    PARTIES, JURISDICTION, AND VENUE

**Plaintiffs**

46.    Plaintiffs are companies that assist Government Healthcare Plans in identifying claims payments that are subject to recoupment, either because they were conditional secondary payments or because there was fraud, mistake, or other recovery rights implicated by the payment. Pursuant to this, Plaintiffs obtained Assignments from their Assignors to recover claims paid to Defendants as a result of Defendants' fraud, waste, and abuse. Assignors provide health insurance

13

coverage, pursuant to Medicare Part C and Part D and Medicaid on behalf of their enrollees. Specifically, Assignors made payments for, or otherwise became financially responsible for the cost of the inflated, and, upon information and belief, AKS-tainted, and excessively dispensed Novartis Drugs as a result of the Scheme.

47.     Each and every cause of action identified in this Complaint was expressly assigned to the named Plaintiffs. [**Exhibit 3,** Assignment Agreements].

48.     Series 21-12-1644 is a designated series of MSP Recovery Claims, Series LLC, a Delaware series limited liability company with its principal place of business at 2701 S. Le Jeune Road, Coral Gables, Florida 33131.

49.     Series 17-03-615 is a designated series of MSP Recovery Claims, Series LLC, a Delaware series limited liability company with its principal place of business at 2701 S. Le Jeune Road, Coral Gables, Florida 33131.

50.     Series 21-12-1644 and Series 17-03-615 have the right to seek reimbursement for payments of the Novartis Drugs made by its assignor AvMed, Inc. ("AvMed") for which Defendants are liable due to the conduct alleged herein.

51.     Series 17-04-631 is a designated series of MSP Recovery Claims, Series LLC, a Delaware series limited liability company with its principal place of business at 2701 S. Le Jeune Road, Coral Gables, Florida 33131.

52.     Series 17-04-631 has the right to seek reimbursement for payments of the Novartis Drugs made by its assignor Fallon Community Health Plan, Inc.

("FCHP") for which Defendants are liable due to the conduct alleged herein.

53.    Series 23-05-1945 is a designated series of MSP Recovery Claims, Series LLC, a Delaware series limited liability company with its principal place of business at 2701 S. Le Jeune Road, Coral Gables, Florida 33131.

54.    Series 23-05-1945 has the right to seek reimbursement for payments of the Novartis Drugs made by its assignor Health Alliance Medical Plans, Inc. ("HEAL") for which Defendants are liable due to the conduct alleged herein.

55.    Series 16-08-483 is a designated series of MSP Recovery Claims, Series LLC, a Delaware series limited liability company with its principal place of business at 2701 S. Le Jeune Road, Coral Gables, Florida 33131.

56.    Series 16-08-483 has the right to seek reimbursement for payments of the Novartis Drugs made by its assignor Emblem Health Services Company, LLC, Group Health Incorporated, and Health Insurance Plan of Greater New York ("Emblem") for which Defendants are liable due to the conduct alleged herein.

57.    Series 15-09-157 is a designated series of MSP Recovery Claims, Series LLC, a Delaware series limited liability company with its principal place of business at 2701 S. Le Jeune Road, Coral Gables, Florida 33131.

58.    Series 15-09-157 has the right to seek reimbursement for payments of the Novartis Drugs made by its assignor ConnectiCare, Inc ("ConnectiCare") for which Defendants are liable due to the conduct alleged herein.

59.     Series 15-09-355 is a designated series of MSP Recovery Claims, Series LLC, a Delaware series limited liability company with its principal place of business at 2701 S. Le Jeune Road, Coral Gables, Florida 33131.

60.     Series 15-09-355 has the right to seek reimbursement for payments of the Novartis Drugs made by its assignor Network Health, Inc. ("Network Health") for which Defendants are liable due to the conduct alleged herein.

61.     Series 16-11-509 is a designated series of MSP Recovery Claims, Series LLC, a Delaware series limited liability company with its principal place of business at 2701 S. Le Jeune Road, Coral Gables, Florida 33131.

62.     Series 16-11-509 has the right to seek reimbursement for payments of the Novartis Drugs made by its assignor SummaCare, Inc. ("SummaCare") for which Defendants are liable due to the conduct alleged herein.

63.     AvMed, FCHP, HEAL Emblem, ConnectiCare, Network Health, and SummaCare are collectively referred to as "Assignors".

64.     The Assignors made purchases of the Novartis Drugs from *at least* 2010 to 2022.

65.     Upon information and belief, Defendants' Co-Payment Schemes triggered payment obligations of Assignors and Class Members. These actions caused the Assignors and Class Members to pay artificially inflated prices for the Novartis Drugs. The fraudulent, deceptive, and unfair conduct described herein

directly caused damage to Assignors and the Class Members.

**Defendants**

### *Novartis Pharmaceuticals Corporation*

66.    Novartis is a Delaware corporation with principal executive offices located in East Hanover, New Jersey. At all relative times, Novartis advertised, marketed, and sold pharmaceutical products, including the Novartis Drugs, throughout all states and territories of the United States, including the State of Florida. Novartis derived substantial revenue related to the Novartis Drugs from its business throughout each of the states and territories of the United States, including the State of Florida.

67.    This Court has personal jurisdiction over Novartis. At all relevant times, Novartis transacted business in Florida; marketed and sold the Novartis Drugs in Florida to consumers located in Florida; and made payments to cover cost-sharing obligations for patients using its products in Florida, including patients covered by the Assignors' MA Plans. Fla. Stat § 48.193(1)(a)(2). In addition, 18 U.S.C. § 1965(d) provides personal jurisdiction over "any person in any judicial district in which such person resides, is found, has an agent, or transacts his affairs." Novartis transacts its affairs in Florida, including the marketing, sale, and distribution of the Novartis Drugs. Novartis maintains systematic and continuous contacts in Florida, and regularly transacts business in Florida. Novartis purposefully availed itself of

the privilege of conducting activities in Florida.

*Express Scripts*

68.    Defendant Express Scripts Inc. and Express Scripts Specialty Distribution Services, Inc. ("Express Script"), is a corporation organized and existing under the laws of the State of Delaware with its principal place of business located at One Express Way, St. Louis, Missouri.

69.    Defendant Accredo Health Group, Inc. ("Accredo"), headquartered in Memphis, Tennessee, is a wholly owned subsidiary of Medco Health Solutions, Inc. ("Medco"). Accredo is one of the largest specialty pharmacies and, as of 2010, was the largest mail order pharmacy in the United States. In April 20212, Medco was acquired by Express Scripts.

70.    Defendants Priority Healthcare Corp. and Priority Healthcare Distribution, Inc. ("Priority") d/b/a CuraScript SD (collectively, "CuraScript SD"), are wholly owned subsidiaries of Express Scripts. CuraScript SD has maintained corporate offices at 1680 Century Center Parkway, Memphis, Tennessee 38134-8827.

71.    Defendant CuraScript, Inc., d/b/a CuraScript SD, f/k/a CuraScript Pharmacy, Inc., is a wholly owned subsidiary of Express Scripts. Express Scripts acquired CuraScript in January 2004. Its operation was expanded when Express Scripts acquired Priority in October 2005 and combined it with CuraScript. The

combined Priority and CuraScript SD (collectively "CuraScript") has become one of the nation's largest specialty pharmacy and distributions companies.

72.    CuraScript is an Indiana corporation with corporate offices located at 255 Technology Park, Lake Mary, Florida 32746.

73.    Defendants, Express Script, Accredo, and CuraScript are collectively referred to throughout this Complaint as "ESI".

74.    This Court has personal jurisdiction over ESI. At all relevant times, ESI transacted business in Florida; marketed and sold the Gilenya in Florida to consumers located in Florida; and made payments to cover cost-sharing obligations for patients using Gilenya in Florida, including patients covered by the Assignors' MA Plans. Fla. Stat § 48.193(1)(a)(2). In addition, 18 U.S.C. § 1965(d) provides personal jurisdiction over "any person in any judicial district in which such person resides, is found, has an agent, or transacts his affairs." ESI transacts its affairs in Florida, including the marketing, sale, and distribution of Gilenya. ESI maintains systematic and continuous contacts in Florida, and regularly transacts business in Florida. ESI purposefully availed itself of the privilege of conducting activities in Florida.

### The Assistance Fund, Inc.

75.    TAF is a Florida non-profit organization with a principal place of business in Orlando, Florida. TAF operates funds that receive donations from

pharmaceutical manufacturers and uses a portion of those payments to subsidize co-payment obligations for patients. Upon information and belief, TAF subsidized copays for the Assignors' Enrollees and the Class Members.

76.    This Court has personal jurisdiction over TAF. TAF is domiciled in, organized under the laws of, and maintains its principal place of business in Florida. Fla. Stat § 48.193(1)(a)(2). TAF transacts its affairs in Florida, including the marketing, advertising, solicitation of patients and physicians, and distribution of copayments for Gilenya. TAF maintains systematic and continuous contacts in Florida, and regularly transacts business in Florida. TAF purposefully availed itself of the privilege of conducting activities in Florida.

### *Chronic Disease Fund, Inc.*

77.    CDF is a Texas non-profit organization with a principal place of business in Frisco, Texas. CDF operates funds that receive donations from pharmaceutical manufacturers, and uses a portion of those payments to subsidize drug co-payment obligations of patients. Upon information and belief, CDF subsidized the copays for Assignors' Enrollees and the Class Members

78.    This Court has personal jurisdiction over CDF. At all relevant times, CDF was a conspiring member, constitutes doing or causing any act to be done, or consequences to occur, in the state resulting in tortious injury under. Fla. Stat § 48.193(1)(a)(2). In addition, 18 U.S.C. § 1965(d) provides personal jurisdiction over

"any person in any judicial district in which such person resides, is found, has an agent, or transacts his affairs." CDF transacts its affairs in Florida, including the marketing, advertising, solicitation of patients and physicians, and distribution of copayments for Afinitor. CDF maintains systematic and continuous contacts in Florida, and regularly transacts business in Florida. CDF purposefully availed itself of the privilege of conducting activities in Florida.

### *National Organization for Rare Disorders, Inc.*

79.     NORD is a New York non-profit organization with a principal place of business in Quincy, Florida. NORD operates funds that receive donations from pharmaceutical manufacturers and uses a portion of those payments to subsidize drug co-payment obligations of patients. Upon information and belief, NORD subsidized the copays for Assignors' Enrollees and the Class Members.

80.     This Court has personal jurisdiction over NORD. At all relevant times, NORD was a conspiring member, constitutes doing or causing any act to be done, or consequences to occur, in the state resulting in tortious injury under. Fla. Stat § 48.193(1)(a)(2). In addition, 18 U.S.C. § 1965(d) provides personal jurisdiction over "any person in any judicial district in which such person resides, is found, has an agent, or transacts his affairs." NORD transacts its affairs in Florida, including the marketing, advertising, solicitation of patients and physicians, and distribution of copayments for Afinitor. NORD maintains systematic and continuous contacts in

Florida, and regularly transacts business in Florida. NORD purposefully availed itself of the privilege of conducting activities in Florida.

81.    This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331, because the causes of action alleged arise under federal law.

82.    This Court has subject matter jurisdiction under 28 U.S.C. § 1332(d), because at least one member of the Class is a citizen of a state different from Defendants and the amount in controversy exceeds $5,000,000.00, exclusive of interest and costs.

83.    This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367, as the state-law claims are so related to the federal claims as to form part of the same case or controversy.

84.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events that gave rise to this lawsuit occurred in this district. Venue is also proper in this district under 18 U.S.C. § 1965(a) and because Defendants transact their affairs in the Middle District of Florida.

### III.    <u>STANDING</u>

85.    The Assignors pay for Gilenya and Afinitor as Medicare Part D Sponsors (or Medicare Advantage Plans).

86.    Between 2010 and 2022, Assignors have paid more than

$13,000,000.00 for Gilenya.

87. Between 2010 and 2021, Assignors have paid more than $14,000,000.00 for Afinitor.

88. The claims paid for by Assignors involved transactions (and related events) in at least the following states: Connecticut, Florida, Illinois, Massachusetts, New Hampshire, New York, Ohio, Pennsylvania, Washington, and Wisconsin.

89. *First*, because the claims for Gilenya and Afinitor submitted to Assignors are believed to be the products of the unlawful Copayment Schemes, they were unpayable under federal law. Novartis and ESI knew this, and therefore misrepresented and concealed the nature of their financial relationship with and use of TAF, to ensure that claims for Gilenya continued to be paid. Similarly, Novartis knew that its relationship with CDF and NORD was improper, and therefore misrepresented and concealed those financial relationships to ensure Afinitor payments would continue. TAF, CDF, and NORD (the "Charity Defendants") also publicly misrepresented their status as independent charities to the OIG, on their websites, and in their tax filings.

90. *Second*, Defendants' Copayment Schemes defrauded Assignors, tortiously interfered with the contractual relationships between Assignors and their Enrollees, and unjustly enriched Defendants at the direct expense of the Assignors and Class Members. Under the relevant contracts, Assignors' Enrollees were

obligated to bear some of the cost of their prescription drugs through co-payments, co-insurance, or deductibles. Defendants incentivized patients to choose Gilenya and Afinitor over other drugs by funneling kickbacks to patients to cover the out-of-pocket costs for Gilenya and Afinitor. Upon information and belief, Defendants thus caused Assignors and Class Members to pay for Gilenya and Afinitor even though the patients had not met their contractual cost-sharing obligations. In doing so, Defendants improperly eliminated members' contractual incentive to use lower-cost alternatives. The contractual provisions that create this incentive are an essential element of the Assignors' health coverage plans. The provisions encourage patients and prescribers to make cost comparisons when choosing among alternative drugs. The provisions thus promote price competition in the prescription drug market. By nullifying the cost-comparison incentive for Defendants' own private benefit, the Copayment Schemes suppressed price competition, harmed Medicare Advantage plans and the Medicare program, and diverted millions of dollars from the nation's taxpayers.

91.    *Third*, Defendants' Copayment Schemes effectively eliminated patient and physician price sensitivity to Novartis' Drugs. Congress included mandatory patient copayments to encourage patients and physicians to be efficient with medical products paid for by federal healthcare programs and to encourage drug manufacturers to price their products upon market forces. By eliminating price

24

sensitivity, Novartis was able to raise prices for Gilenya and Afinitor without having to reconcile with congressionally imposed market restraints—namely affordability. Furthermore, by covering patients' mandatory copayments for Gilenya and Afinitor, Novartis effectively induced patients to seek dispensing of the Novartis Drugs given that Novartis' Drugs were essentially free to patients. In reality, Defendants' Copayment Schemes were gimmicks that resulted in overall increases in healthcare costs, particularly for federal healthcare programs, like the Assignors, who were left to pay for increasingly expensive Novartis Drugs.

92.     Thus, as discussed in greater detail below, the Assignors and Class Members suffered a redressable injury as a result of Defendants' conduct.

### A. ASSIGNMENT AGREEMENTS

93.     Plaintiffs executed irrevocable assignments of certain defined property and acquired any and all rights to recover payments made on behalf of their Assignors' Enrollees and health plan members. These assignments convey legal and beneficial ownership of the identified claims and authorize Plaintiffs to pursue and enforce all legal rights of recovery and reimbursement for health care services and benefits. Plaintiffs allege the below assignments to demonstrate standing.

94.     On June 26, 2019, **AvMed**, a non-for-profit organization, irrevocably assigned to Series 17-03-615, a designated series of MSP Recovery Claims, Series LLC, all rights to recover payments made on behalf of AvMed's members or

enrollees under CMS Contract ID Number H1016 (the "AvMed Assignment"). The

AvMed Assignment expressly provides, in pertinent part:

> Assignor irrevocably assigns, transfers, conveys, sets over and delivers to MSP Recovery, and any of its designated series, successors and assigns, any and all of Assignor's right, title, ownership and interest in and to (i) all Claims existing on the date hereof, whether based in contract, tort or statutory right, and all related recovery rights arising from and related to the claims data transferred to MSP Recovery (or its affiliates or service providers, including [MSP Recovery]), and (ii) any and all causes of action, claims and demands of any nature whatsoever relating to payments for health care services provided to Assignor's members and enrollees, and legal or equitable rights (including, but not limited to, subrogation) to pursue and/or recover monies related to the Claims that Assignor had, may have had, or has asserted against any party in connection with the Claims; and (iii) all causes of action, claims, rights and demands of any nature whatsoever, legal or equitable, against primary payers, Responsible Parties and/or third parties that may be liable to Assignor arising from or relating to the Claims, including claims under consumer protection statutes and laws (aal of the items set forth in (i)-(iii), the "Assigned Claims") . . . . The assignment of the Assigned Claims set forth herein is irrevocable and absolute.

95.    The "Assigned Claims" exclude claims against "[AvMed's] network

healthcare providers and current and former members" as well as "[c]laims arising

from and related to the GlaxoSmithKline[] manufacturing facility in Cidra, Puerto

Rico[.]" Defendants are not AvMed "network healthcare providers" or "current [or]

former members" and the claims at issue in this action do not relate

"GlaxoSmithKline's manufacturing facility in Cidra, Puerto Rico."

96.    The AvMed Assignment also provided for a due diligence period

wherein the parties would exchange deliverables and contemplated that the parties

would enter into a separate "Stand-Alone Assignment Agreement" further evidencing the assignment. Upon completion of the prescribed due diligence period, and satisfaction of all conditions precedent, the parties finalized the transaction, including the exchange of compensation and execution of the Stand-Alone Assignment Agreement. The AvMed Assignment and Stand-Alone Assignment assigned claims for dates of service up to June 26, 2019.

97.    On December 31, 2020, AvMed irrevocably assigned to Series 17-03-615 all rights to recover for health care services provided to any of AvMed's members or enrollees under CMS Contract ID Number H1016 (the "Second AvMed Assignment"). The Second AvMed Assignment assigned claims under CMS Contract ID Number H1016 for dates of service from June 27, 2019, to July 31, 2020.The Second AvMed Assignment expressly provides, in pertinent part:

> Assignor irrevocably assigns, transfers, conveys, sets over and delivers to Assignee, and any of its designated series, successors, and assigns, any and all of Assignor's right, title, ownership, and interest in and to (i) all Quarterly Claims arising from or evidenced in the Quarterly Claims Data, whether based in contract, tort, or statutory right, and all related recovery and receivable rights arising from and related to the Quarterly Claims Data transferred to MSP Recovery, LLC; (ii) any and all causes of action, claims, and demands of any nature whatsoever relating to payments for health care services provided to individuals enrolled under Assignor's Medicare Advantage plan(s) …, and all legal or equitable rights (including, but not limited, to subrogation) to pursue and/or recover monies related to the Quarterly Claims that Assignor had, may have had, or has asserted against any party in connection with the Quarterly Claims Data; and (iii) all causes of action, claims, rights, and demands of any nature whatsoever, legal or equitable, against primary payers and/or third parties that may be liable to Assignor

arising from or relating to the Quarterly Claims, including claims under consumer protection statutes and laws (all of the items set forth in (i)-(iii) …, except for Assignor's right to recovery, under any theory against its network healthcare providers and current and former Members (the "Excluded Claims"). The assignment of the Assigned Claims is irrevocable and absolute. The assignment of the Quarterly Assigned Claims is irrevocable and absolute.

98.    On December 28, 2021, AvMed irrevocably assigned to Series 21-12-1644 all rights to recover for health care services provided to any of AvMed's members or enrollees under CMS Contract ID Number H1016 (the "Third AvMed Assignment"). The Third AvMed Assignment assigned claims under CMS Contract ID Number H1016 for dates of service from August 1, 2020, through June 30, 2021. The Third AvMed Assignment expressly provides, in pertinent part:

Assignor irrevocably assigns, transfers, conveys, sets over and delivers to Assignee, and any of its designated series, successors, and assigns, any and all of Assignor's right, title, ownership, and interest in and to all Claims arising from or evidenced in the Claims Data transferred to MSP Recovery, LLC commencing with and encompassing dates of service from August 1, 2020 through and including June 30, 2021 (the "Assigned Claims"), except for Assignor's right to recover, under any theory, against its network healthcare providers and current and former Members (the "Excluded Claims"). The assignment of the Assigned Claims is irrevocable and absolute.

99.    Consideration was given between the parties in executing these agreements.

100.    AvMed paid more than $4.4 million for Gilenya from 2010 to 2021. Of that, AvMed paid more than $2.1 million directly to ESI.

101.    AvMed paid more than $3.4 million for Afinitor from 2010 to 2021.

102.   On March 20, 2018, **ConnectiCare**, irrevocably sold and assigned all legal ownership in certain property and its rights and claims to recovery against any liable entity (including Defendants) for payments made on behalf of its Enrollees to Series 15-09-157, a designated series of MSP Recovery Claims, Series LLC and to MSP Recovery, LLC, a Florida Limited Liability Company ("ConnectiCare Assignment"). Specifically, the ConnectiCare Assignment states:

> Assignor hereby irrevocably assigns, transfers, conveys, sets over and delivers to Assignee, and any of its successors and assigns, any and all of Assignor's right, title, ownership and interest in and to all [claims against third parties], whether based in contract, tort, statutory right, and any and all rights (including, but not limited to, subrogation) to pursue and/or recover monies that Assignor had, may have had, or has asserted against any party in connection with the [claims] and all rights and claims against primary payers and/or . . . third parties that may be liable to Assignor arising from or relating to the [claims], including claims under consumer protection statutes and laws, and all information relating thereto, as may be applicable.

> The transfer, grant, right, or assignment of any and all of Assignor's right, title, ownership, interest and entitlements in and to the Assigned Medicare Recovery Claims shall remain the confidential and exclusive property of Assignee or its assigns. This assignment is irrevocable and absolute.

ConnectiCare Assignment at 2.

103.   Under the ConnectiCare Assignment, "Claims" is defined to include:

> [L]egal and equitable rights to seek reimbursement and/or recover payments … for Health Care Services provided to Seller's Medicare … enrollees arising under state and/or federal laws, including common law subrogation theories, that provide for the reimbursement of payments made by the Seller for such Medicare services, [including] all outstanding liens, potential liens, lien rights and subrogation recovery

rights, legal or equitable, in favor of Seller, including in any litigation such as but not limited to mass tort actions, class actions, [etc.]….

104.    On April 4, 2018, MSP Recovery, LLC assigned the rights it acquired in the ConnectiCare Assignment to Series 15-09-157, a designated series of MSP Recovery Claims, Series LLC ("MSPRC Assignment"). The MSPRC Assignment from MSP Recovery, LLC to Series 15-09-157, which was ratified and approved by ConnectiCare, Inc., states:

> MSP Recovery, LLC ("Assignor"), for and in consideration of the sum of . . . and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, hereby irrevocably assigns, sells, transfers, conveys, sets over and delivers to Series 15-09-157, a designated series of MSP Recovery Claims, Series LLC . . . ("Assignee"), and its successors and assigns, any and all of Assignor's right, title, ownership and interest in and to all assigned Subject Medicare Recovery Claims, . . . as such terms may be defined in the March 20, 2018 Assignment Agreement[.]

105.    Consideration was given between the parties in executing these agreements.

106.    CONC paid more than $2.1 million for Gilenya from 2011 to 2017. Of that, CONC paid more than $960,000.00 directly to ESI.

107.    CONC paid approximately $2 million for Afinitor from 2011 to 2017.

108.    On March 20, 2018, **Emblem**, a not-for-profit organization, irrevocably assigned all legal ownership of certain property and rights and claims to recovery against any liable entity (including Defendants) for payments made on behalf of its Enrollees to Series 16-08-483, a designated series of MSP Recovery Claims, Series

LLC and to MSP Recovery, LLC ("Emblem Assignment"). The Emblem Assignment expressly provides, in pertinent part:

> Assignor hereby irrevocably assigns, transfers, conveys, sets over and delivers to Assignee, and any of its successors and assigns, any and all of Assignor's right, title, ownership and interest in and to all Assigned Medicare Recovery Claims, whether based in contract, tort, statutory right, and any and all rights (including, but not limited to, subrogation) to pursue and/or recover monies that Assignor had, may have had, or has asserted against any party in connection with the Assigned Medicare Recovery Claims and all rights and claims against primary payers and/or, subject to the definition of Assigned Medicare Recovery Claims, third parties that may be liable to Assignor arising from or relating to the Assigned Medicare Recovery Claims, including claims under consumer protection statutes and laws, and all information relating thereto, as may be applicable…

> The transfer, grant, right, or assignment of any and all of Assignor's right, title, ownership, interest and entitlements in and to the Assigned Medicare Recovery Claims shall remain the confidential and exclusive property of Assignee or its assigns. This assignment is irrevocable and absolute.

> [Emblem] has certain legal and equitable rights to seek reimbursement and/or recover payments from primary payers and any other party or entity that may be responsible to [Emblem] directly or through rights conferred on the [Emblem] pursuant to state and/or law pertaining to beneficiaries, for Health Care Services paid to [Emblem]'s Medicare (as defined above) enrollees arising under state and/or federal laws, including common law subrogation theories, that provide for the reimbursement of made by the [Emblem] for such Medicare services, whether under Parts A. B and D of the Medicare Act, including pursuant to a Medicare Advantage Plan, including the right to recover claims Medicare Health Care Services that are billed on a fee for service basis and all outstanding liens, potential liens, lien rights and subrogation recovery rights, legal equitable, in favor of [Emblem], including in any litigation, such as bill not limited to mass tort actions, class actions and multi-district litigation for which a primary payer has demonstrated responsibility, all of the foregoing defined as

(the "Medicare Recovery Claims;").

109. The "Medicare Recovery Claims" assigned to Series 16-08-483 includes Emblem's "legal and equitable rights to seek reimbursement and/or recover payments from primary payers . . . responsible to [Emblem] directly or through rights conferred on [Emblem] pursuant to state and/or federal law pertaining to beneficiaries, for Health Care Services provided to [Emblem's] Medicare (as defined above) enrollees arising under state and/or federal laws, including common law subrogation theories, that provide for the reimbursement of payments made by [Emblem] . . . pursuant to a Medicare Advantage Plan[.]" *Id*. at p. 1.

110. The "Assigned Medicare Recovery Claims" included the above-referenced Medicare Recovery Claims but excluded "Medicare Recovery Claims that [could] be asserted against Assignor's members, enrollees and/or contracted providers" and Medicare Recovery Claims that as of March 20, 2018 (the Effective Date of the agreement) had been assigned to and/or were being pursued "by other recovery vendors" for services rendered within a defined six-year time period. Id. These excluded claims are defined in the Emblem Assignment as "Assignor Retained Claims." *Id*. None of these Retained Claims are implicated here.

111. On April 4, 2018, MSP Recovery, LLC assigned the rights it had acquired in the Emblem Assignment to Series 16-08-483, a designated series of MSP Recovery Claims, Series LLC ("MSPRC Assignment"). The MSPRC Assignment

from MSP Recovery, LLC to Series 16-08-483, which was ratified and approved by

Emblem, states:

> MSP Recovery, LLC ("Assignor"), for and in consideration of the sum
> of … and other good and valuable consideration, the receipt and
> sufficiency of which is hereby acknowledged, hereby irrevocably
> assigns, sells, transfers, conveys, sets over and delivers to Assignee,
> Series 16-08-483, a designated series of MSP Recovery Claims, Series
> LLC, a Delaware Series Limited Liability Company, and its successors
> and assigns, any and all of Assignor's right, title, ownership and interest
> in and to the "Assigned Claims", "Claims", "Assigned Assets"
> "Assigned Medicare Recovery Claims" and "Assigned Documents"
> (and all proceeds and products thereof) as such terms may be defined
> in the March 20, 2018 Assignment Agreement[.]

112. Consideration was given between the parties in executing this

assignment.

113. Emblem paid approximately $3 million for Gilenya from 2012 to 2017.

114. Emblem paid more than $5.4 million for Afinitor from 2012 to 2017.

115. On June 19, 2017, **FCHP**, a not-for-profit organization, irrevocably

assigned all legal ownership of certain property and its rights and claims to recovery

against any liable entity (including Defendants) for payments made on behalf of its

Enrollees to MSP Recovery, LLC ("FCHP Assignment"). Specifically, the FCHP

Assignment states:

> [FCHP] hereby irrevocably assigns, transfers, conveys, sets over and
> delivers to MSP Recovery, and any of its successors and assigns, any
> and all of [FCHP's] right, title, ownership and interest in and to all
> Claims existing on the date hereof, whether based in contract, tort,
> statutory right, and any and all rights (including, but not limited to,
> subrogation) to pursue and/or recover monies for [FCHP] that [FCHP]

had, may have had, or has asserted against any party in connection with Claims and all rights and claims against primary payers and/or third parties that may be liable to [FCHP] arising from or relating to the Claims, including claims under consumer protection statutes and laws, and all information relating thereto, all of which shall constitute the "Assigned Claims."

[FCHP] has certain legal rights to recover payments for the provision of health care services arising from contractual agreements, such as participation and network agreements with applicable capitation and risk sharing arrangements, and state and federal laws that provide for the reimbursement of conditional payments made by the [FCHP], including the right to recover claims for health care services that are billed on a fee for service basis (the "General Claims");

MSP Recovery is in the business of identifying and analyzing Parts A, B and D of [FCHP]'s Medicare, Medicare Advantage and/or Medicaid claims (the "Medicare/Medicaid Claims, and together with the General Claims, the "Claims") and pursuing the recovery of Claims.

116.   On June 20, 2017, MSP Recovery, LLC irrevocably assigned all rights acquired under the FCHP Assignment to Series 17-04-631, LLC, a designated series of MSP Recovery Claims, Series LLC:

[Assignor] irrevocably assigns, sells, transfers, conveys, sets over and delivers to Assignee and its successors and assigns, any and all of Assignor's rights, title, ownership and interest in and to the [claims] (and all proceeds and products thereof) as such terms are defined in the Recovery Agreement dated June 19, 2017, by and among [FCHP] and MSP Recovery, LLC . . .

117.   Consideration was given between the parties in executing these agreements.

118.   FCHP paid more than $290,000.00 for Gilenya from 2016 to 2019.

119.   FCHP paid more than $546,000.00 for Afinitor from 2013 to 2019.

120.    On March 19, 2019, **HEAL** irrevocably assigned all legal ownership of certain property and its rights and claims to recovery against any liable entity (including Defendants) for payments made on behalf of its Enrollees to MSP Recovery, LLC ("HEAL Assignment"). Specifically, the HEAL Assignment states:

> [HEAL] assigns, transfers, conveys, sets over and delivers to MSP Recovery, and any of its successors and assigns, any and all of [HEAL's] right, title, ownership and interest in and to (i) all Claims existing on the date hereof, whether based in contract, tort, statutory right, and all related recovery rights arising from the health care claims data transferred to MSP Recovery, and (ii) any and all causes of action and legal or equitable rights (including, but not limited to, subrogation) to pursue and/or recover monies related to the Claims that [HEAL] had, may have had, or has asserted against any party in connection with the Claims and (iii) all causes of action and rights and claims, legal or equitable, against primary payers, Responsible Parties and/or third parties that may be liable to [HEAL] arising from or relating to the Claims, including claims under consumer protection statutes and laws (all of the Claims and rights set forth in (i)-(iii), the "Assigned Claims").

> [HEAL] has or may in the future have certain legal and equitable rights to seek reimbursement, recover payments and/or seek damages from primary payers and any Other party or entity that may be responsible to [HEAL], including "Responsible Parties,'" whose failure, directly or through rights conferred on the [HEAL] pursuant to state and/or federal law pertaining to beneficiaries, for health care services provided to any of its members or enrollees for the provision of health care services arising either from (i) contractual agreements, which may include but not limited to agreements with the Centers for Medicare & Medicare Services ("CMS"), along with such other participation and network agreements in place containing applicable capitation and risk sharing arrangements, and/or (ii) state and/or federal laws that provide for the reimbursement of conditional payments made by the [HEAL], whether under Parts A, B and D of the Medicare Act, including pursuant to a Medicare Advantage Plan or otherwise, includin
> the right to recover claims for health care services that are billed on a

fee for service basis and all outstanding liens, potential liens, lien rights and subrogation recovery rights in favor Of [HEAL] against recoveries by enrollees, including in any litigation, such as but not limited to mass tort actions, class actions and multi-district litigation for which a primary payer has demonstrated responsibility, all of the forgoing defined as the "Claims".

121.   On April 10, 2019, MSP Recovery, LLC irrevocably assigned all rights acquired under the HEAL Assignment to Series 17-03-583, a designated series of MSP Recovery Claims, Series LLC:

> The Assignor hereby irrevocably assigns, transfers, conveys, sets over and delivers to Assignee and its successors and assigns, any and all of Assignor's right, title, ownership and interest in and to the "Claims" and "Assigned Claims", and all proceeds and products thereof (collectively, the "Assigned Claims") as such terms are defined in the Recovery Agreement.

122.   Further, on October 22, 2020, Series 17-03-583 entered into an assignment agreement with Series 44-20-583, a designated series of Series 44, whereby it irrevocably assigned all rights it acquired through its assignment agreement with MSP Recovery, LLC. This third assignment agreement was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties, and was entered into under Florida law:

> [Series 17-03-583] . . . hereby irrevocably assigns, transfers, conveys, sets over, and delivers to [Series 44-20-583] and its successors and assigns, (i) any and all of Assignor's right, title, ownership, and interest in and to that Agreement, as well as (ii) the "Claims" and "Assigned Claims", and all proceeds and products thereof (collectively the "Assigned Claims") as such terms are defined in the Agreement.

> This Assignment includes all the Assigned Claims irrespective of when

the claims were vested in HEAL, inclusive of any and all claim(s), causes of actions, proceeds, products, and distributions of any kind, and proceeds of proceeds, in respect thereof, whether based in contract, tort, statutory right, and any and all rights (including, but not limited to, subrogation) to pursue and/or recover monies that Assignor had, may have had, or has asserted against any party, including claims under consumer protecti

n statutes and laws, any and all rights and claims against primary payers and/or third parties that may be liable to HEAL arising from or relating to the Claims and all information relating thereto.

123.    Pursuant to that certain Assignment Agreement dated May 31, 2023 (the "Assignment"), by and between Series 44-20-583 and Series 23-05-1945, a designated series of MSP Recovery Claims, Series LLC, Series 44-20-583 irrevocably assigned, transferred, conveyed, set over, and delivered to Series 23-05-1945 (i) any and all of Series 44-20-583's rights, title, ownership, obligations, and interest in and to the Agreement, as well as, (ii) the "Claims" and "Assigned Claims", and all proceeds and products thereof (collectively the "Assigned Claims") as such terms are defined in the Agreement.  Series 23-05-1945 thereby accepted such Assignment and assumed all the rights, duties and obligations of the Series 44-20-583 under the Agreement.

124.    Such Assignment also included, but was not limited to, any and all rights of Series 44-20-583 to conduct the prosecution of the Assigned Claims.

125.    Consideration was given between each party in executing these assignments.

126.    HEAL paid more than $762,000.00 for Gilenya from 2013 to 2018.

127.   HEAL paid more than $2 million for Afinitor from 2013 to 2018.

128.   On August 9, 2017, Network Health, irrevocably assigned all legal ownership of certain property and its rights and claims to recovery against any liable entity (including Defendants) for payments made on behalf of its Enrollees to MSP Recovery, LLC ("NHPN Assignment"). Specifically, the NHPN Assignment states:

> [NHPN] hereby irrevocably assigns, transfers, conveys, sets over and delivers to MSP Recovery, and any of its successors and assigns, any and all of [NHPN's] right, title, ownership and interest in and to all Claims existing on the date hereof, whether based in contract, tort, statutory right, and any and all rights (including, but not limited to, subrogation) to pursue and/or recover monies for [NHPN] that [NHPN] had, may have had, or has asserted against any party in connection with the Claims and all rights and claims against primary payers and/or third parties that may be liable to [NHPN] arising from or relating to the Claims, including claims under consumer protection statutes and laws, and all information relating thereto, all of which shall constitute the "Assigned Claims."

129.   Under the NHPN Assignment, "Claims" includes all rights based in a "contractual, statutory, equitable, or legal basis, whether state or federal." Further, "Claims" is defined as:

> "[L]egal and equitable rights … in connection with Assignor's payment, liability, or other obligation arising from the provision of Health Care Services to its Members, … including the right to all receivables, proceeds, and products thereof. Assignor's reimbursement and recovery rights include all rights arising under any legal or equitable theories, including but not limited to, contract, tort, state law, federal law, common law, other statutory rights, or otherwise provide for (a) the reimbursement … [of any] payments made by Assignor, … (c) liens, potential liens, lien rights, and subrogation recovery rights … or (e) any receivable or reimbursement rights associated with Assignor's claims payments, whether known or unknown, or arising in

the future. Assignor's reimbursement and recovery rights include any and all causes of action, claims, and demands of any nature whatsoever related to payments for Health Care Services … to pursue and/or recover monies related to claims payments, and rights to initiate and pursue litigations…. All of the rights described herein are referred to collectively as the 'Claims.'"

The conveyance of "[NHPN's] right, title, ownership, interest, and entitlements in and to the Assigned Claims shall remain the confidential and exclusive property of MSP Recovery or its assigns."

130.  On August 10, 2017, MSP Recovery, LLC irrevocably assigned all rights acquired under the NHPN Assignment to Series 15-09-355, LLC, a designated series of MSP Recovery Claims, Series LLC:

[Assignor] irrevocably assigns, sells, transfers, conveys, sets over and delivers to Assignee and its successors and assigns, any and all of Assignor's rights, title, ownership and interest in and to the [claims] (and all proceeds and products thereof) as such terms are defined in the Recovery Agreement dated August 9, 2017, by and among [NHPN] and [MSP Recovery, LLC] . . .

131.  Consideration was given between each party in executing these assignments.

132.  NHPN paid more than $4.8 million for Gilenya from 2011 to 2021. Of that, NHPN paid more than $193,000.00 directly to ESI.

133.  NHPN paid more than $1.3 million for Afinitor from 2010 to 2021.

134.  On May 12, 2017, SummaCare, a Medicare Advantage Organization, irrevocably assigned to MSP Recovery, LLC all its legal ownership of certain property and the rights to recover against any liable third party (including

Defendants) for payments made on behalf of its Enrollees ("SMCR Assignment").

Specifically, the SMCR Assignment states the following:

> [SMCR] hereby irrevocably assigns, transfers, conveys, sets over and delivers to MSP Recovery, and any of its successors and assigns, any and all of [SMCR]'s right, title, ownership and interests in and to all Claims existing on the date hereof, whether based in contract, tort, statutory right, and any and all rights (including, but not limited to, subrogation) to pursue and/or recover monies for [SMCR] that [SMCR] had, may have had, or has asserted against any party in connection with the Claims and all rights and claims against primary payers and/or third parties that may be liable to [SMCR] arising from or relating to the Claims, including claims under consumer protection statutes and laws, and all information relating thereto, all of which shall constitute the "Assigned Claims[.]"

> Assigned Claim includes any actions, rights or lawsuits of any nature whatsoever, arising out of or in connection with the Assigned Claims, whether founded on the contractual term and/or any other cause(s) of action either in equity of in law.

135.    On June 12, 2017, MSP Recovery, LLC irrevocably assigned all rights acquired under the SMCR Assignment to Series 16-11-509, a designated series of MSP Recovery Claims, Series LLC ("Series 16-11-509 Assignment"):

> Assignor … irrevocably assigns, sells, transfers, conveys, sets over and delivers to Assignee and its successors and assigns, any and all of Assignor's right, title, ownership and interest in and to the [Assigned Claims] (and all proceeds and products thereof) as such terms are defined in the [SMCR Assignment.]

136.    SummaCare consented to, acknowledged, approved, and ratified the Series 16-11-509 Assignment, which is memorialized in a letter dated September 5, 2018.

137.    Several continuing assignment/purchase agreements were executed between SMCR and Plaintiffs ("SMCR Follow-on Assignments"). Each of the SMCR Follow-on Assignments contains materially the same language regarding what is being conveyed. The SMCR Follow-on Assignments have the effect of extending the date range for the claims that were conveyed.

138.    On February 23, 2018, MSP Recovery, LCC purchased SummaCare's interest in all claims with dates of service through March 24, 2016. The rights under this purchase agreement were subsequently assigned to Series 16-11-509, a series entity of MSP Recovery Claims, Series LLC.

139.    On November 03, 2018, MSP Recovery, LCC purchased SummaCare's interest in all claims with dates of service between March 25, 2016, and March 24, 2019. The rights under this purchase agreement were subsequently assigned to Series 16-11-509, a series entity of MSP Recovery Claims, Series LLC. For claims between the date of the assignment and the end of the date range, the parties agreed that SummaCare would transfer the claims data and convey all related claims interest (and assignee would make additional payment) on a quarterly basis until the end of the term. This agreement was fully executed.

140.    On July 23, 2021, MSP Recovery, LCC purchased SummaCare's interest in all claims with dates of service between March 25, 2019, and March 31, 2024. The rights under this purchase agreement were subsequently assigned to Series

21-06-1592, a series entity of MSP Recovery Claims, Series LLC. For claims between the date of the assignment and the end of the date range, the parties agreed that SummaCare would transfer the claims data and convey all related claims interest (and assignee would make additional payment) on a quarterly basis until the end of the term. To date, this agreement has been faithfully executed.

141.    Consideration was given between each party in executing these assignments.

142.    SMCR paid more than $1.6 million for Gilenya from 2011 to 2022.

143.    SMCR paid more than $1.2 million for Afinitor from 2012 to 2021.

144.    In total, from 2010 to 2022, Assignors paid more than $17 million for Gilenya. Of that, Assignors paid at least $3.9 million directly to ESI.

145.    From 2010 to 2014, the timeframe identified in the Novartis Settlement with the DOJ, Assignors paid $5.1 million for Gilenya. Of that, Assignors paid at least $2.7 million directly to ESI.

146.    In total, from 2010 to 2021, Assignors paid more than $16.2 million for Afinitor.

147.    From 2012 to 2014, the timeframe identified in the Novartis Settlement with the DOJ, Assignors paid more than $6.5 million for Afinitor.

## IV.    FACTUAL ALLEGATIONS

### A. REGULATORY BACKGROUND

*Medicare Cost-Sharing, Payments, and Drug Dispensing Under Part D*

148.    In 1965, Congress amended the Social Security Act to create the Medicare act under Title XVIII of the U.S. Code. The Medicare Act created a federally funded health insurance program for the nation's elderly and disabled.

149.    The Medicare Act consists of five parts—Parts A, B, C, D, and E. Parts A and B create, describe, and regulate traditional fee-for-service, government-administered Medicare. Part C outlines the Medicare Advantage program and provides that Medicare beneficiaries may elect for private insurers to deliver their Medicare benefits. Part D provides for prescription drug coverage to Medicare beneficiaries. Part E includes "Miscellaneous Provisions."

150.    Assignors provide Medicare benefits under Parts C and D. Medicare Part D coverage is a voluntary prescription drug benefit program for Medicare beneficiaries established in 2003. Medicare Part D took full effect in 2006.

151.    Medicare Part D is based on a private-market model, where Medicare contracts with private entities known as Part D "Sponsors." These Sponsors administer prescription drug plans and provide qualified prescription drug coverage.

152.    Part D Sponsors submit bids the year before it delivers Part D benefits. The bid contains a per member, per month cost estimate for providing Part D benefits to an average Medicare beneficiary in the geographic area. If the Part D plan sponsor's bid exceeds the benchmark, the enrolled beneficiary may have to pay the difference as part of a monthly premium. Centers for Medicare and Medicaid

Services ("CMS") then provides each Part D plan sponsor with advance monthly payments equal to the Part D plan sponsor's standardized bid.

153. Under Part D, three entities have separate, independent cost-sharing responsibilities for any covered prescription payment: Part D Sponsors, Medicare, and Part D beneficiaries.

154. There are four payment stages of a Part D drug plan: (1) Annual Deductible, (2) Initial Coverage, (3) Coverage Gap, and (4) Catastrophic Coverage. In each stage, the enrollee, Plan Sponsor, and/or Medicare are required to contribute their independent and exclusive portion of the total costs in accordance with the applicable cost-sharing parameters.

155. For example, in 2018, the cost-sharing obligations were, as follows:



**Medicare Part D Standard Benefit Design in 2018**

*Note.* Some amounts rounded to nearest dollar. *The estimate of $8,140 in total drug costs corresponds to a $5,000 out-of-pocket threshold for catastrophic coverage in 2018.
*Source.* KFF, Based on 2018 Part D benefit parameters.

156.   As displayed in the table above, the Part D standard benefit had a $405 deductible and 25% coinsurance up to an Initial Coverage limit of $3,750 in total drug costs, followed by a Coverage Gap. During the Coverage Gap, Part D Sponsors covered 15% of costs for brand-name drugs and 56% of costs for generic drugs.

157.   Once the Catastrophic Coverage stage begins, Part D Sponsors are responsible for 15% of drug costs. Thus, under Medicare Part D cost-sharing parameters, there is an exclusive portion of total drug expenses that are always paid for by the Assignors and Class Members—i.e., Part D Sponsors.

158.    Generally, after a physician writes a prescription for a Part D beneficiary, the patient then takes the prescription to a pharmacy to submit it to a mail order specialty pharmacy to be filled—this is known as the "*dispensing stage*".

159.    When the patient submits the prescription, the patient's copay is due from the patient to complete the transaction, at which point the pharmacy will dispense the drug. After dispensing the drug, the pharmacy receives payment from the Part D Sponsor.

160.    Part D payments and prescriptions are tracked through electronic records called a Prescription Drug Event ("PDE"). The PDE contains many specific representations regarding each Medicare prescription drug claim, including the patient's name, service provider of the drug, the prescriber of the drugs, the name of the drug, and the quantity dispensed to the patient. Each PDE that is submitted is a summary record that documents the final adjudication of a dispensing event based upon the claims received from the pharmacies and serves as a request for payment for each individual prescription submitted under the Part D program.

161. CMS regulations require Part D Plan Sponsors and related "downstream" entities that generate and submit PDE claims data to certify that such data is "true, accurate, and complete" and that the PDE is the basis for obtaining payment from federal healthcare programs for the products or services reflected therein. 42. C.F.R. § 423.505(k). Certifying that the claims data in the PDE record

to be "true, accurate, and complete" is an express condition for payment under the Medicare Part D Program. *Id*.

162.    The submission of accurate PDEs is essential to the functioning of the Part D program, the singular purpose of which is to provide affordable coverage for drug products for the Medicare population.

### *Medicare Participation: Conditions, Certifications, and Legal Prohibitions*

163.    All providers and suppliers of medical services and items—*including drug manufacturers who supply covered medications indirectly*—must enroll with Medicare to be eligible to receive any payment for their items or services through Medicare. 42 C.F.R. § 424.505.

164.    To enroll in Medicare, all providers and suppliers must submit an enrollment application to CMS and must "attest[] that the information submitted is accurate and that the provider or supplier is aware of, and abides by, all applicable statutes, regulations, and program instructions." 42 C.F.R § 424.510(d)(3).

165.    The application forms used by all providers and suppliers to enroll in Medicare includes the following attestation: "I agree to abide by the Medicare laws, regulations and program instructions that apply to me or to the organization listed in . . . this application. . . . I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations and program instructions (including, but not limited to, the Federal

Anti-Kickback Statute, 42 U.S.C. section 1320a-7b(b)).”[6] (emphasis added).

166.  “[I]n order for coverage to be available under Medicare Part D for applicable drugs of a manufacturer, the manufacturer must,” among other things, enter “into and have in effect an agreement described in § 423.2315(b).” 42 C.F.R. § 423.2310(a). This manufacturer agreement requires that “[e]ach manufacturer . . . must comply with the requirements imposed by CMS . . . for purposes of administering the program.” 42 C.F.R. § 423.2315. In other words, this agreement is a precondition for any Novartis Drug to qualify for payment by Assignors and Class Members.

167.  Congress has unequivocally instructed that “compliance with federal health care laws, including the [AKS], is a condition of payment by the Medicare program.” *McNutt ex rel. U.S. v. Haleyville Med. Supplies, Inc*., 423 F.3d 1256, 1260 (11th Cir. 2005).

168.  When a bill for payment is submitted to a federal healthcare program, that bill carries an implied certification that the related conduct complied with the AKS, the analogous state law bribery statutes referenced herein, and the applicable rules and regulations provided by HHS. Because Medicare Advantage is a “Federal healthcare program” as defined by 42 U.S.C. § 1320-7b(f), pharmaceutical

---

[6] Medicare Enrollment Application, CMS Form 855i, Available at: https://www.cms.gov/Medicare/CMS-Forms/CMS-Forms/Downloads/cms855i.pdf. *See also* https://www.cms.gov/Medicare/Provider-Enrollment-and-Certification/Enrollment-Applications.

manufacturers, like Novartis, who obtain payment for their drugs through a Part D Sponsor or MA Plan—including Assignors—must comply with the AKS, and other state and federal law.

169.   Similarly, MA Plans are required to certify compliance with the AKS and are prohibited from paying for claims that are tainted by an AKS violation or are rendered unpayable due to disqualifying conduct by the underlying provider or supplier. 42 C.F.R. § 422.504(h)(1). Every subcontract that the MA Plan enters must also contain this certification of compliance. 42 C.F.R. § 422.504(i).

170.   Entities submitting claims to Medicare are subject to mandatory exclusion from Medicare by HHS-OIG if criminally convicted of an AKS violation, *see e.g.*, 42 U.S.C. § 1320a-7(a)(1), and subject to permissive exclusion if HHS-OIG determines that the entity "has committed an act" described in the AKS, 42 U.S.C. § 1320a-7(b)(7).

### *OIG Guidance for Co-Payment Charities and Donors*

171.   The federal government, through the Office of Inspector General of the Department of Health and Human Services ("HHS OIG" or "OIG"), has provided guidance to co-payment charities and donors about compliance with applicable laws and regulations, including the AKS and FCA. The OIG has made clear that such charities will violate those laws and regulations if they do not follow the specified rules and/or guidance. Those rules ensure that a pharmaceutical manufacturer cannot

control a co-payment charity or receive information from such a charity that would allow the manufacturer to link the amount it donates to additional profits from the sale of a particular drug.

172.    On November 22, 2005, the OIG released an advisory bulletin applicable to all patient assistance programs for Medicare Part D enrollees ("PAP") (the "2005 PAP Bulletin"). 70 Fed. Reg. 70623 (Nov. 22, 2005). "That 2005 PAP Bulletin provided guidance, in anticipation of Medicare Part D taking effect in 2006, to entities operating PAPs." *Patient Servs., Inc. v. United States*, 2019 WL 267872, at *4 (E.D. Va. Jan. 18, 2019).

173.    The OIG warned it would be a violation of the AKS and other laws for a drug manufacturer to knowingly provide subsidies to Part D beneficiaries taking its product. The OIG identified criteria for PAPs and manufacturers to avoid "potentially abusive PAP structures," and to ensure any donations from manufacturers, for Part D beneficiaries, were provided through "bona fide"[7] independent charities.

174.    The OIG explained that failure to abide by its regulations will result in "increasing costs to Medicare" and "reducing beneficiaries' incentives to locate and use less expensive, equally effective drugs." Circumventing "cost-sharing subsidies"

---

[7] As explained, "[the OIG] would not consider a charitable foundation . . . formed, funded or controlled by a manufacturer . . . to be a bona fide, independent charity[.]" 70 Fed. Reg. 70623-03.

would "shield beneficiaries from the economic effects of drug pricing, thus eliminating a market safeguard against inflated prices." Failure to abide by its regulations would "have the practical effect of locking beneficiaries into the manufacturer's products, even if there are other equally effective, less costly alternatives[.]"

175.    Recognizing the potential for extraordinary profits that could be garnered through abuse, "the OIG expressed concern[] . . . manufacturers may seek improperly to maximize these profits by creating sham 'independent' charities to operate PAPs; by colluding with independent charity programs . . . ; or by manipulating . . . eligibility criteria to maximize the number of beneficiaries[.]" 70 Fed. Reg. 70623-03. "Simply put, the . . . PAP must not function as a conduit for payments by the . . . manufacturer to patients[.]"

176.    Finally, the OIG identified specific procedures for entities seeking an "Advisory Opinion" from the OIG.[8] 70 Fed. Reg. 70623-03.

177.    Accordingly, the 2005 Bulletin set forth factors that the OIG considers to be "fundamental" to a properly structured, independent, bona fide PAP, including the following "Five Requirements":

        a.    Neither the pharmaceutical manufacturer itself nor any affiliate "exerts any direct or indirect influence or control over

---

[8] As explained by the PAP in *Patient Servs., Inc.*, 2019 WL 267872, at *8, "operating without an [A]dvisory [O]pinion is practically impossible"; therefore, to successfully operate within the Part D framework, it is essential for a PAP to convince the OIG to endorse its operations.

the charity or the subsidy program";

b. The "charity awards assistance in a truly independent manner that severs any link" between the pharmaceutical manufacturer's funding and the beneficiary ("i.e., the assistance provided to the beneficiary cannot be attributed to the donating drug manufacturer");

c. The "charity awards assistance without regard to the pharmaceutical manufacturer's interest and without regard to the beneficiary's choice of product, provider, supplier, or Part D drug plan";

d. The "charity awards assistance based on a reasonable, verifiable, and uniform measure of financial need applied in a consistent manner"; and

e. The "pharmaceutical manufacturer does not solicit or receive data from the PAP that would allow the manufacturer to substantiate the amount of its donations with the number of subsidized prescriptions for its products. *Id.* at 70626-27 ("Simply put, the independent charity PAP must not function as a conduit for payments by the pharmaceutical manufacturer to patients and must not impermissibly influence beneficiaries drug choices."). *Id.*

178. Since 2005, the OIG has published multiple Advisory Opinions and Special Advisory Bulletins ("SABs") (including in 2006, 2011, 2014, 2015, and 2020).

179. For instance, in 2014, the OIG issued a SAB relating to "indirect remuneration" provided by drug companies. *See* 79 Fed. Reg. 31120-31123 (May 30, 204). The OIG reiterated, that "[i]f a donation is made to a PAP to induce the PAP to recommend or arrange for the purchase of the donor's federally reimbursable items," as well as if a PAP's grant of financial assistance to a patient is made "to

influence the patient to purchase (or induce the patient's physician to prescribe) certain items", the "[AKS] could be violated." *Id*. The OIG stated that independent charities were prohibited from "giv[ing] a donor any information that would enable a donor to correlate the amount or frequency of its donations with the number of aid recipients who use its products or services, or the volume of those products supported by the PAP." *Id*.

### *Abusing PAPs Undermines Part D Sponsors' Crucial Role in Controlling Drug Costs*

180.   Part D Sponsors play an important role in the American healthcare landscape. They provide thousands of Americans with not only health insurance, but with the freedom to go into the marketplace and select the health insurance that best meets their needs.

181.   Congress's goal in creating the Medicare Advantage program was to harness the power of private sector competition to stimulate experimentation and innovation.

182.   Each year, more and more Americans receive their health insurance from a MA Plan. In 2017, 33% of Medicare-eligible individuals got their health insurance from MA Plans. In 2021, that figure rose to 42% and will likely rise further in the coming years.  In 2022, more than 28 million people are enrolled in a Medicare Advantage plan, accounting for nearly half or 48 percent of the eligible Medicare population, and $427 billion (or 55%) of total federal Medicare spending (net of

premiums).

183.   One of the primary measures taken to effectuate this goal was the inclusion of cost-sharing obligations, like patient copays.

184.   The Assignors' Part D plans include cost-sharing provisions, which require that the beneficiary fulfill their agreed upon payment obligations. These cost-sharing provisions are a crucial factor in managing healthcare costs. *See United States v. Teva Pharmaceuticals USA, Inc*. 560 F.Supp.3d 412, 416 (Mass. Sept. 9, 2021) ("Those partial payments ("copays") are intended to encourage physicians and beneficiaries to be efficient consumers of federally reimbursed health care products and to encourage drug manufacturers to price their products upon market forces").

185.   As the DOJ recognized, "Congress included co-pay requirements, in part, to encourage market forces to serve as a check on health costs, including the prices that pharmaceutical manufacturers can demand for their drugs."[9]

186.   However, when drug manufacturers employ schemes to pay the Medicare Part D co-pays of patients taking their products, they "eliminta[e] a market safeguard against inflated prices." 70. Fed. Reg. 70623, 70625. Schemes or "programs" intended to eliminate this market safeguard "weaken manufacturers' incentives to accept lower prices from insurers. By undermining patient cost sharing,

---

[9] U.S. Attorney's Office for the Dist. of Mass., *Fourth Foundation Resolves Allegations It Conspired with Pharmaceutical Companies to Pay Kickbacks to Medicare Patients Taking the Companies' Drugs*," (Apr. 1, 2021), available at https://www.justice.gov/usao-ma/pr/fourth-foundation-resolves-allegations-it-conspired-pharmaceutical-companies-pay

copay assistance programs leave insurers with a less effective took kit for steering [drug] utilization and containing spending." [**Exhibit 4** – OIG Adv. Op. 22-19].[10]

187.   The 2005 Bulletin, [attached as **Exhibit 8**] the OIG detailed the anti-competitive and undermining effects of drug manufacturers abusing PAPs:

> Subsidies provided by traditional pharmaceutical manufacturer PAPs have the practical effect of locking beneficiaries into the manufacturer's product, even if there are other equally effective, less costly alternatives (and even if the patient's physician would otherwise prescribe one of these alternatives). Subsidizing Medicare Part D cost-sharing amounts will have this same steering effect. …. We are concerned that pharmaceutical manufacturers may seek improperly to maximize these profits by creating sham "independent" charities to operate PAPs; *by colluding with independent charity programs to ensure that the manufacturer's contributions only or primarily benefit patients using its products*; or by *manipulating financial need or other eligibility criteria to maximize the number of beneficiaries* qualifying for cost-sharing subsidies.
>
> [A] core question is whether the anti-kickback statute would be implicated if a manufacturer of a drug covered under Part D were to subsidize cost-sharing amounts (directly or indirectly through a PAP) incurred by Part D beneficiaries for the manufacturer's product….[W]e believe such subsidies for Part D drugs would implicate the anti-kickback statute and pose a substantial risk of program and patient fraud and abuse. *Simply put, the subsidies would be squarely prohibited by the statute, because the manufacturer would be giving something of value (i.e., the subsidy) to beneficiaries to use its product. Where a manufacturer PAP offers subsidies tied to the use of the*

---

[10] Peter A. Ubel, MD, and Peter B. Bach, MD, *Copay Assistance for Expensive Drugs: A Helping Hand That Raises Costs*, Ann Intern Med. (2016) ("But copay assistance programs act as an artificial price support, which lessens the incentive for consumers to factor cost into their decisions and further weakens the pressure on pharmaceutical companies to lower the price of their products"); *see also* Dept. of Justice, Office of Public Affairs, *Patient Services Inc. Agrees to Pay $ Million for Allegedly Serving as Conduit for Pharmaceutical Companies to Illegal Pay Patient Copy payments*, (Jan. 21, 2020) (noting that schemes, such as Defendants', are simply a means to "increase company profits while avoiding important cost-control aspects."), available at https://www.justice.gov/opa/pr/patient-services-inc-agrees-pay-3-million-allegedly-serving-conduit-pharmaceutical-companies.

> ***manufacturer's products (often expensive drugs used by patients with chronic illnesses), the subsidies present all of the usual risks of fraud and abuse associated with kickbacks, including steering beneficiaries to particular drugs; increasing costs to Medicare; providing a financial advantage over competing drugs; and reducing beneficiaries['] incentives to locate and use less expensive, equally effective drugs.***

*Id.* at 70,625-626 (emphasis added, footnotes omitted).

188.    On at least two other occasions, the OIG reiterated its concerns:

In 2014, the OIG asserted that drug manufacturer's "ability to subsidize copayments for their own drugs may encourage manufacturers to increase prices at additional costs to [federal] health care programs."; [attached as **Exhibit 9**] and

In 2022, the OIG explained how programs, like the Copayment Schemes, "could further hinder a Part D plan sponsor's ability to control costs" and "circumvent one of the key pricing controls (exposing beneficiaries to the economic effects of drug prices set by manufacturers) that Congress instituted…and would lay bare the dangers of allowing manufacturers to dictate the terms of this market safeguard." [attached as **Exhibit 4**].

189.    As demonstrated above, Medicare Advantage entities, such as Part D Sponsors, cannot play the vital role that Congress intended if they are hamstrung by fraudulent and anticompetitive conduct. When Medicare Advantage entities "faithfully pursue and recover from liable third parties," they "will have lower medical expenses and will therefore be able to provide additional benefits to their enrollees." *In re Avandia Mktg., Sales Pracs. & Prod. Liab. Litig*., 685 F.3d 353, 363 (3d Cir. 2012) (quoting Policy and Technical Changes to Medicare Advantage and the Medicare Prescription Drug Benefit Programs, 75 Fed. Reg. 19678, 19797

(April 15, 2010)).

### *Abusing PAPs Induces Patient and Prescriber Medical Decisions*

190.   Another major concern arises when drug manufacturers abuse PAPs to steer patients and prescribers towards their products, over cheaper, equally effective alternatives.

191.   It is common sense that patients will not purchase, nor will physicians prescribe, medication if the patient cannot afford it.

192.   Indeed, it is "widely understood that high co-payments are a leading cause [of prescription abandonment], and lowering co-payments significantly reduces abandonment for highly effective chronic treatments."[11] The Congressional Budget Office ("CBO") referred to this phenomenon as the "use effect", which captures the changes in demand for drugs resulting from changes in beneficiaries' out-of-pocket expenses.[12]

193.   In the context of PAPs, "that donations induce utilization is not surprising: Cost sharing is known to reduce utilization, so defraying it should

---

[11] Prescription abandonment—when a prescription is transmitted to the pharmacy but never filled. Prescription abandonment is multi-faceted, but it is widely understood that high co-payments are a leading cause, and lowering co-payments significantly reduces abandonment for highly effective chronic treatments. *See* Dana P. Goldman et al., *Prescription Drug Cost Sharing: Associations with Medication and Medical Utilization and Spending and Health*. 298.1 Jama 61, 61–69 (2007), available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6375697/
[12] Congressional Budget Office, *Prescription Drugs: Spending, Use, and Prices* (Jan. 2022), available at https://www.cbo.gov/publication/57772#_idTextAnchor027 ("The reduction in consumers' out-of-pocket costs for prescription drugs is one key factor that explains the increased use of prescription drugs.").

logically induce some portion."[13] Other studies on the effects of copay assistance found increases for "branded drug sales by over 60%[.]"[14]

194.   Similarly, the OIG observed that "prescribers could be dissuaded from prescribing a product for which a beneficiary would pay the full cost-sharing amount if a different, clinically appropriate drug were covered." [**Exhibit 4** – OIG Adv. Op. No. 22-19.].

195.   Even when a physician prescribes a particular drug, a "patient[] with higher levels of cost-sharing are more likely to delay or forgo prescription medications" or "not take medication as prescribed".[15]

196.   Put differently, "[r]egradless of whether patients and doctors are induced by PAP funds at the prescription stage, the data is clear that ***patients are induced by co-payment assistance at the dispensing stage***." (emphasis added).[16]

## B. DEFENDANTS' UNLAWFUL CO-PAYMENT SCHEMES

197.   From at least 2012 through at least 2014, Novartis worked with TAF and ESI to funnel subsidies and guarantee copayment waivers for beneficiaries taking Gilenya. Defendants accomplished this objective through the following steps.

---

[13] *Giving a Buck or Making a Buck? Donations by Pharmaceutical Manufacturers to Independent Patient Assistance Charities*, Health Affairs, Nurses, Care Delivery, Pharmaceuticals, & More 41, No. 9 (2022).
[14] *Id.*
[15] Report to Congress, *Prescription Drugs: Innovation, Spending, and Patient Access* (Dec. 7, 2016), available at https://aspe.hhs.gov/sites/default/files/migrated_legacy_files//192456/DrugPricing RTC2016.pdf [hereinafter "*Innovation, Spending, and Patient Access*"].
[16] Hayden B. Bosworth et al., *Medication Adherence: A Call for Action*. 162.3 Am Heart J. 412 (2011), available at, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3947508/.

First, TAF deceived the OIG in order to obtain favorable Advisory Opinions to enable TAF to provide copayment waivers to Medicare beneficiaries. Next, Novartis created a free drug fund where under and uninsured patients could apply to receive free Gilenya from Novartis. Novartis then designated ESI as the administrator of its free drug program. Upon information and belief, as patients were referred to Novartis's free drug program, ESI and Novartis identified the Medicare-eligible patients, and assisted those patients in obtaining Medicare coverage. Once those patients were approved for Medicare-coverage, ESI and Novartis referred those patients to TAF. ESI and Novartis worked with TAF to ensure that Novartis's payments to TAF would be reserved for beneficiaries taking Novartis's drugs. Novartis timed its payments to TAF, with the opening of TAF's fund, along with the submission of applications sent by ESI. In doing so, Defendants utilized TAF as a willing conduit to funnel funds exclusively to beneficiaries taking Novartis's drug, in direct contravention to federal rules and regulations governing PAPs.

198.  From at least 2010 to 2014, Novartis worked with NORD to funnel subsidies and guarantee copayment waivers for beneficiaries taking Afinitor. Defendants accomplished this objective through the following steps. First, NORD deceived the OIG in order to obtain favorable Advisory Opinions to enable NORD to provide copayment waivers to Medicare beneficiaries. Then Novartis entered into an arrangement with NORD to provide copayment waivers to patients taking

Novartis's drugs. Defendants knew that Afinitor was FDA-approved to use as a second-line RCC treatment only, *and only after certain first-line products failed*. Defendants knew that OIG regulations required, among other things, that patients applying for co-payment waivers from NORD receive copayment assistance on a first-come, first-serve basis. Because Afinitor was a *second*-line treatment only, Novartis and NORD created a new fund, narrowly defined to ensure that only beneficiaries seeking Afinitor would receive the money provided by Novartis. In doing so, Novartis utilized NORD as its willing conduit to funnel funds exclusively to beneficiaries taking Novartis's drug, in direct contravention to federal rules and regulations governing PAPs.

199. From at least 2012 to 2012, Novartis worked with CDF to funnel subsidies and guarantee copayment waivers for beneficiaries taking Afinitor. Defendants accomplished this objective through the following steps. First, CDF deceived the OIG in order to obtain favorable Advisory Opinions to enable CDF to provide copayment assistance to Medicare beneficiaries. Then, CDF created a fund exclusively reserved for beneficiaries taking Afinitor. Despite promising the OIG that CDF would not award assistance based on the identity of the donor, CDF would not provide copay assistance for beneficiaries seeking to take any drug other than Afinitor. Novartis knew this, and knew that funds paid to CDF would be exclusively reserved for beneficiaries taking Afinitor, and made payments to CDF with

agreement in mind. In doing so, Novartis utilized CDF as its willing conduit to funnel funds exclusively to beneficiaries taking Novartis's drug, in direct contravention to federal rules and regulations governing PAPs.

### *The Copayment Scheme for Gilenya*

200.   On May 26, 2010, at the request of TAF and based on promises made by TAF, the OIG issued an Advisory Opinion to TAF, allowing it to provide copayment assistance services to Medicare beneficiaries. [**Exhibit 5**, OIG Adv. Op. No. 10-07].

201.   The OIG made clear that TAF's receipt of the Advisory Opinion was based upon certain promises and certifications made by TAF to the OIG.

202.   In relevant part, the OIG identified the following six promises made by TAF regarding its future operations,

Underline First, no Donor or affiliate of any Donor would exert direct or indirect control over Requestor or its program. Requestor is an independent, nonprofit, tax-exempt charitable organization that operates with absolute, independent, and autonomous discretion as to the use of donor contributions…

Underline Second, Requestor would award assistance in a truly independent manner that would sever any link between Donors and beneficiaries…

Underline Third, Requestor would award assistance without regard to any Donor's interests and without regard to the applicant's choice of provider, practitioner, supplier, test, or product. When determining patient eligibility for the Proposed Arrangement, Requestor would not take into account the identity of any provider, practitioner, insurer, health plan, supplier of items or services, test, drug, or other product the patient may use; the identity of any referring person or organization; or the amount

of any contributions made by a Donor whose services or products are used or may be used by the patient.

Fourth, based on Requestor's certifications, Requestor would provide assistance based on a reasonable, verifiable, and uniform measure of financial need that would be applied in a consistent manner.

Fifth, Requestor would not provide Donors with any data that would facilitate the Donor in correlating the amount or frequency of its donations with the amount or frequency of the use of its products or services. No individual patient information would be conveyed to any Donor, nor would be any data related to the identity, amount, or nature of products or services subsidized under the Proposed Arrangement...

Finally, the fact that Requestor permits Donors to earmark donations for particular Specified Diseases or for genetic testing, generally, should not, on the facts presented, significantly raise the risk of abuse. In this case, Requestor has certified that no Donor or affiliate of any Donor (including, without limitation, any employee, agent, officer, shareholder, or contractor (including, without limitation, any wholesaler, distributor, or pharmacy benefits manager)) would directly or indirectly influence the identification of the Specified Diseases. To ensure that Requestor's Specified Diseases are appropriately defined, Requestor has further certified that: (i) it would define its Specified Diseases in accordance with widely recognized clinical standards and in a manner that covers a broad spectrum of available products; and (ii) its Specified Diseases would not be defined by reference to specific symptoms, severity of symptoms, the method of administration of drugs, or the availability of associated genetic testing. Moreover, several different Specialty Medications are currently available to treat each Specified Disease, and Requestor has certified that it will cover all new Specialty Medications as they become FDA-approved and available. Donors would not be permitted to earmark contributions for specific Specialty Medications or genetic tests, nor could they earmark contributions for genetic tests applicable to a particular Specified Disease. Under these circumstances, it is unlikely that the earmarking would result in the Proposed Arrangement serving as a disguised conduit for financial assistance from a Donor to patients using its products.

In sum, Requestor's interposition as an independent charitable organization between Donors and patients and the design and administration of the Proposed Arrangement provide sufficient insulation so that Requestor's assistance to patients should not be attributed to any of its Donors. Donors would not be assured that the amount of financial assistance their patients, clients, or customers receive would bear any relationship to the amount of their donations. Indeed, Donors would not be guaranteed that any of their patients, clients, or customers would receive any financial assistance whatsoever from Requestor. In these circumstances, we do not believe that the contributions Donors would make to Requestor can reasonably be construed as payments to eligible beneficiaries of the Medicare or Medicaid programs or to Requestor to arrange for referrals.

203.    Unbeknownst to the OIG, the public, and third-party payors (including Assignors), these were false promises and fraudulent representations made by TAF to the OIG.

204.    On May 19, 2011, at the request of TAF and based on promises made by TAF, the OIG issued a Modification of OIG Advisory Opinion No. 10-07. [**Exhibit 6,** Modification of OIG Adv. Op. No. 10-07].

205.    The OIG stated that TAF had again certified and promised that TAF "would continue to operate in accordance with all material facts certified in the Requestor's original request (and supplemental submissions) in connection with OIG Advisory Opinion No. 10-07." [*Id.*].

206.    Unbeknownst to the OIG, the public, and third-party payors (including Assignors), these were false promises and fraudulent representations made by TAF to the OIG.

207.  On May 21, 2014, the OIG notified TAF of concerns it had with the manner in which TAF operated its copayment assistance funds. [**Exhibit 7,** Modification of OIG Adv. Op. No. 10-07]

208.  On May 5, 2016, at the request of TAF and based on promises made by TAF, the OIG issued a Notice of Modification of OIG Advisory Opinion No. 10-07, as modified. [*Id.*].

209.  The OIG stated that TAF had again recertified and promised that TAF's current and future operations would abide by the terms and conditions outlined in the OIG's Advisory Bulletins and Advisory Opinions provided to TAF. [*Id.*].

210.  Unbeknownst to the OIG, the public, and third-party payors (including Assignors), these were false promises and fraudulent representations made by TAF to the OIG.

211.  Also in May 2016, Novartis received a subpoena from the DOJ relating to its payments to 501(c)(3) organizations that provide co-payment assistance to Medicare patients taking Novartis' drugs.

212.  In 2017, Novartis received another subpoena from the DOJ relating to its payments to 501(c)(3) organizations that provide co-payment assistance to Medicare patients taking Novartis' drugs.

213.  It was through those investigative tools that the DOJ learned of Novartis's, TAF's and ESI's conspiratorial scheme to circumvent the cost-sharing

mandates relating to Gilenya.

214.    Particularly, the DOJ discovered evidence that starting in at least October of 2012, Novartis conspired with ESI and TAF to funnel subsidies and waive copayments for beneficiaries taking Novartis's drugs.

215.    By virtue of the contractual relationship between Novartis and ESI, ESI is considered an "affiliate" of Novartis, as defined by the OIG. [**Exhibit 5** – OIG Adv. Op. No. 10-07, at pg. 3 ("The term 'affiliate' of any Donor includes, without limitation, any employee, agent, officer, shareholder, or contractor (including, without limitation, any wholesaler, distributor, or pharmacy benefits manager) of a Donor.")].

216.    TAF agreed to act as a conduit to pay kickbacks, in the form of copay assistance, to Part D patients taking Gilenya. In doing so, TAF aided Novartis in circumventing Congressional drug price controls (i.e., doctor and patient price sensitivity), and steered patients and physicians into the TAF fund allowing Novartis to knowingly waive copay obligations for only those patients prescribed Novartis's drugs.

217.    ESI agreed to funnel patients from Novartis's free drug program to the TAF fund, thereby increasing Gilenya revenue. Novartis paid bribes to ESI to provide such services and facilitate the transfer of patients from Novartis's free drug program to TAF.

218. Upon information and belief, ESI agreed to provide Medicare-eligible patients free services in assisting those patients in applying for Medicare coverage, and appealing any related denials. Novartis paid ESI bribes for providing such services to maximize Medicare coverage for Novartis's drugs.

219. Pursuant to its agreement with Novartis, ESI directly assisted patients applying to the TAF fund and coordinated with TAF and Novartis to ensure that most, if not all, of Novartis's donations would be provided exclusively for patients with Gilenya prescriptions instead of other competing drugs.

220. For instance, in October 2012, ESI, which then was managing Novartis' free drug program for Gilenya, informed Novartis that Novartis was providing free Gilenya to 364 patients who would become eligible for Medicare the following year.

221. Novartis and ESI transitioned these patients to Medicare Part D so that, in the future, Novartis would obtain revenue from Medicare Part D when the patients *filled* (i.e., the *dispensing* stage) their prescriptions for Gilenya.

222. Knowing that these patients could not afford co-pays for Gilenya, Novartis and ESI developed a plan to cover patient co-pays through TAF.

223. Though Novartis was not the exclusive donor to the TAF's MS fund, TAF's practice of not maintaining wait lists and coordinating with Novartis ensured Novartis's donations would exclusively cover patients with Gilenya prescriptions.

224. During the relevant period, TAF's MS fund frequently ran out of

funding and was closed to new patients. If any new patients applied for co-pay assistance at that time, TAF did not maintain a waitlist of such patients. Consequently, whenever TAF's MS fund received a payment and opened to new patients, the fund provided grants to patients who applied immediately after the opening and did not provide grants to patients who had sought to apply earlier, but at a time when the fund was closed.

225.   Unlike other foundations, TAF was willing to accept batch applications from ESI, facilitating the mass enrollment of Gilenya patients whenever Novartis made a payment to TAF.

226.   For example, on Friday, December 14, 2012, at the same time Novartis made a payment (i.e., grant or donation) to TAF, Novartis arranged for TAF to open its MS fund at 6:00 p.m. and for ESI to have personnel working overtime that night and the following morning, submitting applications to TAF on behalf of patients who previously had been receiving free Gilenya from Novartis.

227.   Novartis, TAF, and ESI knew that timing the opening of TAF's MS fund and the readiness of ESI to submit applications on behalf of Gilenya patients would result in Gilenya patients receiving a disproportionate share, if not all, of Novartis' donations from the fund while it was open.

228.   After the fund closed on Saturday, December 15, 2012, Novartis and ESI confirmed that, during the brief period the fund had been open, TAF used

Novartis's money to cover copays for 374 Gilenya patients with grants for Part D co-pay assistance in 2013. Hence, TAF's practice of not maintaining wait lists enabled TAF to coordinate with Novartis and ESI to ensure that TAF used Novartis's money entirely or primarily to cover the co-pays for patients with Gilenya prescriptions.

229.    Novartis continued making payments to TAF, and TAF provided many of these same Gilenya patients with grants for Part D co-pay assistance in 2014. Novartis, TAF, and ESI continued employing this same strategy for new and existing patients taking Gilenya.

230.    Meanwhile, Novartis periodically raised the price of Gilenya and paid TAF to eliminate the bite of those increases on patients and physicians, but not Part D Sponsors.

231.    As a result, Novartis, ESI, and TAF engaged in numerous unlawful acts or practices, including, but not limited to:

    a.  Novartis improperly "collud[ed] with [TAF] to ensure that the [Novartis'] contributions only or primarily benefit patients using its drug." [*See* **Exhibit 8**];

    b.  Novartis, ESI, and TAF improperly "correlate[d] the amount [and] frequency of its donations with the number of aid recipients who use [Gilenya] or the volume of [Gilenya] supported by the PAP." [*See* **Exhibit 9**];

    c.  Novartis, ESI, and TAF improperly "steer[ed] beneficiaries to [Gilenya]; increasing costs to Medicare [including Part D Sponsors]; provid[ed] a financial advantage over competing drugs; and reduc[ed] beneficiaries' incentives to locate and

use less expensive, equally effective drugs." [*See* **Exhibit 8**]; and

d. Novartis' copay "subsidies [were] squarely prohibited…because [Novartis] [gave] something of value (i.e., the subsidies) to beneficiaries to use its product. *Id*.

232. During this time (from 2010 to 2014), and as a result of this Scheme, Assignors paid more than $5.1 million in inflated and, upon information and belief, fraudulently-generated claims of Gileyna. Of that, Assignors paid more than $2.7 million directly to ESI, after ESI submitted claims along with certifications directly to Assignors.

233. Several state laws prohibit similar conduct involving any health insurance transaction, namely (1) Conn. Gen. Stat. §§ 53a-161c and 53a-161d; (2) Fla. Stat. §§ 456.054 and 817.505; (3) 740 Ill. Comp. Stat. 92/5; (4) Mass. Gen. Laws ch. 175H, § 3; (5) Ohio Rev. Code Ann. § 3999.22.

234. Defendants' conduct undertaken in furtherance of the Gilenya Scheme also violated several state consumer protection laws, namely, (1) Conn. Gen. Stat. §§ 42-110a ; (2) Fla. Stat. § 501.201; (3) 815 Ill. Comp. Stat. 505/1; (4) Mass. Gen. Laws Ch. 93A; (5) N.Y. Gen. Bus. Law § 349; (6) Ohio Rev. Code Ann. § 4165; (7) 73 Pa. Cons. Stat. § 201-1; (8) Wash. Rev. Code § 19.86.919; (9) Wis. Stat. § 100.18.

### *The Copayment Schemes for Afinitor*

235. Like TAF, NORD also certified and promised to abide by the requirements outlined in the OIG's Advisory Bulletins. In reliance on this, the OIG

authorized NORD to operate copayment assistance for Medicare beneficiaries.

236.   NORD then engaged in the precise conduct it promised the OIG it would not engage in.

237.   For instance, in the 2010 donation year, Novartis learned that no other manufacturer of RCC medications would be contributing to a pre-existing NORD RCC copay assistance fund.

238.   Novartis knew that Afinitor was approved solely for use as a second-line RCC treatment, and only after certain first-line products failed.

239.   Novartis also knew, therefore, that any co-pay assistance given to patients for initial or first-line RCC treatments would not be used to provide co-pay assistance to patients on Afinitor.

240.   Novartis informed NORD that it would be willing to donate to its RCC fund if NORD narrowed the fund's eligibility definition so as not to cover initial or first-line treatments.

241.   Novartis wanted the definition narrowed to ensure that its donations would be used entirely or primarily to subsidize Afinitor co-pays, as opposed to treatments.

242.   NORD agreed with Novartis and subsequently created a new fund entitled "Advanced Renal Cell Carcinoma Second Line Co-Payment Assistance Program."

243.   As intended, the new RCC fund was narrowly defined to exclude any patients seeking assistance with initial or first-line RCC treatments and disproportionately funded patients taking Afinitor compared to its overall usage rate among all RCC drugs.

244.   As a result, Novartis and NORD engaged in numerous unlawful acts or practices including, but not limited to:

a. Novartis and NORD "manipulated…. eligibility criteria [i.e., narrowing the fund to second-line RCC treatment] to maximize the number of [Afinitor] beneficiaries qualifying for cost-sharing subsidies." [*See* **Exhibit 8**];

b. Novartis "collud[ed] with [NORD] to ensure that the [Novartis'] contributions only or primarily benefit patients using its drug." [*See id.*];

c. Novartis continued financing NORD's narrowly defined fund, despite the OIG asserting that a "co-payment charity will not define its disease funds by reference to… stages of a particular disease, type of drug treatment, or any other way of narrowing the definition of widely recognized disease states."; [*See* **Exhibit 9**] and

d. Novartis and NORD "steer[ed] beneficiaries to [Afinitor]; increasing costs to Medicare [including Part D Sponsors]; provid[ed] a financial advantage over competing drugs; and reduc[ed] beneficiaries' incentives to locate and use less expensive, equally effective drugs." [*See* **Exhibit 8**].

245.   Like TAF and NORD, CDF also certified and promised to abide by the requirements outlined in the OIG's Advisory Bulletins. In reliance on this, the OIG authorized CDF to operate copayment assistance for Medicare beneficiaries.

246.   CDF then engaged in precisely the same conduct it promised the OIG

it would not engage in.

247.   For instance, in 2012, after Afinitor was approved to treat progressive neuroendocrine tumors of pancreatic origin ("PNET"), Novartis asked CDF to open a co-pay assistance fund to pay Afinitor co-pays for PNET patients.

248.   At that time, Novartis knew that the FDA had approved a competing drug to treat PNET.

249.   At Novartis' request, CDF launched a fund labeled "PNET" that paid the co-pays of Afinitor patients alone and not those of patients seeking assistance for the other PNET drug.

250.   Novartis and CDF continued with this understanding, and Novartis remained the sole donor to CDF's "PNET" fund.

251.   As a result, Novartis and CDF engaged in numerous unlawful acts or practices, including, but not limited to:

    a.   Novartis "collud[ed] with [CDF] to ensure that the [Novartis'] contributions only or primarily benefit patients using its drug." [*See* **Exhibit 8**];

    b.   Novartis and CDF improperly "steer[ed] beneficiaries to [Gilenya]; increasing costs to Medicare [including Part D Sponsors]; provid[ed] a financial advantage over competing drugs; and reduc[ed] beneficiaries' incentives to locate and use less expensive, equally effective drugs." [*See id*.].

252.   Upon information and belief, Novartis directed many of its requests and communications to CDF's Executive Agents, Clorinda Walley and Michael Banigan.

253.   In two separate ongoing cases involving nearly identical schemes, the DOJ discovered that Ms. Walley regularly communicated (often via email) with executives at Regeneron Pharmaceuticals, Inc., and Teva Pharmaceuticals, Inc. Mr. Banigan was also implicated in the Teva case.

254.   These communications suggest Ms. Walley to be the primary point of contact at CDF, where Ms. Walley routinely colluded with drug manufacturers to orchestrate copayment schemes using CDF as a conduit to funnel kickbacks to patients, and coordinate funding to ensure most, if not all, of the manufacturers' donations would be used exclusively for its own drug. Indeed, Ms. Walley (and CDF) informed its donors that CDF would not provide copayment assistance for a particular drug, until and unless, the drug manufacturers agreed to provide sufficient funds to cover to copayment requirements for beneficiaries taking that manufacturer's drug.

255.   During this time (from 2010 to 2014), and as a result of these Schemes, Assignors paid more than $6.8 million in inflated and, upon information and belief, fraudulently-generated claims of Afinitor.

256.   Several state laws prohibit similar conduct involving any health insurance transaction, namely (1) Conn. Gen. Stat. §§ 53a-161c and 53a-161d; (2) Fla. Stat. §§ 456.054 and 817.505; (3) 740 Ill. Comp. Stat. 92/5; (4) Mass. Gen. Laws ch. 175H, § 3; (5) Ohio Rev. Code Ann. § 3999.22.

257.   Defendants' conduct undertaken in furtherance of the Schemes also violated several state consumer protection laws, namely, (1) Conn. Gen. Stat. §§ 42-110a ; (2) Fla. Stat. § 501.201; (3) 815 Ill. Comp. Stat. 505/1; (4) Mass. Gen. Laws Ch. 93A; (5) N.Y. Gen. Bus. Law § 349; (6) Ohio Rev. Code Ann. § 4165; (7) 73 Pa. Cons. Stat. § 201-1; (8) Wash. Rev. Code § 19.86.919; (9) Wis. Stat. § 100.18.

### *CMS Data Substantiates the Existence and Effects of the Copayment Schemes*

258.   As displayed below, the price and quantity dispensed for the Novartis Drugs increased substantially in a brief period. Such increases would not have been possible but for the Copayment Schemes.

### *Medicare Part D Spending: Gilenya*

259.   According to CMS data, in 2012 the average spending per beneficiary was approximately $39,000.00. By 2016, that figure jumped to approximately $61,000.00—**a 56% increase**.

260.   In 2012, there were approximately 29,000 total claims paid, and approximately 58,000 total claims paid in 2016—**a 100% increase**.

261.   In 2012, the total spending for Gilenya was approximately $144,000,000.00, and approximately $430,000,000.00 in 2016—**a 198% increase**.

### *Medicare Part D Spending: Afinitor*

262.   According to CMS data, in 2012 the average spending per beneficiary was approximately $28,700.00. By 2016, that figure jumped to approximately

$58,300.00—**a 103% increase**.

263.   In 2012, there were approximately 15,500 total claims paid, and approximately 29,000 total claims paid in 2016—**an 87% increase**.

264.   In 2012, the total spending for Gilenya was approximately $124,000,000.00, and approximately $347,000,000.00 in 2016—**a 180% increase**.

## C. DEFENDANTS' MISREPRESENTATIONS AND FALSE CERTIFICATIONS

### *The Charity Defendants' False Certifications*

265.   When a requestor—such as the Charity Defendants—seek a favorable advisory opinion form the OIG, they must certify that the information provided to the OIG is "true and correct" and "a complete description of the relevant facts and agreements among the parties." In awarding a favorable advisory opinion, the OIG explicitly "reli[es] on the facts and information presented."

266.   Here, each of the Charity Defendants sought and received favorable advisory opinions as a result of falsely certifying compliance and/or deliberately concealing the true nature of their relationships with pharmaceutical manufacturers, like Novartis.

267.   *First*, in 2006, CDF sought an Advisory Opinion from the OIG. [**Exhibit 11** – 2006 CDF OIG Adv. Op.]. To do so, CDF used the wire or mail to request OIG approval for their arrangements with drug manufacturers, like Novartis. CDF certified that it provided a "complete and specific description of all relevant

information bearing on the arrangement . . . and on the circumstances of the conduct," including complete copies of documents "sufficient to permit the OIG to render an informed opinion." 42 C.F.R. §1008.36. CDF certified "all of the information provided is true and correct and constitutes a complete description of the facts[.]" 42 C.F.R. §1008.38.

268. On October 26, 2015, the OIG issued its modification of the 2006 CDF Advisory Opinion. The Modification of the CDF Advisory Opinion noted that the OIG: "asked [CDF] to certify, and [CDF] did certify, that it determines eligibility according to a reasonable, verifiable, and uniform measure of financial need that is applied for in a consistent manner." [**Exhibit 10** – CDF Modified OIG Adv. Op.]

269. However, the conduct alleged herein, in addition to numerous DOJ settlements, demonstrates the CDF falsely certified and/or concealed material facts from the OIG, and public at large, related to CDF's unlawful relationships with pharmaceutical manufacturers, including Novartis.

270. *Second*, in June 2010, TAF sought and received an advisory opinion from the OIG. To do so, TAF used the wire or mail to request OIG approval for their arrangements with drug manufacturers, like Novartis. TAF certified that it provided a "complete and specific description of all relevant information bearing on the arrangement . . . and on the circumstances of the conduct," including complete copies of documents "sufficient to permit the OIG to render an informed opinion." 42

C.F.R. §1008.36. TAF certified "all of the information provided is true and correct and constitutes a complete description of the facts[.]" 42 C.F.R. §1008.38.

271.  In May 2011, TAF sought and received another favorable advisory opinion based on the same procedures and representations of fact discussed above. [**Exhibit 6**].

272.  On May 5, 2016, the OIG issued its modification of the 2010 and 2011 TAF Advisory Opinions. The Modification of the TAF Advisory Opinions noted that the OIG: "asked [TAF] to certify, and [TAF] did certify, that it determines eligibility according to a reasonable, verifiable, and uniform measure of financial need that is applied for in a consistent manner." [**Exhibit 7**].

273.  However, the conduct alleged herein, in addition to numerous DOJ settlements, demonstrates that TAF falsely certified and/or concealed material facts from the OIG, and public at large, related to TAF's unlawful relationships with pharmaceutical manufacturers, including Novartis.

274.  *Third*, although Plaintiffs do not currently have access to the Advisory Opinions provided by the OIG to NORD, in order for NORD to operate as a patient assistance fund for Medicare beneficiaries, NORD was required, and did, use the mail and wires to certify and promises that it would comply with the requirements outlined in the OIG's Advisory Bulletins.

275.  Based on the certifications and promises provided by NORD to the

OIG, the OIG permitted NORD to operate its copayment assistance funds for Medicare beneficiaries.

276.   However, the conduct alleged herein demonstrates that NORD falsely certified and/or concealed material facts from the OIG, and public at large, related to NORD's unlawful relationships with pharmaceutical manufacturers, including Novartis

### *Novartis' and ESI's False Certifications*

277.   Novartis, ESI and every physician who prescribed any Novartis Drug entered into Medicare Provider and/or Supplier agreements with the HHS in order to participate in the Medicare Program.

278.   Each of these entities and individuals explicitly acknowledged they knew and understood the rules and regulations governing the Medicare Program, certified compliance with those rules and regulations, and promised to not engage in conduct prohibited by the rules and regulations governing the Medicare Program. *See* 18 U.S.C. §§ 1341, 1343 (RICO liability attaches to "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." (emphasis added)).

279.   Novartis and ESI knew that self-certification and ongoing compliance were preconditions for eligibility to receive payment for any services or items to provided—directly or indirectly—to Part D beneficiaries.

280. As an additional eligibility requirement to participate in the Part D program, Novartis and ESI entered contractual relationships with CMS—a branch of HHS responsible for overseeing the Medicare Program—agreeing to comply with all Medicare Program rules, including the AKS, and the applicable rules and regulations set by HHS (including those rules provided in the OIG's SABs). Without this contract, none of Novartis' Drugs would have been eligible for payment under Medicare Part D. Such an agreement placed Novartis in a position of trust with HHS and Medicare participants, including Medicare Payors (such as Assignors).

281. Novartis and ESI were required to, and did, "attest[] that the information submitted is accurate and that the provider or supplier is aware of, and abides by, all applicable statutes, regulations, and program instructions." 42 C.F.R. § 424.510(d)(3).

282. Novartis and ESI were required to, and did, certify that they "understand that payment of a claim by Medicare is condition upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal Anti-Kickback Statute, 42 U.S.C. section 1320a-7b(b) (section 1128B(b) of the Social Security Act) and the Physician Self-Referral Law (Stark Law), 42 U.S.C. section 1395nn (section 1877

of the Social Security Act)).”[17]

283.   For Novartis, “in order for coverage to be available under Medicare Part D for applicable drugs of a manufacturer, the manufacturer must,” among other things, enter “into and have in effect an agreement described in § 423.2315(b).” 42 C.F.R. § 423.2310(a). This manufacturer agreement requires that “[e]ach manufacturer . . . must comply with the requirements imposed by CMS . . . for purposes of administering the program.” 42 C.F.R. § 423.2315. These agreements are renewed annually, on January first each year for a period of 1 year thereafter. *Id*.

284.   Every time ESI submitted PDE claims data (i.e., when ESI dispensed Gilenya), ESI was required to, and did, certify that such data is “true, accurate, and complete” and that the PDE is the basis for obtaining payment from federal healthcare programs for the products or services reflected therein. 42. C.F.R. § 423.505(k).

285. However, the conduct alleged herein, in addition to the DOJ settlements, demonstrates that Novartis and ESI falsely certified and/or concealed material facts material to the Medicare Part D eligibility for Novartis’ Drugs.

### D. DEFENDANTS’ SCHEME IMPLICATED RELATIONS OF SPECIAL TRUST

---

[17] Medicare Enrollment Application, CMS Form 855I, Available at: https://www.cms.gov/Medicare/CMS-Forms/CMS-Forms/Downloads/cms855i.pdf. *See also* https://www.cms.gov/Medicare/Provider-Enrollment-and-Certification/Enrollment-Applications.

286.   The Medicare Program is a "social insurance program" administered by the Department of Health and Human Services ("HHS") (including through the OIG, and CMS). *See In re Tri Cnty. Home Health Servs., Inc.,* 230 B.R. 106, 114 (Bankr. W.D. Tenn. 1999).

287.   These government agencies are "charged with protecting the interests of Medicare beneficiaries and with the effective management of the public funds entrusted to the Medicare program." *Id*. at 113; *see also Neurological Associates-H Hooshmand v. Bowen*, 658 F. Supp. 468, 473 (S.D. Fla. 1987) (HHS "has a critical interest in maintaining the integrity of the Medicare program for the benefit of all, including the taxpaying public.").

288.   "The Government has a legitimate and significant interest in prohibiting financial fraud or acts of bribery being perpetrated upon Medicare providers. Fraudulent acts threaten the program's integrity." *Fischer v. United States,* 529 U.S. 667, 681 (2000).

289.   "Protection of the public fisc requires that those who seek public funds act with scrupulous regard for the requirements of law[.]" *Heckler v. Cmty. Health Servs. of Crawford Cnty., Inc*., 467 U.S. 51, 63 (1984).

290.   Those that are approved by HHS (including by CMS and the OIG) to participate in the Medicare Program, such as Defendants, have "a duty to familiarize [themselves] with the legal requirements for cost reimbursement." *Id*.

291.   As stated above, in order to participate in the Medicare Program and facilitate copay assistance to Medicare beneficiaries, the Charity Defendants sought Advisory Opinions from the OIG.

292.   The Charity Defendants repeatedly certified to the OIG that they knew and understood the rules and regulations applicable to the legitimate operation of a copay assistance charity, and certified that they were, and would continue to, abide by such rules and regulations.

293.   Based on these certifications and false promises, the OIG issued Advisory Opinions permitting the Charity Defendants to participate in the Medicare Program and operate copay assistance charities.

294.   Through grant of its Advisory Opinions, the OIG required the Charity Defendants to self-certify ongoing compliance with OIG regulations governing copay assistance programs. *See, e.g., U.S. ex rel. Strunck v. Mallinckrodt Ard LLC,* 2020 WL 362717, at *5 (E.D. Pa. Jan. 22, 2020) ("CDF received a favorable advisory opinion from HHS OIG. The advisory opinion relied on CDF to self-certify compliance with certain safeguards.")

295.   Through grant of its Advisory Opinions, the OIG placed the Charity Defendants in positions of trust with respect to HHS and Medicare payors. *See, e.g., United States v. Boyle*, 10 F.3d 485, 489 (7th Cir. 1993) (in determining whether a defendant occupies a "position of trust", a court must look "to the actual nature of

the relationship and the responsibility the defendant is given").

296. Through grant of its Advisory Opinions, the OIG vested a significant degree of authority and trust in the Charity Defendants.

297. the Charity Defendants violated their positions of trust by engaging in the precise conduct that it promised to refrain from, and instead serving as a conduit for Novartis over the course of several years.

298. Courts routinely find entities and individuals that are trusted to self-certify continued compliance with Medicare rules and regulations abuse their positions of trust when they fail to do so, particularly when noncompliance is difficult to detect.[18]

299. This position of trust is found to exist particularly when the defendant is trusted to self-certify and self-regulate its conduct in compliance with public-

---

[18] *See, e.g., U.S. v. Glymph*, 96 F.3d 772 (1996) (Medicare participants occupy a position of trust with government payors); *United States v. Valez*, 168 F.3d 1137, 1139 (9th Cir. 1999); *U.S. v. Nathan*, 188 F.3d 190, 207 (3d Cir. 1999) (same); *United States v. Miller*, 607 F.3d 144, 150 (5th Cir. 2010) (same); *United States v. Liss*, 265 F.3d 1220, 1229–30 (11th Cir. 2001) (same); *United States v. Sherman*, 160 F.3d 967, 968–71 (3d Cir. 1998) (same); *United States v. Conner*, 262 F. App'x 515, 518 (4th Cir. 2008) (same); *United States v. Erhart*, 415 F.3d 965, 972-73 (8th Cir. 2005) (same); *United States v. Hodge*, 259 F.3d 549, 556 (6th Cir. 2001) (same); *United States v. Hoogenboom*, 209 F.3d 665, 666, 671 (7th Cir. 2000) (same); *United States v. Gieger*, 190 F.3d 661, 663, 665 (5th Cir. 1999) (same); *United States v. Iloani*, 143 F.3d 921, 922-23 (5th Cir. 1998) (same); *United States v. Bolden*, 325 F.3d 471, 504-05 (4th Cir. 2003) (same); *United States v. Ntshona*, 156 F.3d 318, 321 (2d Cir. 1998) (same); *United States v. Hoogenboom*, 209 F.3d 665, 671 (7th Cir. 2000) (same); *United States v. Rutgard*, 116 F.3d 1270, 1293 (9th Cir. 1997) (same); *United States v. Garcia*, 211 F.3d 128 (11th Cir. 2000) (same); *United States v. Goldman*, 607 F. App'x 171, 176 (3d Cir. 2015) (same); *United States v. Advantage Med. Transp. Inc*, 698 F. App'x 680, 690 (3d Cir. 2017), as amended (Aug. 16, 2017) (same); *United States v. Gieger*, 190 F.3d 661, 665 (5th Cir. 1999) (same); *United States v. Read*, 710 F.3d 219, 228 (5th Cir. 2012) (same); *United States v. Valdez*, 726 F.3d 684, 687-89, 694 (5th Cir. 2013) (same); *United States v. Fairley*, 880 F.3d 198, 217 (5th Cir. 2018) (same); *United States v. Adebimpe*, 819 F.3d 1212, 1219 (9th Cir. 2016) (same)

welfare legislation, such as Medicare.[19]

300.  By nature of its relationship with the OIG, the Charity Defendants occupied a position of trust, and owed a duty of fidelity, to the OIG and Medicare payors.

301.  This position of trust is evident from the fact that the Charity Defendants were required to self-certify and self-regulate its participation in the Medicare Program.

302.  This position of trust is further evident from the fact that the Charity Defendants noncompliance with the applicable rules and regulations was difficult to detect and remained undetected over the course of several years.

303.  The fact that Novartis' use of the Charity Defendants as its conduits went undetected for several years supports a finding that the Charity Defendants occupied positions of special trust with Medicare payors. *See, e.g., United States v. Babaria*, 775 F.3d 593, 597 (3d Cir. 2014).

304.  Novartis' bribes to the Charity Defendants to engage in conduct expressly prohibited by the OIG, and applicable rules and regulations (including the

---

[19] *See United States v. Snook*, 366 F.3d 439, 446 (7th Cir. 2004) (defendant found to occupy a position of trust in the context of the Clean Water Act); *United States v. Gonzalez–Alvarez*, 277 F.3d 73, 81–82 (1st Cir. 2002) (similar); *United States v. White*, 270 F.3d 356, 372–73 (6th Cir. 2001) (similar); *United States v. Turner*, 102 F.3d 1350, 1360 (4th Cir. 1996) (similar); *United States v. Nathan*, 188 F.3d 190, 205–08 (3d Cir. 1999) (similar); *United States v. Glymph*, 96 F.3d 722, 727–28 (4th Cir. 1996) (similar); *United States v. Velez*, 185 F.3d 1048, 1050–51 (9th Cir. 1999) (similar); *United States v. Walker*, 490 F.3d 1282, 1300–01 (11th Cir. 2007) (similar); *United States v. Harness*, 180 F.3d 1232, 1236–37 (11th Cir. 1999) (similar); *United States v. Turner*, 102 F.3d 1350, 1360 (4th Cir. 1996) (similar).

AKS), implicated their positions of trust with the OIG and Medicare payors.

305.   The Charity Defendants' acceptance of these payments to disregard their duty of fidelity to the OIG and Medicare payors, threatened the "integrity and proper operation of the federal program[.]" *Salinas v. United States,* 522 U.S. 52, 61 (1997).

306.   Further, Novartis' bribes to the Charity Defendants corrupted the relationship of trust that existed between the Charity Defendants' lawful donors. A donor-donee relationship is a relationship of trust. *See, e.g., United States v. Bennett,* 161 F.3d 171, 196 (3d Cir. 1998) (executive of a charity occupies a fiduciary relationship with respect to its donors).

307.   Donors contribute to a non-profit based on the explicit promise that the non-profit operates lawfully and in furtherance of a charitable goal. Novartis' bribes influenced the Charity Defendants to betray the trust that its legitimate donors had placed in it.

308.   In addition, Novartis funneled remuneration through the Charity Defendants to induce patients to seek dispensing of and for physicians to recommend Medicare-subsidized purchases for the Novartis Drugs. Courts have found such allegations sufficient to allege an interference with the positions of trust that exist been providers and beneficiaries. *See, e.g., United States v. Regeneron Pharms., Inc.,* 2023 WL 6296393, at *7 (D. Mass. Sept. 27, 2023); *United States v. Regeneron*

*Pharms., Inc.,* 2020 WL 7130004, at *2 (D. Mass. Dec. 4, 2020) ("The complaint alleges that the promise, or implicit guarantee, of copay assistance from CDF significantly altered the decision-making of patients and physicians.").

309.   In other words, a scheme allowing for the routine waiver of copayments for beneficiaries prescribed a certain drug induces both patients and physicians to seek Medicare-funded dispensing of that drug; thus, a drug manufacturer, like Novartis, that guarantees copayment waiver for beneficiaries taking its product, engages in acts of bribery with the intent to implicate special trust relationships.[20]

310.   Additionally, pharmacies that participate in the Medicare Program occupy a position of trust with HHS and Medicare Payors, including Assignors.

311.   Novartis' bribes to ESI to knowingly arrange for the indirect receipt of copay waivers through TAF violates ESI's position of trust with HHS and Medicare Payors.

312.   The relationship of trust between ESI and Assignors is further evidenced by the fact that Medicare requires ESI to submit claims to Assignors that are accompanied by certifications regarding the underlying conduct of those claims.

---

[20] *See, e.g., Regeneron Pharms., Inc.*, 2020 WL 7130004, at *10 ("[T]he promise of copay waivers through CDF also provided remuneration to the physicians . . . by saving physicians' time that might be spent on explaining copays and assessing patients' financial hardship, removing the financial risk to physicians if they prescribed a drug that patients could not pay them back for, appeasing staff and patients, and generating increased business due to satisfied patients.") (citing cases); *United States ex rel. Strunck v. Mallinckrodt Ard LLC*, 2020 WL 362717, at *4 (E.D. Pa. Jan. 22, 2020) ("Because of the funds it established at CDF, Mallinckrodt was able to market Acthar as free to doctors and patients, regardless of its actual, exorbitant price.").

313. Novartis' bribes to ESI to arrange for beneficiaries to receive indirect subsidies through Novartis' conduit, TAF, and then submit claims and false certifications for those beneficiaries, unduly implicated ESI's trust relationship with HHS and Medicare Payors.

314. Accordingly, Novartis' bribes to the Charity Defendants were made with the intent to implicate the Charity Defendants' duty of fidelity and position of trust with HHS and Medicare Payors, including Assignors.

315. Novartis' bribes to ESI were made with the intent to implicate ESI's duty of fidelity and positions of trust with HHS and Medicare Payors, including Assignors.

316. Novartis' payment of bribes to the Charity Defendants to guarantee copayment waivers for all beneficiaries seeking to fill prescriptions of Novartis' Drugs, also interfered with the position of trust occupied by Medicare providers, such as the prescribing physicians.

### E. THE HARMFUL IMPACT ON ASSIGNORS AND THE CLASS MEMBERS

317. Between 2011 and 2022, Assignors have paid more than $13,000,000.00 for Gilenya.

318. Between 2010 and 2021, Assignors have paid more than $14,000,000.00 for Afinitor.

319.   As a result of Defendants' conduct, and upon information and belief, Assignors paid for tainted Gilenya and Afinitor claims that otherwise would *not* have been paid, let alone at inflated prices.

320.   As discussed herein, federal law strictly prohibits Part D Sponsors from paying for claims tainted by violations of federal law. Thus, all Gilenya and Afinitor claims exposed to Novartis' illegal remuneration (i.e., kickbacks covering patient copays) were therefore tainted, and unpayable.

321.   All claims exposed to Novartis' illegal remuneration through Novartis' conduits, the Charity Defendants, ran afoul of federal law and state laws for numerous reasons, including:

a.   Novartis indirectly provided patients with something of value (i.e., copay subsidies), which is squarely prohibited, as the copay subsidies were provided to patients to use Novartis' Drugs;

b.   Novartis' copay assistance eliminated price sensitivity for the Novartis Drugs, with the intent to induce patients and physicians to utilize Novartis' Drugs;

c.   Novartis colluded with the Charity Defendants to ensure that Novartis' contributions exclusively or primarily covered Novartis' Drugs;

d.   Novartis solicited, and the Charity Defendants provided, data that facilitated Novartis and ESI in correlating the amount and frequency of its donations with the number of subsidized prescriptions for its products;

e.   The Charity Defendants acted as conduits for Novartis and falsely certified compliance with the OIG, and misrepresented their status as independent Charities on their websites and tax filings;

f. Novartis certified compliance with federal law and CMS regulations as a condition for Gilenya and Afinitor to eligible for payment by federal healthcare programs, despite Novartis knowing that its participations in the Copayment Schemes rendered those certifications false;

g. ESI also certified compliance with federal law and CMS regulations despite knowing its arraignment with Novartis and TAF rendered those certifications false; and

h. As intended, the Copayment Schemes resulted in payments for tainted claims, at inflated prices, and increased the total number of prescriptions dispensed that otherwise would not have occurred but-for the Copayment Scheme.

322. The allegations above, and those stated throughout the Complaint, resulted in economic damages to the Assignors and Class Members.

## V.    CLASS ACTION ALLEGATIONS

323. At all material times, the Novartis Drugs were shipped across state lines and sold to customers located both within and outside its state of manufacture.

324. During the relevant period, in connection with the purchase and sale of the Novartis Drugs, monies as well as contracts, bills, and other forms of business communication and transactions, were transmitted in continuous and uninterrupted flow across state lines.

325. During the relevant period, various methods of communication were used to carry out the illegal acts alleged here, including the United States mail, interstate, and foreign travel, interstate and foreign telephone commerce, and interstate wire facilities. The activities of Defendants, as alleged in this Complaint, were within the flow of, and have substantially affected, interstate commerce.

326.   Plaintiffs bring this action on behalf of themselves and the following

Class Members:

Federal RICO / State RICO / State Consumer Protection Statute Class
1:

All Medicare Advantage Organizations, Medicaid Managed Care
Organizations, and at-risk, first-tier, and downstream entities in the
United States and its territories that from at least 2010, through present,
pursuant to Medicare and/or Medicaid contracts offering Medicare and
Medicaid benefits, provided services, purchased the Novartis Drugs,
provided payment relating to, or possess the recovery rights for some
or all of the purchase price of the Novartis Drugs resulting from illegal
co-payment assistance.  This class excludes: (a) Defendants, their
officers, directors, management, employees, subsidiaries, and affiliates;
(b) the federal government; and (c) any judges or justices involved in
this action and any members of their immediate families.

Federal RICO / State RICO / State Consumer Protection Statute Class
2:

All self-funded, insurers and related entities in the United States and its
territories that from at least 2010, through present, provided services,
purchased the subject pharmaceuticals, provided payment relating to,
or possess the recovery rights for some or all of the purchase price of
the Novartis Drugs resulting from illegal co-payment assistance. This
class excludes: (a) Defendants, their officers, directors, management,
employees, subsidiaries, and affiliates; (b) the federal government; and
(c) any judges or justices involved in this action and any members of
their immediate families.

327.   Plaintiffs bring this action under Federal Rule of Civil Procedure 23

both individually and on behalf of a national damages class.

328.   As discussed in this Complaint, Defendants' Scheme resulted in

inflated prices for, and increased quantities of, the Novartis Drugs, the costs of which

were borne by the Assignors and Class Members. The damages suffered by the Assignors apply to all individual Class Members (and Plaintiffs as the rightful assignees of those organizations rights of recovery). Class action law has long recognized that, when companies engage in conduct that has uniformly harmed many claimants such as Assignors, and other Medicare and Medicaid insurers, class resolution is an effective tool to redress the harm.

329.    Assignors and Class Members have been deprived of money as a result of their obligation to pay for dispensed Novartis Drugs at artificially inflated quantities and prices, and, upon information and belief, because of Defendants' improper shifting of patients from Novartis' free drug program to the co-payment charity. But for the Scheme, Assignors and Class Members would have paid less for Novartis Drugs during the time in which the Scheme was in effect.

330.    The Class Members claims are properly brought and should be maintained as a nationwide class action under Rule 23(a), satisfying the class action prerequisites of numerosity, commonality, typicality, and adequacy:

> Numerosity: The Class Members are so numerous that joinder is impracticable. Plaintiffs believe the Class includes thousands of insurers that paid for hundreds of thousands, if not millions, of prescriptions. There are thousands of entities (including the organizations that assigned their rights to Plaintiffs) throughout the United States that sustained damages as a result of their payment for the Novartis Drugs caused by Defendants' Scheme. Thus, the numerosity element for class certification is met.

> Commonality: Defendants' misconduct was directed at all Class

Members. Questions of law or fact are common to all Class Members. Defendants' co-payment assistance conspiracy Scheme and racketeering activity carried out by their enterprise have a common, adverse effect on all Class Members. Thus, common questions of law or fact are prevalent throughout the class, such as whether Defendants engaged in a pattern of racketeering activity and conspired to induce Class Members' payment for the Novartis Drugs disbursements. Each Class Member shares the same needed remedy—namely payment for unlawfully paid bills and lost money or disgorgement of Defendants' profits as a result of Defendants' Co-Payment Scheme and racketeering activity that caused the Assignors and Class Members to pay inflated prices for tainted and artificially inflated quantities of the Novartis Drugs.

Typicality: Plaintiffs' claims are typical of the claims of the Class Members because their claims arise from the same course of conduct by Defendants, namely Defendants' formation of their Co-Payment Scheme and racketeering activity unlawfully causing Class Members to pay pharmacies for the over-dispensing of the Novartis Drugs at inflated prices and actual payment that would otherwise not have been made but for Defendants' conduct. Plaintiffs' claims are, therefore, typical of the Class Members.

Adequacy: Plaintiffs will fairly and adequately represent and protect the interests of the Class Members. Plaintiffs' interests in vindicating these claims are shared with all of the Class Members. Plaintiffs are represented by counsel who are experienced and competent in the prosecution of class action litigation and have particular experience with class action consumer protection and RICO litigation in the pharmaceutical industry.

331.   The Classes properly brought and should be maintained as a class action under Rule 23(b) because a class action is the superior method for resolving these claims. Under Rule 23(b)(3), common issues of law and fact predominate over any questions affecting only individual members of the Class. Defendants deliberately conspired to cause Assignors to pay for the Novartis Drugs through the formation of

their Co-Payment Scheme that subsequently resulted in the submission and payment of inflated prices for the Novartis Drugs by Assignors and the Class Members that otherwise would not have been paid.

332.   Upon information and belief, Assignors and Class Members paid for prescriptions of the Novartis Drugs that they otherwise would not have paid but for Defendants' Co-Payment Scheme and racketeering activity.

333.   Additional questions of law and fact common to some or all of the Class Members include:

> a.   Whether Defendants engaged in a bribery scheme and thereby violated the AKS, FCA, the applicable state bribery laws, the applicable OIG regulations, the Travel Act, and mail and wire fraud statutes;
>
> b.   The effect of such bribery scheme on the quantities dispensed and prices of the Novartis Drugs; and
>
> c.   The quantum of overcharges paid by the Assignors and Class Members in the aggregate.

334.   Class action treatment is a superior method for the fair and efficient adjudication of the controversy in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress on claims

that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

335.   Plaintiffs know of no difficulty to be encountered in this action that would preclude its maintenance as a class action.

## VI.        TOLLING OF THE STATUTE OF LIMITATIONS

### *Fraudulent Concealment Tolling*

336.   The claims asserted in this Complaint have been tolled as a matter of law as Defendants took affirmative steps to conceal the wrongful conduct alleged here including, *inter alia*, Novartis' use of the Charity Defendants as conduits and concealing such use under the guise of "donations" to an "independent" co-payment assistance charity.

337.   The claims asserted in this Complaint have been tolled as a matter of law as the Charity Defendants repeatedly and continuously took affirmative steps to conceal the wrongful conduct alleged herein by misleading the OIG, DOJ, health care providers, certain pharmacies, beneficiaries, insurers, and the general public, into believing it was operating a legitimate, legal, and independent 501(c)(3) charitable organization, when in reality, it was serving as an illegal conduit for Novartis.

### *Discovery Rule Tolling*

338.   Assignors did not know, and no reasonable way of discovering Defendants' Scheme until, *at earliest*, the DOJ publishing the relevant settlement

agreement, discussed herein. However, there remains a question of fact as to when Plaintiff's had sufficient knowledge as to the Co-payment Schemes.

339.   Within the applicable statutes of limitation, Assignors could not have discovered through the exercise of reasonable diligence that Defendants were engaged in and concealing the conduct alleged herein.

340.   Assignors did not discover, and did not know of, facts that would have caused a reasonable person to suspect that the Defendants were engaged in the alleged Schemes, nor would a reasonable diligent investigation have disclosed the facts.

### Continuing Violation Doctrine

341.   The Complaint alleges a continuing course of conduct, and Defendants' unlawful conduct has inflicted continuing and accumulating harm. Defendants' unlawful conduct and the accumulating harm to the Assignors did not end alongside the DOJ Settlement Agreements. Accordingly, Plaintiffs can recover for damages that they suffered during any applicable limitations period.

### Equitable Tolling

342.   Defendants were under a continuous duty to disclose to Assignors and Class Members the existence and true nature of the Co-Payment Scheme, including the subsequent obligations for payment triggered by Defendant's misconduct.

343.   The existence of Copayment Schemes was a material fact, and

Defendants concealed its existence and falsely represented that they were in compliance with federal regulations including the FCA, AKS, and OIG guidance. When Defendants made these misrepresentations and concealed their co-payment assistance conspiracy scheme, they had knowledge of the facts surrounding existence of the Copayment Schemes. Defendants concealed the Copayment Schemes and, upon information and belief, made misrepresentations about it with the intention that Assignors and Class Members would rely on said misrepresentations and would pay for the Novartis Drugs. Defendants' concealment induced Assignors and Class Members to reasonably rely and act upon these misrepresentations and were misled into paying for the Novartis Drugs. *See, Safe Env't of Am., Inc. v. Emps. Ins. of Wausau*, 278 F. Supp. 2d 121, 126–27 (D. Mass. 2003).

344. Based on the foregoing, Defendants are estopped from relying on any statutes of limitations in defense of this action and all equitable principles of tolling should apply.

## VII.   CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

### Violation of 18 U.S.C. § 1964(c) Through the Use of the Co-Payment Scheme
*Against All Defendants*

345. Plaintiffs re-allege and incorporate by reference paragraphs 1–343 of

this Complaint as if fully set forth herein.

346.   At all relevant times, Defendants were "persons" under 18 U.S.C. § 1961(3) who conducted the affairs of the enterprise through the pattern of racketeering activity detailed throughout this Complaint in violation of 18 U.S.C. § 1962(c).

347.   Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c).

348.   Section 1964(c) provides that "any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee." The elements of a RICO claim under § 1964(c) pursuant to a violation of § 1962(c) are: (i) conduct; (ii) of an enterprise; (iii) through a pattern of; (iv) racketeering activity.

### *Description of the Co-payment Schemes*

349.   RICO defines an enterprise as "any individual, partnership, corporation, association, or other legal entity, and any union group or individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).

350.   Under 18 U.S.C. § 1961(4), a RICO "enterprise" may be an association-in-fact that, although it has no formal structure, has (i) a common purpose, (ii) relationships among those associated with the enterprise, and (iii) longevity sufficient to pursue the enterprises' purpose.

351.   The Co-payment Schemes are an association-in-fact enterprise under 18 U.S.C. § 1961(4), consisting of (1) Novartis, TAF, and ESI, including their directors, officers, employees, and agents; and (2) Novartis, CDF, and NORD, including their directors, officers, employees, and agents.

352.   The Co-payment Schemes functioned as ongoing and continuing units. The Co-payment Schemes were created and used as tools to carry out a pattern of racketeering activity. Each of the Enterprise participants is a "person" distinct from the Co-payment Schemes.

353.   The Co-payment Schemes had a common purpose that united its members. One purpose was to defraud Medicare payors and steal funds from the Medicare Trust Fund by circumventing Medicare's cost-sharing obligations. Another purpose was to generate personal profits for Defendants' executives from unlawful bribes and kickbacks.

354.   Defendants' common purposes were, among other things, (1) growing the Charity Defendants' executive compensation; (2) eliminating price sensitivity for patients and health care providers; (3) misleading government agencies, insurers,

health care providers, and beneficiaries regarding the legitimacy of the Charity Defendants' operations and their conduct; (4) funneling patients away from Novartis' free drug program; (5) applying to Medicare and Medicaid programs on behalf of beneficiaries; and (6) violating OIG regulations and providing data to allow Novartis to conduct continuous ROI calculations, all of which, upon information and belief, resulted in the unlawful depletion of state and federal dollars, increased the number of patients who had their drugs purchased by Assignors and Class Members, and increased the personal gains received by Defendants' executives through the payment of AKS-tainted claims and drugs at supra-competitive prices.

355.   Upon information and belief, by funneling patients into Charity Defendants' co-payment assistance funds, the Co-Payment Schemes increased Novartis' number of covered "customers," thereby triggering the Assignors' and Class Members' coverage obligations for their Enrollees and eliminating price sensitivity to the Novartis Drugs.

356.   Each of the Defendants received substantial revenue from participating in the Co- Payment Schemes. Such revenue was exponentially greater than it would have been without such Enterprise.

357.   Each portion of the Enterprises benefitted as intended from the existence of the other parts.

358.   The Co-payment Schemes have a systemic linkage because there are

contractual relationships, financial ties, and continuing coordination of activities between the Defendants.

359.   There were interpersonal relationships between those associated with the Co- Payment Schemes. This includes relationships (1) among the Charity Defendants' officers and directors and relationships among Novartis' officers, directors, principals, and agents and ESI's officers, directors, principals and agents; and (2) relationships between Novartis, TAF, and ESI. This is evidenced by routine communications (through the U.S. Mail and Wire) between Novartis and the Charity Defendants to ensure that its "donations" were sufficient to drive increased profits. ESI would facilitate this process by sharing TAF data with Novartis to ensure that Novartis' "donations" achieved their proper purpose of paying co-pays for Gilenya, thereby increasing profits for Novartis and substantially depleting state and federal funds. Novartis and TAF knew and intended for ESI to facilitate this illegal sharing of information.

360.   The OIG explicitly warned the Charity Defendants not to send pharmaceutical manufacturers this information because doing so would violate the AKS and FCA, and the Charity Defendants certified their understanding and compliance with the OIG's warnings. But Defendants participated in this conduct anyway. Novartis, TAF, CDF, and NORD all entered into settlement agreements with the DOJ as a result of the conduct alleged herein and similar unlawful conduct

related to other copay assistance schemes.

361.    Novartis and the Charity Defendants were communicating—directly and, with regard to TAF, through ESI—information important to their Schemes through the mail and wires to profit illegally and that they had a relationship.

362.    The Gilenya Scheme had longevity sufficient to permit its associates to pursue the enterprise's purpose. Since at least 2010, Novartis made "donations" to TAF, a purportedly "independent" charity, and TAF continued to increase their executive compensation. As part of the distribution chain for the Novartis Drugs, ESI increased the number of prescriptions they could fill by ensuring Novartis had sufficient data from TAF to verify that TAF used Novartis' "donations" to pay the co-pays of Gilenya patients. Novartis further insulated the price sensitivity of Gilenya. Novartis' use of anticompetitive and illegal tactics increased the number of "customers" buying Gilenya, facilitating increased profits.

363.    The Afinitor Scheme had longevity sufficient to permit its associates to pursue the enterprise's purpose. Since at least 2010, Novartis made "donations" to NORD and/or CDF, purportedly "independent" charities, and NORD and CDF continued to increase their executive compensation. Novartis directly communicated with NORD and CDF to verify that NORD and CDF used Novartis' "donations" to pay the co-pays of Afinitor patients. Novartis further insulated the price sensitivity of Afinitor. Novartis' use of anticompetitive and illegal tactics increased the number

of "customers" buying Afinitor, facilitating increased profits.

364.   Novartis carried out its business activities both with and without the Charity Defendants and ESI,  including using other co-payment charities. Similarly, the Chairty Defendants operated other funds without Novartis. ESI also conducted other business apart from Novartis and the Charity Defendants. The  Schemes  thus did  not  involve  parallel  conduct  because  the  Defendants  participate  in transactions with co-payment charities that do not result violations of the AKS, FCA, RICO, Consumer Protection Laws, OIG regulations, or other state and federal laws.

### Conduct of the Enterprise's Affairs

365.  Each Defendant conducted or participated in, either directly or indirectly, the conduct of the Co-payment Schemes' affairs. Each Defendant was part of one or both of the Co-payment Schemes and each operated and managed the Co-payment Schemes. Such participation included, but is not limited to: (1) the Charity Defendants shared data (through the U.S. mail and wire facilities) with ESI and/or Novartis, and ESI shared data (through the U.S. mail and wire facilities) with Novartis so the Charity Defendants and Novartis could effectively conduct ROI analyses on the amounts of Novartis' "donations" to the Charity Defendants for Novartis Drugs co-pays; (2) Novartis provided necessary bribes, disguised as donations, for the co-payments, thus, upon information and belief, triggering the payment obligations of Assignors; (3) Defendants steered and funneled patients into

the Charity Defendants' co-payment assistance funds; (4) Novartis, TAF, and ESI coordinated payments to TAF's MS fund, price increases, and directed patients to the program and subsidized their co- payments, thus eliminating price sensitivity and raising the quantity of Gilenya dispensed; and (5) Novartis, CDF, and NORD coordinated payments to CDF's and NORD's funds, price increases, and directed patients to the program and subsidized their co-payments, thus eliminating price sensitivity and raising the quantity of Afinitor dispensed.

366.  At all relevant times, each Defendant was aware of the Co-payment Schemes' conduct and has been a knowing and willing participant in the racketeering conduct of the Enterprise.

### *Defendants' Pattern of Racketeering Activity*

367.  To carry out their illegal and collusive bribery Scheme, Defendants knowingly conducted or participated, directly or indirectly, in the affairs of the Co-payment Schemes through a pattern of racketeering activity under 18 U.S.C. §§ 1961(1), 1961(5), and 1962(c), and employed the use of the mail, wire, and other facilities in interstate commerce, to promote, manage, establish, and carry out the Co-payment Schemes in violation of 18 U.S.C. § 1952 (Travel Act), § 1341 (mail fraud), and § 1343 (wire fraud).

368.  Defendants intended to, and in fact did, commit bribery in violation of state and federal law, specifically 42 U.S.C. § 1320a-7b; Conn. Gen. Stat. §§ 53a-

161c and 53a-161d; Fla. Stat. §§ 456.054 and 817.505; 740 Ill. Comp. Stat. 92/5;

Mass. Gen. Laws ch. 175H, § 3; and Ohio Rev. Code Ann. § 3999.22; (collectively,

"unlawful activity"). Defendants used interstate mail and wire facilities with the

intent to (1) distribute the proceeds from this unlawful activity and (2) promote,

manage, establish, carry on, or facilitate the promotion, management, establishing,

or carrying on of this unlawful activity.

369.    Defendants' pattern of racketeering involved thousands, if not hundreds

of thousands, of separate instances of use of the U.S. mail and interstate wire

facilities to further the Co-payment Schemes. Each of these mailings and interstate

wire transmissions constitutes an instance of "racketeering activity" under 18 U.S.C.

§ 1961(1)(B) by violating the underlying predicate acts of § 1952, § 1341, § 1343.

Collectively, these violations constitute a "pattern of racketeering activity," under

18 U.S.C. § 1961(5), to advance Defendants' intentional and illegal Schemes.

370.    Defendants engaged in Schemes to profit at the direct expense of

insurers, including the Assignors and Class Members. They funneled and steered

patients into the Charity Defendants' assistance funds, funded by Novartis'

kickbacks, knowing insurers such as the Assignors and Class Members would

ultimately bear the cost of the Novartis Drugs. Defendants knew their Schemes to

funnel, steer, and refer were violative of federal and state laws including, but not

limited to, the AKS and the FCA and that they were transmitting false and illegal

information through mail and wire communications.

371.    Defendants' use of the mails and wires to perpetuate their Co-payment Schemes involved thousands of communications which involved, among others, the following:

     a.  Communications from Novartis, ESI, and TAF to patients, steering them to TAF's copay assistance fund;

     b.  Communications from Novartis, CDF, and NORD to patients, steering them to CDF's and NORD's copay assistance fund;

     c.  Transmittal of bribes, disguised as donations, by Novartis to the Charity Defendants, which were used, in part, to pay the co-payments of Novartis' "customers" in the Charity Defendants' co-pay assistance programs;

     d.  Submission of certifications by Defendants, in which they claimed to be in compliance with federal law and OIG regulations;

     e.  Submissions of data from Novartis to ESI, and ESI to TAF so that Novartis could conduct ROI analyses on its "donations" to TAF to forecast the ROI resulting from said "donations" and to see how much more revenue it could generate by increasing its "donations";

     f.  Communications between Novartis, ESI, and TAF ensuring the fund's opening coincided with Novartis' payments to the TAF MS fund;

     g.  Certifications by the Charity Defendants that they would determine eligibility according to a "uniform measure of financial need that is applied in a consistent manner" when in fact the Charity Defendants emphasized patients taking the Novartis Drugs based on Novartis' bribes, not financial need; and

     h.  Causing false claims, in violation of the FCA and AKS, to be submitted by innocent, non-party pharmacies to the Assignors and Class Members;

     i.  Using the mail and wire to mislead the government agencies

(i.e., the OIG, IRS, DOJ, and state departments of record) through false certifications and misrepresentations;

j.  Misleading insurers, health care providers, investors, government agencies, and the general public into believing the legitimacy of Defendants' Scheme.

372.  Defendants violated the Travel Act by using the mail and wire facilities to commit, promote, manage, establish, and carry on their bribery and/or kickback scheme in violation of the laws of the United States, namely, the AKS, as well as the laws of several States, namely (1) Conn. Gen. Stat. §§ 53a-161c and 53a-161d; (2) Fla. Stat. §§ 456.054 and 817.505; (3) 740 Ill. Comp. Stat. 92/5; (4) Mass. Gen. Laws ch. 175H, § 3; (5) Ohio Rev. Code Ann. § 3999.22;. Defendants further used the mail and wire facilities to distribute the proceeds of their bribery and/or kickback scheme.

373.  Upon information and belief, Defendants' activity was intended to and did in fact violate the federal AKS by knowingly and willfully offering (by Novartis) and accepting (by the Charity Defendants) bribes (i.e., "donations") in return for the Charity Defendants referring, accepting referrals for, and arranging for Assignors and Class Members to buy, and beneficiaries to receive, the Novartis Drugs.

374.  Defendants' activity was intended to and did in fact violate <u>Conn. Gen. Stat. §§ 53a161c and 53a-161d</u>. These two laws prohibit two sides of the same scheme. Under Conn. Gen. Stat. § 53a-161c(a), it is illegal to "knowingly solicit[], accept[] or agree[] to accept any benefit, in cash or in kind, from another person

upon an agreement or understanding that such benefit will influence such person's conduct in relation to referring an individual or arranging for the referral of an individual for the furnishing of any goods, facilities or services to such other person under contract to provide goods, facilities or services to a local, state or federal agency." Upon information and belief, this was violated by the Charity Defendants accepting money from Novartis to influence  the Charity Defendants' conduct in referring and arranging for the referral of beneficiaries of Assignors and Class Members, who are under contract to provide health insurance benefits on behalf of state and federal agencies (e.g., CMS). Similarly, it is illegal under Conn. Gen. Stat. § 53a-161d(a) to "knowingly offer[] or pay[] any benefit, in cash or kind, to any person with intent to influence such person: (1) To refer an individual, or to arrange for the referral of an individual, for the furnishing of any goods, facilities or services for which a claim for benefits or reimbursement has been filed with a local, state or federal agency; or (2) to purchase, lease, order or arrange for or recommend the purchasing, leasing or ordering of any goods, facilities or services for which a claim of benefits or reimbursement has been filed with a local, state or federal agency." Defendants' Schemes operated in Connecticut and thereby violated these state laws.

375. Defendants' activity was intended to and did in fact violate Fla. Stat. §§ 456.054 and 817.505. Specifically, under Fla. Stat. § 456.054(2) "[i]t is unlawful for . . . any provider of health care services to offer, pay, solicit, or receive a kickback,

directly or indirectly, overtly or covertly, in cash or in kind, for referring or soliciting patients." Novartis and ESI are a providers of health care services and Novartis paid kickbacks to the Charity Defendants, and to pharmacies through the Charity Defendants, for referring patients to receive Novartis' Drugs. Similarly, under Fla. Stat. § 817.505(1) it is illegal "for any person . . . to (a) [o]ffer or pay a commission, benefit, bonus, rebate, kickback, or bribe, directly or indirectly, in cash or in kind, . . . to induce the referral of a patient or patronage to or from a health care provider or health care facility." Likewise, subsection (b) prohibits soliciting or receiving the same. Here, Novartis paid, and the Charity Defendants received, bribes to induce the referral of patients to receive the Novartis Drugs. Defendants' Scheme operated in Florida and resulted in claims being submitted therein and thereby violated these state laws.

376. Defendants' activity was intended to and did in fact violate 740 Ill. Comp. Stat. 92/5 "it is unlawful to knowingly offer or pay any remuneration directly or indirectly, in cash or in kind, to induce any person to procure clients or patients to obtain services or benefits under a contract of insurance or that will be the basis for a claim against an insured person or the person's insurer." Novartis bribed the Charity Defendants to procure patients to receive co-payment assistance from Novartis for Novartis' Drugs knowing and requiring that these patients were insured and, upon information and belief, would submit a claim to Assignors and Class

Members. Defendants' Schemes operated in Illinois and resulted in claims being submitted therein and thereby violated this state law.

377.   Defendants' activity was intended to and did in fact violate <u>Mass. Gen. Laws ch. 175H, § 3</u>. Specifically, it is illegal for any person to "offer[] or pay[] [(or solicit or receive)] any remuneration, including any bribe or rebate, except as provided in subsection (b), directly or indirectly, overtly or covertly, in cash or in kind to induce any person to purchase, lease, order or arrange for or recommend purchasing, leasing or ordering of any good, facility, service, or item for which payment is or may be made in whole or in part by a health care insurer." Mass. Gen. Laws ch. 175H, § 3. Novartis offered and paid, and the Charity Defendants solicited and received, bribes in return for the Charity Defendants referring patients to receive Novartis' Drugs and arranging for the purchase of same by funneling Novartis' money to these patients. Defendants' Schemes operated in Massachusetts and resulted in claims being submitted therein and thereby violated this state law.

378.   Defendants' activity was intended to and did in fact violate <u>Ohio Rev. Code Ann. § 3999.22</u>. Under Ohio law, "No person shall knowingly solicit, offer, pay, or receive any kickback, bribe, or rebate, directly or indirectly, overtly or covertly, in cash or in kind, in return for referring an individual for the furnishing of health care services or goods for which whole or partial reimbursement is or may be made by a health care insurer[.]" Ohio Rev. Code Ann. § 3999.22. Novartis offered

and paid, and the Charity Defendants solicited and received, bribes in return for the
Charity Defendants referring patients to receive Novartis' Drugs for which the non-
co-payment portion was paid by a health insurer (i.e., Assignors and Class
Members). Defendants' Schemes operated in Ohio and resulted in claims being
submitted therein and thereby violated this state law.

379.   The predicate act violations of the Travel Act, as well as mail and wire
fraud, had the same purpose; that is, to make money by growing the Charity
Defendants' copay assistance programs, funded by Novartis' money, as large as
possible so the Charity Defendants' officers and directors could justify increasing
their compensation, ESI (as part of the distribution chain for the Gilenya) could fill
as many prescriptions for Novartis' Drugs as possible, thereby increasing their own
profits, and so Novartis could get as many "customers" for the Novartis Drugs as
possible, at the expense of the Assignors and Class Members.

380.   All of the predicate acts detailed above, including the certifications
made by Defendants as well as the wire communications in furtherance of their
Schemes, were for the purpose of the Scheme.

381.   Upon information and belief, if the Charity Defendants had not falsely
certified that they used uniform measures of financial eligibility, and if Defendants
had not deceptively caused innocent, non-party pharmacies to provide bills for
payment, the Assignors and Class Members would not have paid the inflated prices

or for improperly increased quantities of the Novartis' Drugs. Defendants caused innocent, non-party pharmacies to send false bills for payment over the mail and wire so Novartis could make larger bribes to the Charity Defendants to fund patient copays, resulting in more prescriptions as part of the distribution chain for the Novartis Drugs, in turn harming the Assignors and Class Members.

382.    These predicate acts allowed the continuance of the Schemes to increase the quantity of Novartis Drugs and maintain inflated prices. As a result, the Assignors and Class Members paid inflated prices for the Novartis Drugs, and upon information and belief, paid at inflated volumes (dispensed quantities).

383.    Upon information and belief, as a result of Defendants' Scheme, Assignors and Class Members unknowingly paid tainted claims.

384.    Novartis, ESI, and the Charity Defendants, including their officers, directors, agents, and principals, participated in all of the predicate acts. These individuals sent, or caused to be sent, all of the false certifications through the mail or wire facilities. These individuals communicated with each other, and others, in furtherance of the Scheme.

385.    The intended and most direct victims of the Scheme are the Assignors and Class Members.

386.    The violations of the Travel Act and mail and wire fraud included transmission of false claims and the unlawful transmission of data and

communications to further the racketeering Scheme over a period of at least five years involving harm to multiple parties.

387.   The illegal Schemes and the related predicate acts proximately caused injury to the Assignors' and Class Members' business and property by triggering the Assignors' and Class Members' duty to purchase the Novartis Drugs and driving up the cost of the Novartis Drugs. Defendants' Schemes rendered the claims for the Novartis Drugs unpayable, and, upon information and belief, Assignors and Class Members would not have (and could not have) paid if Defendants had not concealed their Scheme.

388.   Accordingly, Defendants' violations of 18 U.S.C. § 1962(c) directly and proximately caused injuries and damages to the Assignors and Class Members. Defendants' actions entitle Plaintiffs to bring this action for three times their actual damages, as well as injunctive/equitable relief, costs, and reasonable attorneys' fees under 18 U.S.C. § 1964(c).

## SECOND CLAIM FOR RELIEF

### Violation of 18 U.S.C. § 1964(d) Through the Co-Payment Scheme
*Against All Defendants*

389.   Plaintiffs re-allege and incorporate by reference paragraphs 1–343 of this Complaint as though set forth at length here.

390.   Section 1962(d) makes it unlawful for "any person to conspire to violate" section 1962(c), among other provisions.

391.    Defendants violated § 1962(d) by conspiring to violate § 1962(c). The object of this conspiracy was to conduct or participate in, directly or indirectly, the conduct of the affairs of the Co-payment Schemes described previously, through a pattern of racketeering activity.

392.    Novartis knowingly agreed with the Charity Defendants and ESI that Novartis would perform services that would facilitate the illicit activities of the Co-payment Schemes. Novartis and ESI steered patients needing the Novartis Drugs away from Novartis' free drug program to TAF's MS fund.

393.    Novartis also provided the Charity Defendants with bribes disguised as donations for the charity to subsidize the co-payments of Novartis' "customers" using the co-payment assistance programs.

394.    Novartis also used patient data provided by ESI and the Charity Defendants in violation of the AKS and FCA. The shared data allowed Novartis to perform ROI analyses on its "donations" to forecast the effect of donations on revenue and profit. Novartis thus set out a roadmap of illegal activities and profits.

395.    Defendants also caused false certifications to be sent over the interstate mail and wire facilities claiming they were in compliance with federal law, including the AKS and FCA.

396.    Further, the Charity Defendants knowingly agreed with Novartis that they would perform services that would facilitate the activities of the Co-payment

Schemes and those who were running it in an illegal manner. Some of the services that the Charity Defendants performed were steering people towards their co-payment assistance funds.

397.   The Charity Defendants caused false certifications to be sent over the interstate mail and wire facilities claiming they were in compliance with federal law, including the AKS and FCA.

398.   The Charity Defendants sent data to Novartis and/or ESI in violation of the AKS and FCA, so Novartis could see how much money it was making from its "donations" to the Charity Defendants, and how much more money it could make by increasing its "donations." Indeed, this conduct shows that Defendants did not engage in parallel conduct but worked together and had a meeting of the minds that they could each profit from the Co-payment Schemes. The Charity Defendants knew that if Novartis provided more "donations," Novartis would make more money. Thus, by illegally providing data to Novartis and/or ESI, the Charity Defendants were soliciting greater contributions.

399.   Further, ESI knowingly agreed with Novartis and TAF that they would perform services that would facilitate the activities of the Co-payment Schemes and those who were running it in an illegal manner. Some of the services that ESI performed were steering people towards TAF's MS fund by sharing TAF data with Novartis to ensure Novartis could verify that its "donations" provided co-pays for

Gilenya.

400.   ESI caused false certifications to be sent over the interstate mail and wire facilities claiming they were in compliance with state and federal laws and regulations, including the AKS and FCA. ESI sent Novartis data, in violation of the AKS and FCA, so that Novartis could see how much money it was making from its "donations" to TAF, and how much more money it could make by increasing its "donations." Indeed, this conduct shows that Novartis, ESI, and TAF did not engage in parallel conduct but worked together and had a meeting of the minds that they could each profit from the Co-payment Schemes.

401.   ESI and the Chairty Defendants knew that if Novartis provided more "donations," the Charity Defendants would provide more co- pay assistance, thereby increasing both Novartis' and ESI's profits by further inflating the prices and dispensed quantities of the Novartis Drugs. Thus, by illegally providing data to Novartis, ESI managed to increase its own profits—as well as Novartis' and the Charity Defendants' profits.

402.   Novartis knowingly agreed with ESI and the Charity Defendants hat one or all of them would commit at least two instances of Travel Act violations or mail and wire fraud (or cause an innocent third- party to send false statements over the mails and wires). In short, Novartis—and all other Defendants—knew that Novartis, ESI, and the Charity Defendants had to abide by the AKS and FCA, and it knew the

Schemes it engaged in or planned to engage in with ESI and the Charity Defendants would violate those statutes. Novartis knew that the Charity Defendants certified with the OIG that the Charity Defendants would use a uniform measure of financial need when providing co-pay assistance, when in fact the Charity Defendants were mere conduits to provide co-pay assistance for patients taking the Novartis Drugs. It also knew that each time a pharmacy filled a prescription for someone using Novartis co-pay assistance, funneled through the Charity Defendants, any certifications the pharmacist made that he or she would abide by federal law would be false.

403.    Defendants knew that any communication they had over the telephone, email, or text message in furtherance of the Schemes would be predicate acts.

404.    Defendants knowingly agreed to pursue the same objective(s) of profiting illegally from the Co-payment Schemes. They agreed to divide the work of accomplishing this objective. Novartis would make the "donations"; the Charity Defendants and/or ESI would provide data to Novartis; ESI and/or Novartis would facilitate the data, and each Defendant would all steer patients and make false certifications. Each Defendant intended to further this endeavor, which, as described above, when completed, violated 18 U.S.C. § 1962(c) that proximately and directly injured the Assignors and Class Members.

405.    Plaintiffs bring this action for three times their actual damages, as well as injunctive/equitable relief, costs, and reasonable attorneys' fees under 18 U.S.C.

§ 1964(d).

## THIRD CLAIM FOR RELIEF

### Violations of State Consumer Protection Laws
*Against All Defendants*

406.  Plaintiffs re-allege and incorporate by reference paragraphs 1–343 of this Complaint as if fully set forth herein.

407.  For the reasons set forth below, and those throughout the Complaint, Defendants' conduct violated each of the state statutes below.

### (1) Connecticut Unfair Trade Practices Act
### (Conn. Gen. Stat. §§ 42-110a *et seq.*)

408.  To prevail under the Connecticut Unfair Trade Practices Act ("CUTPA"), Plaintiff must show: (1) Defendants engaged in unfair or deceptive acts or practices in the conduct of any trade or commerce; and (2) Defendants' practices resulted in an ascertainable loss of money or property. Conn. Gen. Stat. § 42-110b.

409.  An unfair act or practice can be any of the following: (1) without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, common law, or otherwise; (2) is immoral, unethical, oppressive, or unscrupulous; or (3) causes substantial injury to consumers, competitors, or other businessmen.

410.  A deceptive act or practice requires: (1) the defendant made a representation, omission, or other practice likely to mislead consumers; (2) the

plaintiff interpreted the message reasonably under the circumstances; and (3) the misleading representation, omission, or practice must have been likely to affect the plaintiff's decision or conduct.

411.    Defendants engaged in numerous deceptive acts or practices for purposes of CUTPA, including, but not limited to: TAF, CDF, and NORD publishing false certifications of compliance with OIG guidelines and federal law; TAF, CDF, and NORD misrepresenting their status as independent charities on tax filings and their websites, Novartis and ESI certifying compliance with federal laws and CMS regulations, despite knowing the nature of the Copayment Schemes directly contradicted their certifications; and Novartis concealing the nature of its copay assistance programs in order to raise the price and dispensed quantity of the Novartis Drugs.

412.    Defendants' conduct undermined or offends other significant public policy considerations including, but not limited to: Encouraging development and use of affordable alternative drugs or treatments; Streamlining access to affordable healthcare; Part D Sponsors intended ability to negotiate lower drug prices; Preserving a fair and competitive market for prescription medications; Avoiding physician-patient conflicts of interests by ensuring medical decisions are not made based on financial incentives; Safeguarding responsible Medicare spending funded by taxpayer dollars; Lowering healthcare costs for citizens generally; using copay

assistance to induce patient and physician decisions; and Maintaining transparency and accountability to avoid distrust between patients and healthcare entities.

413.   Assignors' injuries were the intended and foreseeable consequence of Defendants' conduct, and/or were a substantial factor in bringing about the alleged harm. For instance: Defendants successfully abused copay assistance programs to eliminate price sensitivity for the Novartis Drugs thereby inducing patients and physicians to increase utilization of Novartis Drugs over cheaper and equally effective alternative treatments and enabling Novartis to its prices without having to reconcile with Congressional market safeguards; Novartis, ESI, and the Charity Defendants all certified compliance with federal law, CMS, and/or OIG guidelines to ensure the illegal conduct remained hidden and Part D Sponsors would pay for tainted claims for Novartis Drugs that would not have otherwise been paid.

414.   Thus, Defendants' conduct foreseeably resulted in and/or was a substantial factor in causing Assignors to pay for Novartis Drugs at inflated prices; Assignors paying for more Novartis Drug prescriptions over cheaper and equally effective alternatives; and, upon information and belief, Assignors paying for Novartis Drugs that were tainted, and therefore unpayable.

415.   Defendants' conduct alleged in this Complaint occurred throughout the United States, including the State of Connecticut. For example, the following conduct occurred within the State of Connecticut: advertisement, transport, sale, and

purchase of Novartis Drugs; solicitation of and communication with Connecticut residents (including Assignors' beneficiaries and other patients) for purchase of Novartis Drugs; solicitation of and communication with Connecticut medical physicians; the transfer and disbursement of Novartis' illicit funds from the Charity Defendants to Connecticut residents (including Assignors' beneficiaries and other patients); upon information and belief, the submission of tainted, unpayable claims for payment by Assignors and Class Members; the disbursement of funds for tainted, unpayable claims induced by Defendants' Copayment Schemes; publication of misrepresentations regarding the independence of the Charity Defendants, and all false certifications of compliance with the federal and state laws discussed herein.

416.   For the same reasons mentioned above, Defendants' conduct occurred within the trade and commerce of Connecticut.

417.   The Assignors were harmed in the State of Connecticut for each purchase of Novartis Drugs within the state.

418.   Analysis of the Assignors' data identified one or more purchases of Novartis Drugs in the State of Connecticut.

419.   Accordingly, Defendants violated CUTPA.

420.   As a result of the Scheme, the Assignors paid more than $13,000,000.00 for Gilenya, including claims paid in the State of Connecticut.

421.   As a result of the Scheme, the Assignors paid more than $14,000,000.00

for Afinitor, including claims paid in the State of Connecticut.

422.   Simultaneously with the filing of this Complaint, Plaintiffs served a copy on the Connecticut Attorney General and Commissioner of Consumer Protection.

423.   Plaintiffs are entitled to recover their actual damages, punitive damages, and attorney's fees and costs.

### (2) Florida Deceptive & Unfair Trade Practices Act
#### (Fla. Stat. §§ 501.201 *et seq*.)

424.   To prevail under the Florida Deceptive & Unfair Trade Practice Act ("FDUPTA"), Plaintiff must show: (1) Defendants engaged in unfair or deceptive acts or practices in the conduct of any trade or commerce; and (2) Defendants' practices resulted in an ascertainable loss of money or property. Fla. Stat. § 501.204(1).

425.   An unfair act or practice can be any of the following: (1) without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, common law, or otherwise; (2) is immoral, unethical, oppressive, or unscrupulous; or (3) causes substantial injury to consumers, competitors, or other businessmen.

426.   A deceptive act or practice requires: (1) the defendant made a representation, omission, or other practice likely to mislead consumers; (2) the plaintiff interpreted the message reasonably under the circumstances; and (3) the

misleading representation, omission, or practice must have been likely to affect the plaintiff's decision or conduct.

427. Defendants engaged in numerous deceptive acts or practices for purposes of FDUPTA, including, but not limited to: TAF, CDF, and NORD publishing false certifications of compliance with OIG guidelines and federal law; TAF, CDF, and NORD misrepresenting their status as independent charities on tax filings and their websites, Novartis and ESI certifying compliance with federal laws and CMS regulations, despite knowing the nature of the Copayment Schemes directly contradicted their certifications; and Novartis concealing the nature of its copay assistance programs in order to raise the price and dispensed quantity of the Novartis Drugs.

428. Defendants' conduct undermined or offends other significant public policy considerations including, but not limited to: Encouraging development and use of affordable alternative drugs or treatments; Streamlining access to affordable healthcare; Part D Sponsors intended ability to negotiate lower drug prices; Preserving a fair and competitive market for prescription medications; Avoiding physician-patient conflicts of interests by ensuring medical decisions are not made based on financial incentives; Safeguarding responsible Medicare spending funded by taxpayer dollars; Lowering healthcare costs for citizens generally; using copay assistance to induce patient and physician decisions; and Maintaining transparency

and accountability to avoid distrust between patients and healthcare entities.

429.   Assignors' injuries were the intended and foreseeable consequence of Defendants' conduct, and/or were a substantial factor in bringing about the alleged harm. For instance: Defendants successfully abused copay assistance programs to eliminate price sensitivity for the Novartis Drugs thereby inducing patients and physicians to increase utilization of Novartis Drugs over cheaper and equally effective alternative treatments and enabling Novartis to its prices without having to reconcile with Congressional market safeguards; Novartis, ESI, and the Charity Defendants all certified compliance with federal law, CMS, and/or OIG guidelines to ensure the illegal conduct remained hidden and Part D Sponsors would pay for tainted claims for Novartis Drugs that would not have otherwise been paid.

430.   Thus, Defendants' conduct foreseeably resulted in and/or was a substantial factor in causing Assignors to pay for Novartis Drugs at inflated prices; Assignors paying for more Novartis Drug prescriptions over cheaper and equally effective alternatives; and upon information and belief, Assignors paying for Novartis Drugs that were tainted, and therefore unpayable.

431.   Defendants' conduct alleged in this Complaint occurred throughout the United States, including the State of Florida. For example, the following conduct occurred within the State of Florida: advertisement, transport, sale, and purchase of Novartis Drugs; solicitation of and communication with Florida residents (including

Assignors' beneficiaries and other patients) for purchase of Novartis Drugs; solicitation of and communication with Florida medical physicians; the transfer and disbursement of Novartis' illicit funds from the Charity Defendants to Florida residents (including Assignors' beneficiaries and other patients); upon information and belief, the submission of tainted, unpayable claims for payment by Assignors and Class Members; the disbursement of funds for tainted, unpayable claims induced by Defendants' Copayment Schemes; publication of misrepresentations regarding the independence of the Charity Defendants, and all false certifications of compliance with the federal and state laws discussed herein.

432.   For the same reasons mentioned above, Defendants' conduct occurred within the trade and commerce of Florida.

433.   The Assignors were harmed in the State of Florida for each purchase of Novartis Drugs within the State of Florida.

434.   Analysis of the Assignors' data identified one or more purchases of Novartis Drugs in the State of Florida.

435.   Accordingly, Defendants violated FDUPTA.

436.   As a result of the Scheme, the Assignors paid more than $13,000,000.00 for Gilenya, including claims paid in the State of Florida.

437.   As a result of the Scheme, the Assignors paid more than $14,000,000.00 for Afinitor, including claims paid in the State of Florida.

438.   Plaintiffs seek to recover against each Defendant the amount of their actual damages, attorney's fees, costs, and any other relief available.

## (3) Illinois Consumer Fraud & Deceptive Business Practices Act
### (815 Ill. Comp. Stat. 505/1 *et seq.*)

439.   To prevail under Illinois Consumer Fraud Act ("ICFA"), Plaintiff must show: (1) (1) a deceptive or unfair act or practice committed by the defendant; (2) the defendant's intent that the plaintiff rely on the deception; (3) the occurrence of the deception in the course of conduct involving trade or commerce; (4) actual damages to the plaintiff; and (5) caused by defendant's acts or practices.

440.   Deceptive acts or practices include, but are not limited to, use or employment of any deception, fraud, false pretense, false promise, misrepresentation or concealment, suppression, or omission of any material fact, with the intent that others rely upon the concealment, suppression, or omission of such fact in the conduct of any trade or commerce.

441.   A practice is unfair if the practice: (1) offends public policy; (2) is immoral, unethical, oppressive, or unscrupulous; and/or (3) causes substantial injury to the plaintiff.

442.   An unfair act or practice can be any of the following: (1) without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, common law, or otherwise; (2) is immoral, unethical, oppressive, or unscrupulous; or (3) causes substantial injury to consumers,

competitors, or other businessmen.

443.  A deceptive act or practice requires: (1) the defendant made a representation, omission, or other practice likely to mislead consumers; (2) the plaintiff interpreted the message reasonably under the circumstances; and (3) the misleading representation, omission, or practice must have been likely to affect the plaintiff's decision or conduct.

444.  Defendants engaged in numerous deceptive acts or practices for purposes of ICFA, including, but not limited to: TAF, CDF, and NORD publishing false certifications of compliance with OIG guidelines and federal law; TAF, CDF, and NORD misrepresenting their status as independent charities on tax filings and their websites, Novartis and ESI certifying compliance with federal laws and CMS regulations, despite knowing the nature of the Copayment Schemes directly contradicted their certifications; and Novartis concealing the nature of its copay assistance programs in order to raise the price and dispensed quantity of the Novartis Drugs.

445.  Defendants' conduct undermined or offends other significant public policy considerations including, but not limited to: Encouraging development and use of affordable alternative drugs or treatments; Streamlining access to affordable healthcare; Part D Sponsors intended ability to negotiate lower drug prices; Preserving a fair and competitive market for prescription medications; Avoiding

physician-patient conflicts of interests by ensuring medical decisions are not made based on financial incentives; Safeguarding responsible Medicare spending funded by taxpayer dollars; Lowering healthcare costs for citizens generally; using copay assistance to induce patient and physician decisions; and Maintaining transparency and accountability to avoid distrust between patients and healthcare entities.

446.   Assignors' injuries were the intended and foreseeable consequence of Defendants' conduct, and/or were a substantial factor in bringing about the alleged harm. For instance: Defendants successfully abused copay assistance programs to eliminate price sensitivity for the Novartis Drugs thereby inducing patients and physicians to increase utilization of Novartis Drugs over cheaper and equally effective alternative treatments and enabling Novartis to its prices without having to reconcile with Congressional market safeguards; Novartis, ESI, and the Charity Defendants all certified compliance with federal law, CMS, and/or OIG guidelines to ensure the illegal conduct remained hidden and Part D Sponsors would pay for tainted claims for Novartis Drugs that would not have otherwise been paid.

447.   Thus, Defendants' conduct foreseeably resulted in and/or was a substantial factor in causing Assignors to pay for Novartis Drugs at inflated prices; Assignors paying for more Novartis Drug prescriptions over cheaper and equally effective alternatives; and, upon information and belief, Assignors paying for Novartis Drugs that were tainted, and therefore unpayable.

448.    Defendants' conduct alleged in this Complaint occurred throughout the United States, including the State of Illinois. For example, the following conduct occurred within the State of Illinois: advertisement, transport, sale, and purchase of Novartis Drugs; solicitation of and communication with Illinois residents (including Assignors' beneficiaries and other patients) for purchase of Novartis Drugs; solicitation of and communication with Illinois medical physicians; the transfer and disbursement of Novartis' illicit funds from the Charity Defendants to Illinois residents (including Assignors' beneficiaries and other patients); upon information and belief, the submission of tainted, unpayable claims for payment by Assignors and Class Members; the disbursement of funds for tainted, unpayable claims induced by Defendants' Copayment Schemes; publication of misrepresentations regarding the independence of the Charity Defendants, and all false certifications of compliance with the federal and state laws discussed herein.

449.    For the same reasons mentioned above, Defendants' conduct occurred within the trade and commerce of Illinois.

450.    The Assignors were harmed in the State of Illinois for each purchase of Novartis Drugs within the State of Illinois.

451.    Analysis of the Assignors' data identified one or more purchases of The Novartis Drugs in the State of Illinois.

452.    Accordingly, Defendants violated ICFA.

453.    Simultaneously with the filing of this Complaint, Plaintiff's served a copy on the Illinois Attorney General.

454.    As a result of the Scheme, the Assignors paid more than $13,000,000.00 for Gilenya, including claims paid in the State of Illinois.

455.    As a result of the Scheme, the Assignors paid more than $14,000,000.00 for Afinitor, including claims paid in the State of Illinois.

456.    Plaintiffs are entitled to recover three (3) times the amount of actual damages resulting from Defendants' violation together with costs and reasonable attorney's fees.

### (4) Massachusetts Regulation of Business Practice & Consumer Protection Act
**(Mass. Gen. Laws Ch. 93A, §§ 1 *et seq.*)**

457.    To establish a violation of the Massachusetts unfair and deceptive trade practice statute, a plaintiff must show (1) the defendant engaged in an unfair method of competition or committed an unfair or deceptive act or practice; (2) a loss of money or property was suffered; and (3) defendant's unfair or deceptive act or practice caused the loss suffered. Mass. Gen. Laws. Ch. 93A §§ 9, 11.

458.    An act or practice is considered unfair if (1) the practice is within at least the penumbra of some common-law, statutory, or other established concept of unfairness; (2) it is immoral, unethical, oppressive, or unscrupulous; and (3) it causes substantial injury to consumers, competitors, or businesspeople.

459.   Practices may be deemed deceptive where they could reasonably be found to have caused a person to act differently from the way they would have acted; conduct is deceptive when it tends to mislead.

460.   Defendants engaged in numerous deceptive acts or practices for purposes of Mass. Gen. Laws. Ch. 93A, including, but not limited to: TAF, CDF, and NORD publishing false certifications of compliance with OIG guidelines and federal law; TAF, CDF, and NORD misrepresenting their status as independent charities on tax filings and their websites, Novartis and ESI certifying compliance with federal laws and CMS regulations, despite knowing the nature of the Copayment Schemes directly contradicted their certifications; and Novartis concealing the nature of its copay assistance programs in order to raise the price and dispensed quantity of the Novartis Drugs.

461.   Defendants' conduct undermined or offends other significant public policy considerations including, but not limited to: Encouraging development and use of affordable alternative drugs or treatments; Streamlining access to affordable healthcare; Part D Sponsors intended ability to negotiate lower drug prices; Preserving a fair and competitive market for prescription medications; Avoiding physician-patient conflicts of interests by ensuring medical decisions are not made based on financial incentives; Safeguarding responsible Medicare spending funded by taxpayer dollars; Lowering healthcare costs for citizens generally; using copay

assistance to induce patient and physician decisions; and Maintaining transparency and accountability to avoid distrust between patients and healthcare entities.

462.  Assignors' injuries were the intended and foreseeable consequence of Defendants' conduct, and/or were a substantial factor in bringing about the alleged harm. For instance: Defendants successfully abused copay assistance programs to eliminate price sensitivity for the Novartis Drugs thereby inducing patients and physicians to increase utilization of Novartis Drugs over cheaper and equally effective alternative treatments and enabling Novartis to its prices without having to reconcile with Congressional market safeguards; Novartis, ESI, and the Charity Defendants all certified compliance with federal law, CMS, and/or OIG guidelines to ensure the illegal conduct remained hidden and Part D Sponsors would pay for tainted claims for Novartis Drugs that would not have otherwise been paid.

463.  Thus, Defendants' conduct foreseeably resulted in and/or was a substantial factor in causing Assignors to pay for Novartis Drugs at inflated prices; Assignors paying for more Novartis Drug prescriptions over cheaper and equally effective alternatives; and, upon information and belief, Assignors paying for Novartis Drugs that were tainted, and therefore unpayable.

464.  Defendants' conduct alleged in this Complaint occurred throughout the United States, including the Commonwealth of Massachusetts. For example, the following conduct occurred within the Commonwealth of Massachusetts:

advertisement, transport, sale, and purchase of Novartis Drugs; solicitation of and communication with Massachusetts residents (including Assignors' beneficiaries and other patients) for purchase of Novartis Drugs; solicitation of and communication with Massachusetts medical physicians;  the transfer and disbursement of Novartis' illicit funds from the Charity Defendants to Massachusetts residents (including Assignors' beneficiaries and other patients); upon information and belief, the submission of tainted, unpayable claims for payment by Assignors and Class Members; the disbursement of funds for tainted, unpayable claims induced by Defendants' Copayment Schemes; publication of misrepresentations regarding the independence of the Charity Defendants, and all false certifications of compliance with the federal and state laws discussed herein.

465.   For the same reasons mentioned above, Defendants' conduct occurred within the trade and commerce of Massachusetts.

466.   The Assignors were harmed in the Commonwealth of Massachusetts for each purchase of Novartis Drugs within the Commonwealth of Massachusetts.

467.   Analysis of the Assignors' data identified one or more purchases of Novartis Drugs in the Commonwealth of Massachusetts.

468.   Accordingly, Defendants violated Mass. Gen. Laws ch. 93A.

469.   As a result of the Scheme, the Assignors paid more than $13,000,000.00 for Gilenya, including claims paid in the Commonwealth of Massachusetts.

470.   As a result of the Scheme, the Assignors paid more than $14,000,000.00 for Afinitor, including claims paid in the Commonwealth of Massachusetts.

471.   Plaintiffs seek monetary relief against Defendants measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $25 for each Plaintiff. Because Defendants' conduct was committed willfully and knowingly, Plaintiffs are entitled to recover up to three times actual damages, but no less than two times actual damages pursuant to Mass. Gen. Laws ch. 93A, §§ 9 and 11. Plaintiffs also seek punitive damages, attorneys' fees and costs, and any other just and proper relief.

### (5) New York General Business Law
**(N.Y. Gen. Bus. Law §§ 349 *et seq*.)**

472.   To establish a violation a N.Y. Gen. Bus. Law § 349 violation, plaintiff must allege that defendant engaged in (1) a deceptive act or practice in the conduct of any business, trade or commerce or in the furnishing of any service in the State of New York that is (2) consumer-oriented, and (3) plaintiff suffered injury as a result of the allegedly deceptive act or practice.

473.   Consumer-oriented conduct includes any conduct that potentially affects similarly situated consumers or that has a broader impact on consumers at large.

474.   The scope of N.Y. Gen. Bus. Law § 349 includes businesses, commercial entities, and individual consumers. *See N. State Autoban, Inc., v.*

*Progressive Ins. Grp. Co.*, 953 N.Y.S.2d 96, 104 (N.Y. App. Div. 2012) ("[L]imiting
the scope of § 349 to only consumers" would be "in contravention of the statute's
plain language permitting recovery of any person injured by reason of any
violation.").

475.   A deceptive act or practice is defined as an act likely to mislead a
reasonable consumer acting reasonably under the circumstances.

476.   Defendants' conduct constitutes deceptive acts or practices for
purposes of N.Y. Gen. Bus. Law § 349. Defendants' deceptive acts include, but not
limited to: TAF, CDF, and NORD publishing false certifications of compliance with
OIG guidelines and federal law; TAF, CDF, and NORD misrepresenting their status
as independent charities on tax filings and their websites, Novartis and ESI certifying
compliance with federal laws and CMS regulations, despite knowing the nature of
the Copayment Schemes directly contradicted their certifications; and Novartis
concealing the nature of its copay assistance programs in order to raise the price and
dispensed quantity of the Novartis Drugs.

477.   The above conduct misled Assignors, individuals—such as
beneficiaries and other patients—other Part D Sponsors, Medicare, and/or
physicians thereby inducing purchases and prescriptions of Novartis Drugs.

478.   Defendants' false statements, certifications, misrepresentations, or
omissions tend to, and were designed to, manipulate, induce, or mislead Assignors

and the public at large into paying for tainted claims, which, upon information and belief, is precisely what occurred here.

479.   Defendants' conduct is consumer-oriented because it affected similarly situated entities and the public at large. For instance, Defendants' efforts undermined the competitive market for Multiple Sclerosis and Renal Cell Carcinoma treatments, raised prices across the board for Medicare, Part D Sponsors, and patients who were unable to obtain copay assistance and therefore had to pay higher copays for Novartis Drugs.

480.   Defendants' conduct also implicated significant public policy concerns including: Encouraging development and use of affordable alternative drugs or treatments; Streamlining access to affordable healthcare; Part D Sponsors intended ability to negotiate lower drug prices; Preserving a fair and competitive market for prescription medications; Avoiding physician-patient conflicts of interests by ensuring medical decisions are not made based on financial incentives; Safeguarding responsible Medicare spending funded by taxpayer dollars; Lowering healthcare costs for citizens generally; using copay assistance to induce patient and physician decisions; and Maintaining transparency and accountability to avoid distrust between patients and healthcare entities.

481.   Assignors' injuries were the intended and foreseeable consequence of Defendants' conduct, and/or were a substantial factor in bringing about the alleged

harm. For instance: Defendants successfully abused copay assistance programs to eliminate price sensitivity for the Novartis Drugs thereby inducing patients and physicians to increase utilization of Novartis Drugs over cheaper and equally effective alternative treatments and enabling Novartis to its prices without having to reconcile with Congressional market safeguards; Novartis, ESI, and the Charity Defendants all certified compliance with federal law, CMS, and/or OIG guidelines to ensure the illegal conduct remained hidden and Part D Sponsors would pay for tainted claims for Novartis Drugs that would not have otherwise been paid.

482. Thus, Defendants' conduct foreseeably resulted in and/or was a substantial factor in causing Assignors to pay for Novartis Drugs at inflated prices; Assignors paying for more Novartis Drug prescriptions over cheaper and equally effective alternatives; and, upon information and belief, Assignors paying for Novartis Drugs that were tainted, and therefore unpayable.

483. Defendants' conduct alleged in this Complaint occurred throughout the United States, including the State of New York. For example, the following conduct occurred within the State of New York: advertisement, transport, sale, and purchase of Novartis Drugs; solicitation of and communication with New York residents (including Assignors' beneficiaries and other patients) for purchase of Novartis Drugs; solicitation of and communication with New York medical physicians; the transfer and disbursement of Novartis' illicit funds from the Charity Defendants to

New York residents (including Assignors' beneficiaries and other patients); upon information and belief, the submission of tainted, unpayable claims for payment by Assignors and Class Members; the disbursement of funds for tainted, unpayable claims induced by Defendants' Copayment Schemes; publication of misrepresentations regarding the independence of the Charity Defendants, and all false certifications of compliance with the federal and state laws discussed herein.

484.   For the same reasons mentioned above, Defendants' conduct occurred within the trade and commerce of New York and primarily and substantially within the State of New York.

485.   The Assignors were harmed in the State of New York for each purchase of Novartis Drugs within the state.

486.   Analysis of the Assignors' data identified one or more purchases of Novartis Drugs in the State of New York.

487.   Accordingly, Defendants violated N.Y. Gen. Bus. Law § 349.

488.   As a result of the Scheme, the Assignors paid more than $13,000,000.00 for Gilenya, including claims paid in the State of New York.

489.   As a result of the Scheme, the Assignors paid more than $14,000,000.00 for Afinitor, including claims paid in the State of New York.

490.   As a result of the foregoing willful, knowing, and wrongful conduct alleged herein, Assignors suffered damages, and seek all just and proper remedies

and any other appropriate relief available.

## (6) Ohio Consumer Protection Laws
### (Ohio Rev. Code Ann. §§ 4165 *et seq*.)

491.  A *person*[21] who is injured by a person who commits a deceptive trade
practice that is listed in division (A) of section 4165.02 of the Revised Code may
commence a civil action to recover actual damages from the person who commits
the deceptive trade practice. Ohio Rev. Code Ann. § 4165.03.

492.  Ohio Rev. Code. Ann. § 4165.02(A) states, in relevant part, that a
person engages in a deceptive trade practice when the person's business, vocation,
or occupation, the person does any of the following: Causes likelihood of confusion
or misunderstanding as to the source, sponsorship, approval, or certification of goods
or services; Causes likelihood of confusion or misunderstanding as to affiliation,
connection, or association with, or certification by, another; and Represents that
goods or services have sponsorship, approval, characteristics, ingredients, uses,
benefits, or quantities that they do not have or that a person has sponsorship,
approval, status, affiliation, or connection that he does not have.

493.  Defendants' conduct constitutes deceptive acts or practices for
purposes of Ohio Rev. Code. Ann. § 4165. Defendants' deceptive acts include, but

---

[21] "Person" means an individual, corporation, business trust, estate, trust, partnership,
unincorporated association, limited liability company, two or more of any of the forgoing having
a joint or common interest, or any other legal or commercial entity. Ohio Rev. Code Ann. §
4165.01. Thus, the Assignors and Defendants are considered "Persons" for purposes of Ohio Rev.
Code Ann. § 4165.

not limited to: TAF, CDF, and NORD publishing false certifications of compliance with OIG guidelines and federal law; TAF, CDF, and NORD misrepresenting their status as independent charities on tax filings and their websites, Novartis and ESI certifying compliance with federal laws and CMS regulations, despite knowing the nature of the Copayment Schemes directly contradicted their certifications; and Novartis concealing the nature of its copay assistance programs in order to raise the price and dispensed quantity of the Novartis Drugs.

494.    The above conduct misled Assignors, individuals—such as beneficiaries and other patients—other Part D Sponsors, Medicare, and/or physicians thereby inducing purchases and prescriptions of Novartis Drugs.

495.    Defendants' false statements, certifications, misrepresentations, or omissions tend to, and were designed to, manipulate, induce, or mislead Assignors and the public at large into paying for tainted claims, which, upon information and belief, is precisely what occurred here.

496.    Defendants' conduct also implicated significant public policy concerns including: Encouraging development and use of affordable alternative drugs or treatments; Streamlining access to affordable healthcare; Part D Sponsors intended ability to negotiate lower drug prices; Preserving a fair and competitive market for prescription medications; Avoiding physician-patient conflicts of interests by ensuring medical decisions are not made based on financial incentives; Safeguarding

responsible Medicare spending funded by taxpayer dollars; Lowering healthcare costs for citizens generally; using copay assistance to induce patient and physician decisions; and Maintaining transparency and accountability to avoid distrust between patients and healthcare entities.

497. Assignors' injuries were the intended and foreseeable consequence of Defendants' conduct, and/or were a substantial factor in bringing about the alleged harm. For instance: Defendants successfully abused copay assistance programs to eliminate price sensitivity for the Novartis Drugs thereby inducing patients and physicians to increase utilization of Novartis Drugs over cheaper and equally effective alternative treatments and enabling Novartis to its prices without having to reconcile with Congressional market safeguards; Novartis, ESI, and the Charity Defendants all certified compliance with federal law, CMS, and/or OIG guidelines to ensure the illegal conduct remained hidden and Part D Sponsors would pay for tainted claims for Novartis Drugs that would not have otherwise been paid.

498. Thus, Defendants' conduct foreseeably resulted in and/or was a substantial factor in causing Assignors to pay for Novartis Drugs at inflated prices; Assignors paying for more Novartis Drug prescriptions over cheaper and equally effective alternatives; and, upon information and belief, Assignors paying for Novartis Drugs that were tainted, and therefore unpayable.

499. Defendants' conduct alleged in this Complaint occurred throughout the

United States, including the State of Ohio. For example, the following conduct

occurred within the State of Ohio: advertisement, transport, sale, and purchase of

Novartis Drugs; solicitation of and communication with Ohio residents (including

Assignors' beneficiaries and other patients) for purchase of Novartis Drugs;

solicitation of and communication with Ohio medical physicians;  the transfer and

disbursement of Novartis' illicit funds from the Charity Defendants to Ohio residents

(including Assignors' beneficiaries and other patients); upon information and belief,

the submission of tainted, unpayable claims for payment by Assignors and Class

Members; the disbursement of funds for tainted, unpayable claims induced by

Defendants' Copayment Schemes; publication of misrepresentations regarding the

independence of the Charity Defendants, and all false certifications of compliance

with the federal and state laws discussed herein.

500.   For the same reasons mentioned above, Defendants' conduct occurred

within the trade and commerce of Ohio and primarily and substantially within the

State of Ohio.

501.   The Assignors were harmed in the State of Ohio for each purchase of

Novartis Drugs within the state.

502.   Analysis of the Assignors' data identified one or more purchases of

Novartis Drugs in the State of Ohio.

503.   Accordingly, Defendants violated Ohio Rev. Code. Ann. § 4165.

504.    As a result of the Scheme, the Assignors paid more than $13,000,000.00 for Gilenya, including claims paid in the State of Ohio.

505.    As a result of the Scheme, the Assignors paid more than $14,000,000.00 for Afinitor, including claims paid in the State of Ohio.

506.    Plaintiffs seek actual economic losses, punitive damages, attorney's fees, and any other just and proper relief pursuant to Ohio Rev. Code Ann. § 4165.

507.    Plaintiffs seek actual economic losses, punitive damages, attorney's fees, and any other just and proper relief pursuant to Ohio Rev. Code Ann. § 4165.

### (7) Pennsylvania Unfair Trade and Consumer Protection Law
### (73 Pa. Cons. Stat. §§ 201-1 *et seq.*)

508.    To prevail under the Pennsylvania Unfair Trade and Practice and Consumer Protection Law ("UTPCPL"), a plaintiff must prove: (1) the defendant was engaged in unfair methods of competition and unfair or deceptive acts or practices; (2) plaintiff suffered an ascertainable loss of money or property; (3) the ascertainable loss was a result of the defendant's conduct; and (4) the transaction between plaintiff and defendant constituted trade of commerce within the meaning of the UTPCPL.

509.    The UTPCPL prohibits unfair or deceptive acts and practices; and any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding.

510.    Pursuant to § 201-2, Defendants engaged in various unfair or deceptive

acts or practices, including: Causing likelihood of confusion or misunderstanding as to the source, sponsorship, approval or certification of goods or services; and Causing likelihood of confusion or misunderstanding as to affiliation, connection or association with, or certification by another.

511.    Defendants' conduct constitutes deceptive acts or practices for purposes of the UTPCPL. Defendants' deceptive acts include, but not limited to: TAF, CDF, and NORD publishing false certifications of compliance with OIG guidelines and federal law; TAF, CDF, and NORD misrepresenting their status as independent charities on tax filings and their websites, Novartis and ESI certifying compliance with federal laws and CMS regulations, despite knowing the nature of the Copayment Schemes directly contradicted their certifications; and Novartis concealing the nature of its copay assistance programs in order to raise the price and dispensed quantity of the Novartis Drugs.

512.    The above conduct misled Assignors, individuals—such as beneficiaries and other patients—other Part D Sponsors, Medicare, and/or physicians thereby inducing purchases and prescriptions of Novartis Drugs.

513.    Upon information and belief, Defendants' false statements, certifications, misrepresentations, or omissions tend to, and were designed to, manipulate, induce, or mislead Assignors and the public at large into paying for tainted claims, which is precisely what occurred here.

514.    Defendants' conduct also implicated significant public policy concerns including: Encouraging development and use of affordable alternative drugs or treatments; Streamlining access to affordable healthcare; Part D Sponsors intended ability to negotiate lower drug prices; Preserving a fair and competitive market for prescription medications; Avoiding physician-patient conflicts of interests by ensuring medical decisions are not made based on financial incentives; Safeguarding responsible Medicare spending funded by taxpayer dollars; Lowering healthcare costs for citizens generally; using copay assistance to induce patient and physician decisions; and Maintaining transparency and accountability to avoid distrust between patients and healthcare entities.

515.    Assignors' injuries were the intended and foreseeable consequence of Defendants' conduct, and/or were a substantial factor in bringing about the alleged harm. For instance: Defendants successfully abused copay assistance programs to eliminate price sensitivity for the Novartis Drugs thereby inducing patients and physicians to increase utilization of Novartis Drugs over cheaper and equally effective alternative treatments and enabling Novartis to its prices without having to reconcile with Congressional market safeguards; Novartis, ESI, and the Charity Defendants all certified compliance with federal law, CMS, and/or OIG guidelines to ensure the illegal conduct remained hidden and Part D Sponsors would pay for tainted claims for Novartis Drugs that would not have otherwise been paid.

516.   Thus, Defendants' conduct foreseeably resulted in and/or was a substantial factor in causing Assignors to pay for Novartis Drugs at inflated prices; Assignors paying for more Novartis Drug prescriptions over cheaper and equally effective alternatives; and, upon information and belief, Assignors paying for Novartis Drugs that were tainted, and therefore unpayable.

517.   Defendants' conduct alleged in this Complaint occurred throughout the United States, including the State of Pennsylvania. For example, the following conduct occurred within the State of Pennsylvania: advertisement, transport, sale, and purchase of Novartis Drugs; solicitation of and communication with Pennsylvania residents (including Assignors' beneficiaries and other patients) for purchase of Novartis Drugs; solicitation of and communication with Pennsylvania medical physicians; the transfer and disbursement of Novartis' illicit funds from the Charity Defendants to Pennsylvania residents (including Assignors' beneficiaries and other patients); upon information and belief, the submission of tainted, unpayable claims for payment by Assignors and Class Members; the disbursement of funds for tainted, unpayable claims induced by Defendants' Copayment Schemes; publication of misrepresentations regarding the independence of the Charity Defendants, and all false certifications of compliance with the federal and state laws discussed herein.

518.   For the same reasons mentioned above, Defendants' conduct occurred

within the trade and commerce of Pennsylvania and primarily and substantially within the State of Pennsylvania.

519.   The Assignors were harmed in the State of Pennsylvania for each purchase of Novartis Drugs within the state.

520.   Analysis of the Assignors' data identified one or more purchases of Novartis Drugs in the State of Pennsylvania.

521.   Accordingly, Defendants violated the UTPCPL.

522.   As a result of the Scheme, the Assignors paid more than $13,000,000.00 for Gilenya, including claims paid in the State of Pennsylvania.

523.   As a result of the Scheme, the Assignors paid more than $14,000,000.00 for Afinitor, including claims paid in the State of Pennsylvania.

524.   Plaintiffs are entitled to damages, punitive damages, and attorneys' fees, costs, and any other just and proper relief available pursuant to § 201-9.2(a).

### (8) Washington Consumer Protection Act
**(Wash. Rev. Code § 19.86.919 *et seq*).**

525.   To prevail under the Washington Consumer Protraction Act ("WCPA"), a plaintiff must establish: (1) the defendant has engaged in an unfair or deceptive or practice; (2) in trade or commerce; (3) that impacts the public interest; (4) the plaintiff suffered an injury in his business or property; and (5) a causal link exists between the conduct and injury.

526.   An act or practice is "unfair" if: (1) without necessarily having been

previously considered unlawful, offends public policy as it has been established by statutes, common law, or otherwise; (2) is immoral, unethical, oppressive, or unscrupulous; or (3) causes substantial injury to consumers, competitors, or other businessmen.

527.   An act or practice is "deceptive" if: there is a representation, omission or practice that is likely to mislead a reasonable consumer.

528.   Defendants engaged in numerous deceptive acts or practices for purposes of the WCPA, including, but not limited to: TAF, CDF, and NORD publishing false certifications of compliance with OIG guidelines and federal law; TAF, CDF, and NORD misrepresenting their status as independent charities on tax filings and their websites, Novartis and ESI certifying compliance with federal laws and CMS regulations, despite knowing the nature of the Copayment Schemes directly contradicted their certifications; and Novartis concealing the nature of its copay assistance programs in order to raise the price and dispensed quantity of the Novartis Drugs.

529.   Defendants' conduct undermined or offends other significant public policy considerations including, but not limited to: Encouraging development and use of affordable alternative drugs or treatments; Streamlining access to affordable healthcare; Part D Sponsors intended ability to negotiate lower drug prices; Preserving a fair and competitive market for prescription medications; Avoiding

physician-patient conflicts of interests by ensuring medical decisions are not made based on financial incentives; Safeguarding responsible Medicare spending funded by taxpayer dollars; Lowering healthcare costs for citizens generally; using copay assistance to induce patient and physician decisions; and Maintaining transparency and accountability to avoid distrust between patients and healthcare entities.

530.   Assignors' injuries were the intended and foreseeable consequence of Defendants' conduct, and/or were a substantial factor in bringing about the alleged harm. For instance: Defendants successfully abused copay assistance programs to eliminate price sensitivity for the Novartis Drugs thereby inducing patients and physicians to increase utilization of Novartis Drugs over cheaper and equally effective alternative treatments and enabling Novartis to its prices without having to reconcile with Congressional market safeguards; Novartis, ESI, and the Charity Defendants all certified compliance with federal law, CMS, and/or OIG guidelines to ensure the illegal conduct remained hidden and Part D Sponsors would pay for tainted claims for Novartis Drugs that would not have otherwise been paid.

531.   Thus, Defendants' conduct foreseeably resulted in and/or was a substantial factor in causing Assignors to pay for Novartis Drugs at inflated prices; Assignors paying for more Novartis Drug prescriptions over cheaper and equally effective alternatives; and, upon information and belief, Assignors paying for Novartis Drugs that were tainted, and therefore unpayable.

532.   Defendants' conduct alleged in this Complaint occurred throughout the United States, including the State of Washington. For example, the following conduct occurred within the State of Washington: advertisement, transport, sale, and purchase of Novartis Drugs; solicitation of and communication with Washington residents (including Assignors' beneficiaries and other patients) for purchase of Novartis Drugs; solicitation of and communication with Washington medical physicians; the transfer and disbursement of Novartis' illicit funds from the Charity Defendants to Washington residents (including Assignors' beneficiaries and other patients); upon information and belief, the submission of tainted, unpayable claims for payment by Assignors and Class Members; the disbursement of funds for tainted, unpayable claims induced by Defendants' Copayment Schemes; publication of misrepresentations regarding the independence of the Charity Defendants, and all false certifications of compliance with the federal and state laws discussed herein.

533.   For the same reasons mentioned above, Defendants' conduct occurred within the trade and commerce of Washington.

534.   The Assignors were harmed in the State of Washington for each purchase of Novartis Drugs within the State of Washington.

535.   Analysis of the Assignors' data identified one or more purchases of Novartis Drugs in the State of Washington.

536.   Accordingly, Defendants violated the WCPA.

537.    As a result of the Scheme, the Assignors paid more than $13,000,000.00 for Gilenya, including claims paid in the State of Washington.

538.    As a result of the Scheme, the Assignors paid more than $14,000,000.00 for Afinitor, including claims paid in the State of Washington.

539.    Plaintiffs are entitled to recover their actual damages, punitive damages, and attorneys' fees pursuant, and any other remedies that are just and proper pursuant to the WCPA.

### (9) Wisconsin Deceptive Trade Practices Act
### (Wis. Stat. §§ 100.18 *et seq.*)

540.    Wis. Stat. § 100.18(1) states, "No person, firm, corporation or association, or agent or employee thereof, with intent to sell, distribute, increase the consumption of or in any wise dispose of any real estate, merchandise, securities, employment, service, or anything offered by such person, firm, corporation or association, or agent or employee thereof, directly or indirectly, to the public for sale, hire, use or other distribution, or with intent to induce the public in any manner to enter into any contract or obligation relating to the purchase, sale, hire, use or lease of any real estate, merchandise, securities, employment or service, shall make, publish, disseminate, circulate, or place before the public, or cause, directly or indirectly, to be made, published, disseminated, circulated, or placed before the public, in this state, in a newspaper, magazine or other publication, or in the form of a book, notice, handbill, poster, bill, circular, pamphlet, letter, sign, placard, card,

label, or over any radio or television station, or in any other way similar or dissimilar to the foregoing, an advertisement, announcement, statement or representation of any kind to the public relating to such purchase, sale, hire, use or lease of such real estate, merchandise, securities, service or employment or to the terms or conditions thereof, which advertisement, announcement, statement or representation contains any assertion, representation or statement of fact which is untrue, deceptive or misleading."

541.  Under the Wisconsin Deceptive Trade Practices Act ("WDTPA"), a plaintiff must allege that (1) the defendant made a representation to the public with the intent to induce an obligation; (2) the representation was untrue, deceptive, or misleading; and (3) the representation materially caused a pecuniary loss to the plaintiff.

542.  Defendants engaged in numerous deceptive acts or practices for purposes of the WDTPA, including, but not limited to: TAF, CDF, and NORD publishing false certifications of compliance with OIG guidelines and federal law; TAF, CDF, and NORD misrepresenting their status as independent charities on tax filings and their websites, Novartis and ESI certifying compliance with federal laws and CMS regulations, despite knowing the nature of the Copayment Schemes directly contradicted their certifications; and Novartis concealing the nature of its copay assistance programs in order to raise the price and dispensed quantity of the

Novartis Drugs.

543.   Defendants' conduct undermined or offends other significant public policy considerations including, but not limited to: Encouraging development and use of affordable alternative drugs or treatments; Streamlining access to affordable healthcare; Part D Sponsors intended ability to negotiate lower drug prices; Preserving a fair and competitive market for prescription medications; Avoiding physician-patient conflicts of interests by ensuring medical decisions are not made based on financial incentives; Safeguarding responsible Medicare spending funded by taxpayer dollars; Lowering healthcare costs for citizens generally; using copay assistance to induce patient and physician decisions; and Maintaining transparency and accountability to avoid distrust between patients and healthcare entities.

544.   Assignors' injuries were the intended and foreseeable consequence of Defendants' conduct, and/or were a substantial factor in bringing about the alleged harm. For instance: Defendants successfully abused copay assistance programs to eliminate price sensitivity for the Novartis Drugs thereby inducing patients and physicians to increase utilization of Novartis Drugs over cheaper and equally effective alternative treatments and enabling Novartis to its prices without having to reconcile with Congressional market safeguards; Novartis, ESI, and the Charity Defendants all certified compliance with federal law, CMS, and/or OIG guidelines to ensure the illegal conduct remained hidden and Part D Sponsors would pay for

tainted claims for Novartis Drugs that would not have otherwise been paid.

545.   Thus, Defendants' conduct foreseeably resulted in and/or was a substantial factor in causing Assignors to pay for Novartis Drugs at inflated prices; Assignors paying for more Novartis Drug prescriptions over cheaper and equally effective alternatives; and, upon information and belief, Assignors paying for Novartis Drugs that were tainted, and therefore unpayable.

546.   The Assignors are considered members of the public for purposes of the WDTPA.

547.   To determine whether a plaintiff is a member of the public, Wisconsin courts discern whether there is some particular relationship between the parties. Here, no such relationship exists between the Assignors and Defendants.

548.   Defendants' conduct alleged in this Complaint occurred throughout the United States, including the State of Wisconsin. For example, the following conduct occurred within the State of Wisconsin: advertisement, transport, sale, and purchase of Novartis Drugs; solicitation of and communication with Wisconsin residents (including Assignors' beneficiaries and other patients) for purchase of Novartis Drugs; solicitation of and communication with Wisconsin medical physicians; the transfer and disbursement of Novartis' illicit funds from the Charity Defendants to Wisconsin residents (including Assignors' beneficiaries and other patients); upon information and belief, the submission of tainted, unpayable claims for payment by

Assignors and Class Members; the disbursement of funds for tainted, unpayable claims induced by Defendants' Copayment Schemes; publication of misrepresentations regarding the independence of the Charity Defendants, and all false certifications of compliance with the federal and state laws discussed herein.

549. For the same reasons mentioned above, Defendants' conduct occurred within the trade and commerce of Wisconsin.

550. The Assignors were harmed in the State of Wisconsin for each purchase of Novartis Drugs within the State of Wisconsin.

551. Analysis of the Assignors' data identified one or more purchases of Novartis Drugs in the State of Wisconsin.

552. Accordingly, Defendants violated the WDTPA.

553. As a result of the Scheme, the Assignors paid more than $13,000,000.00 for Gilenya, including claims paid in the State of Wisconsin.

554. As a result of the Scheme, the Assignors paid more than $14,000,000.00 for Afinitor, including claims paid in the State of Wisconsin.

555. Plaintiffs seek damages, court costs, and attorneys' fees under Wis. Stat. § 100.18(11)(b)(2), and any other just and proper relief available under the WDTPA.

## FOURTH CLAIM FOR RELIEF

### Unjust Enrichment Under State Law
*Against All Defendants*

556.  Plaintiffs re-allege and incorporate by reference paragraphs 1-343 of this Complaint as though set forth at length herein.

557.  Plaintiffs' analysis of its Assignors' data identified one or more purchases of the Novartis Drugs in each of following States and Territories:

      a.  Connecticut;

      b.  Florida;

      c.  Illinois;

      d.  Massachusetts;

      e.  New Hampshire;

      f.  New York;

      g.  Ohio;

      h.  Pennsylvania;

      i.  Washington; and

      j.  Wisconsin.

558.  Defendants' conduct directly resulted in the unjust enrichment of the Defendants through the sale of the Novartis Drugs in each of the States and Territory mentioned above.

559.  The laws of each state are materially similar and require a plaintiff to demonstrate the following elements: (1) the plaintiff conferred a benefit onto the defendant(s); (2) the defendant had an appreciation or knowledge of the benefit; and (3) the retention of the benefit by the defendant(s) under the circumstances would

be unjust.[22]

560.   Defendants' conduct directly resulted in the unjust enrichment of the Defendants through the sale of the Novartis Drugs in each of the States and Territory mentioned above.

561.   The economic benefit of overcharges and artificially inflated volumes of prescriptions derived by Defendants through charging supra-competitive and artificially inflated prices for the Novartis Drugs is a direct and proximate result of Defendants' unlawful conduct.

562.   The economic benefits derived by Defendants rightfully belong to the Assignors and Class Members, as they paid inflated prices beginning in *at least* January 1, 2010, through present, and they will continue to do effects of Defendants' illegal conduct cease.

563.   Defendants directly benefitted from the Copayment Schemes at the Assignors' expense by increasing revenue for sales/transactions/compensation in relation to the Assignors' purchases of the Novartis Drugs.

564.   The Copayment Schemes sought to induce to induce patients and physicians to utilize Novartis' Drugs over cheaper, equally effective alternatives.

565.   The Charity Defendants directly benefitted from the Scheme at the

---

[22] For those states where unjust enrichment is not a standalone cause of action, Plaintiffs seek restitution, as an alternative form of relief, for the unjust enrichment arising from Defendants' misconduct.

Assignors' expense by increasing executive salary and/or compensation resulting from Novartis' increased donations that were funneled through the Charity Defendants.

566.    It would be inequitable under unjust enrichment principles under the relevant states and territories for Defendants to be permitted to retain any of the overcharges for the Novartis Drugs derived from Defendants' unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

567.    Defendants are aware of and appreciate the benefits bestowed upon it by the Assignors and the Class Members.

568.    It would be futile for the Assignors and Class Members to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which the Assignors and Class Members purchased the Novartis Drugs, as they are not liable and would not compensate the Assignors and Class Members for unlawful conduct caused by Defendants.

569.    Defendants should be compelled to disgorge all unlawful or inequitable proceeds received in a common fund for Plaintiffs' benefit.

## <u>FIFTH CLAIM FOR RELIEF</u>

**Violations of the Civil Remedies for Criminal Practices Act (Fla. Stat. §§ 772.101 *et seq.*)**
*Against All Defendants*

570.    Plaintiffs re-allege and incorporate by references paragraphs 1-343 of

this Complaint as if fully set forth herein.

571.    At all times, as set forth above, Defendants' actions were unlawful under Fla. Stat. § 772.103(3), as they were all "employed by, or associated with, any enterprise through a pattern of criminal activity."

572.    Defendants violated Fla. Stat. §§ 772.101 et seq., by participating in or conducting the affairs of the Co-payment Schemes (as described more fully above) through a pattern of racketeering activity.

573.    The Assignors and the Class Members are "persons" as defined in Fla. Stat § 1.01, injured in their business or property, because of Defendants' racketeering violations.

### *Description of the Co-payment Schemes*

574.    Defendants are "persons" under Fla. Stat. § 1.01.

575.    Novartis, ESI, and TAF are members of and constitute an "association in-fact enterprise."

576.    Novartis, CDF, and NORD are members of and constitute an "association in-fact enterprise."

577.    The Co-payment Schemes are associations-in-fact of individuals and corporate entities under Fla. Stat. § 772.101 and consists of "persons" associated for a common purpose.

578.    The purpose of the Co-payment Schemes was to maximize Novartis

and/or ESI's profits and the Charity Defendants' executive compensation.

579.    The Co-payment Schemes had an ongoing organization with an ascertainable structure and functioned as continuing units with separate roles and responsibilities. Novartis is the source of the alleged Schemes, including providing kickbacks to subsidize payments for the Novartis Drugs whose co-payments were provided by the Charity Defendants.

580.    The Charity Defendants accepted Novartis' bribes and provided unlawful payments for the Novartis Drugs. The Charity Defendants and/or ESI facilitated and illegally provided grant assistance data to Novartis.

581.    Novartis, ESI, and the Charity Defendants individually and collectively, fulfilled their roles in the Co-payment Schemes.

582.    Novartis, ESI, and the Charity Defendants were distinct legal entities with distinct purposes. For Novartis and ESI, the sole purpose was to make as much money off of the Novartis Drugs as possible. For the Charity Defendants, it was to raise the amount of money in the funds to justify paying higher salaries to their executives.

583.    The Co-payment Schemes had an existence that was distinct from the pattern of racketeering in which Novartis, ESI, and the Charity Defendants engaged. Novartis, ESI, and, upon information and belief, the Charity Defendants conspired with each other to minimize and conceal the amount of information Assignors and

the Class Members received about the claims for payment of the Novartis Drugs, materially resulting in Assignors' and the Class Members' payment of the purchase price of the Novartis Drugs that they would not have otherwise paid for. *See* Fla. Stat. § 817.234 ("A person commits insurance fraud punishable . . . if that person, with the intent to injure, defraud, or deceive any insurer . . . [p]resents or causes to be presented any written or oral statement, as part of, or in support of, a claim for payment or other benefit pursuant to an insurance policy or a health maintenance organization subscriber or provider contract, knowing that such statement contains any false, incomplete, or misleading information concerning any fact or thing material to such claims[.]").

584.  At all relevant times, Novartis, ESI, and the Charity Defendants operated, controlled, and managed the Co-payment Schemes. Novartis, ESI, and the Charity Defendants failed to disclose a material fact about the existence of the bribes in violation of Fla. Stat. § 817.234, which prohibits causing innocent, non-party pharmacies to submit false submissions of payments to Assignors and the Class Members.

585.  Novartis, ESI, and the Charity Defendants participation in the Co-payment Schemes was necessary for the successful operation of the Scheme. The members of the Co- Payment Schemes all served a common purpose, which was to increase the fund to an enormous size while knowing each payment was an illegal

kickback, funded by bribes from Novartis, while minimizing the amount of information that Assignors, the Class Members, and the innocent non-party pharmacies, knew about the program. Upon information and belief, these affirmative acts and strategic omissions were material to Assignors' and the Class Members' decision to issue payment for the Novartis Drugs. The Co-payment Schemes' actions maximized the revenue and profitability of the Enterprises' members by knowingly causing payments for the Novartis Drugs.

586. Fla. Stat. § 772.102 provides that criminal activity is any activity chargeable by indictment or information under Florida law, including Fla. Stat. § 817.234. Section 817.234 criminalizes situations where health care companies, such as Assignors and the Class Members, are provided incomplete or misleading information about any fact or thing material to a claim for payment. As discussed below, and upon information and belief, Novartis, ESI, and the Charity Defendants have violated Fla. Stat. § 817.234 by providing incomplete or misleading information material to Assignors' and the Class Members' decision to issue payment for the Novartis Drugs.

587. Novartis, ESI, and the Charity Defendants committed numerous acts of racketeering by providing incomplete or misleading information related to the Novartis Drugs. Novartis, ESI, and the Charity Defendants knew or had reason to know that they were providing incomplete or misleading information about these

claims.

588.    Novartis, ESI, and the Charity Defendants knew or had reason to know that they were providing incomplete or misleading information under Fla. Stat. § 817.234. Despite knowledge of these facts, and upon information and belief, they induced Assignors and the Class Members to make payment for claims that they otherwise would not have paid. Instead, Novartis, ESI, and the Charity Defendants knowingly provide incomplete information to enrich their bottom line.

589.    Based on these omissions, and upon information and belief, Assignors and the Class Members provided payments for the Novartis Drugs throughout the United States, including Florida, based on half-truths, inaccurate information, and deliberate omissions. Upon information and belief, Defendants' omissions were material to the payment of the Novartis Drugs that the Assignors and Class Members paid for. Had the Assignors and Class Members known of the Co-payment Schemes, they would not have issued payments for the Novartis Drugs.

590.    The Assignors and Class Members were the primary, intended, and most direct victims of Defendants' unlawful Scheme. Upon information and belief, the Assignors and Class Members paid for the Novartis Drugs throughout the United States, including Florida, based on Defendants' omissions of material information under Fla. Stat. § 817.234.

591.    Upon information and belief, as part of this Scheme, Defendants caused

innocent, non-party pharmacies to submit false certifications and misled Assignors and the Class Members into paying for prescriptions of the Novartis Drugs. Defendants conducted or participated, directly or indirectly, in the Co-payment Schemes through a pattern of unlawful activity.

592.  By reason of and as a result of Defendants' illegal conduct, the Assignors and Class Members were injured in their business or property.

593.  Defendants' violations directly and proximately caused injuries and damages to the Assignors and Class Members; and Plaintiffs have a right to bring this action for the alleged damages.

594.  Under Fla. Stat. § 772.11, Plaintiffs seek their reasonable attorneys' fees and costs associated with prosecution of this action.

### SIXTH CLAIM FOR RELIEF

**Tortious Interference with a Contract**
*Against All Defendants*

595.  Plaintiff re-allege and incorporate by reference paragraphs 1–343 of this Complaint as if fully set forth herein.

596.  Assignors' Medicare coverage plans are materially similar to the terms of CMS' model evidence of coverage.[23]

597.  Assignors' MA plans require that covered patients personally bear the cost-sharing responsibility provided by the plans when obtaining prescription drugs,

---

[23] Available at https://www.cms.gov/files/document/nyiageocchapter9cy2020.docx

such as the Novartis Drugs

598.   Novartis knew that Assignors' MA plans contained these cost-sharing provisions, which are standard features for nearly all MA plans. Novartis deliberately sought to subvert these provisions through the Copayment Schemes. By rendering Novartis' Drugs cost-free for patients, Novartis improperly increased the demand for its drugs and maintained exorbitant prices, improperly increasing the costs Assignors and other healthcare plans were required to pay for the Novartis Drugs.

599.   In doing so, Novartis intentionally and tortiously interfered with the cost-sharing provisions in the Assignors' contracts. Upon information and belief, Novartis' interference caused Assignors' beneficiaries to breach their agreements with Assignors by failing to pay the cost-sharing obligations set forth in their healthcare plans.

600.   Novartis' interference and procurement of those contractual breaches was wrongful and without justification and intended to defeat the structure of Assignors' managed care system and to benefit Novartis financially at the Assignors' expense.

601.   Upon information and belief, the contractual breaches caused by Novartis, aided by its co-conspiring Defendants, have directly and proximately cause significant damages to Assignors in the form of payments made by Assignors that it

would not have made is Assignors had known that identifiable claims were tainted by the Copayment Schemes.

602.   By virtue of the foregoing, the Assignors are entitled to compensatory and punitive damages, in amounts to be determined at trial, and other relief.

## VIII.       <u>DEMAND FOR JUDGMENT</u>

WHEREFORE, Plaintiffs and the Class Members demand judgment against Defendants as follows:

1.    Awarding Plaintiffs and the Class Members actual, consequential, compensatory, statutory, treble, punitive, and other damages, in an amount to be proven at trial, including pre- and post- judgment interest at the statutory rates;

2.    Awarding Plaintiffs and the Class Members equitable relief in the nature of disgorgement, restitution, and the creation of a constructive trust to remedy Defendants' unjust enrichment;

3.    Declaring the alleged acts to be unlawful under the state statutes set forth above, and the common law of unjust enrichment of the states and territories set forth above;

4.    Determining that this action is a proper class action, designating Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure and Plaintiffs' counsel as Class Counsel.

5.   Awarding Plaintiffs and the Class Members their reasonable costs and expenses, including attorneys' fees; and

6.   Awarding such other legal or equitable relief as the Court deems just and proper.

## **JURY DEMAND**

Plaintiffs and the Class Members demand a jury trial on all claims so triable under Federal Rule of Civil Procedure Rule 38.

Dated: July 1, 2024                    Respectfully submitted,

By: */s/ Janpaul Portal*
Janpaul Portal (Fla. Bar No. 567264)
John W. Cleary (Fla. Bar No. 118137)
Aida M. Landa (Fla. Bar No. 136451)
**MSP RECOVERY LAW FIRM**
2701 S. LeJeune Road, 10th Floor
Coral Gables, Florida 33134
(305) 614-2222
jportal@msprecoverylawfirm.com
jcleary@msprecoverylawfirm.com
alanda@msprecoverylawfirm.com

Shereef H. Akeel (D.C. Bar No. MI0042)
Adam S. Akeel (MI Bar No. 81328)
Samuel R. Simkins (MI Bar No. 81210)
Daniel W. Cermak (MI Bar No. 84460)
Hayden E. Pendergrass (D.C. Bar No. 1645085)
Emad R. Hamadeh (MI Bar No. 86849)
**AKEEL & VALENTINE, PLC**
888 W. Big Beaver Road, Ste. 350
Troy, Michigan 48084
shereef@akeelvalentine.com

166

adam@akeelvalentine.com (pro hac vice)
sam@akeelvalentine.com (pro hac vice)
daniel@akeelvalentine.com (pro hac vice)
hayden@akeelvalentine.com (pro hac vice
emad@akeelvalentine.com (pro hac vice)

*Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on July 1, 2024, I electronically filed the foregoing paper

with the Clerk of the Court using the ECF system, which will send notification of such

filing to all attorneys of record.

*/s/ Janpaul Portal*
Janpaul Portal
